UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

In re:

ANTARAMIAN PROPERTIES, LLC,
ANTARAMIAN FAMILY, LLC,
ANTARAMIAN FAMILY TRUST,

               Debtors.

_____/

Case No. 9:14-bk-10145-CED [Lead Case]
Case No. 9:14-bk-10146-CED
Case No. 9:14-bk-10148-CED

(Jointly Administered Cases)

JAMES RICHARDS, individually as a unit
owner within the "Naples Bay Resort West
Parcel" and as the representative of the
members of the Naples Bay Resort West
Parcel Property Owners Association. Inc.,
a not-for-profit association,

               Plaintiff,

v.

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT
COMPANY LLC aka KNIGHTSBRIDGE
PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENT'S LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet identified,
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
IJ, ZAND, Individually and
RAYMOND SEHAYEK, Individually,

               Defendants.

_____/

Adv. Pro. No.

## NOTICE OF REMOVAL AND REMOVAL OF ACTION UNDER 28 U.S.C. § 1452

PLEASE TAKE NOTICE that Naples Bay Properties LLC, f/k/a Antaramian Properties, LLC, Naples Bay Resort Investment Company LLC, Knightsbridge Partners of Naples LLC, Sojourn Hospitality Group LLC, Summit Management Group of Florida LLC, Gulfwater Investments LLC, F. Fred Pezeshkan and Thomas MacIvor (collectively, the "Movants"), pursuant to 28 U.S.C. § 1452(a), Federal Rule of Bankruptcy Procedure 9027 and Local Rule 9027-1, hereby remove to this Court the State Court Action described herein and in connection with such removal, represent and allege as follows:

1.      On August 20, 2020, James Richards, individually as a unit owner within the "Naples Bay Resort West Parcel" and claiming, without any identified authority, to be the representative of members of the Naples Bay Resort West Parcel Property Owners Association, Inc., a Florida not-for-profit association (the "Plaintiff"), filed a *Complaint for Damages and for Declaratory, Injunctive and Supplemental Relief* (the "Complaint") against the Movants, as well as additional named defendants that do not appear to legally exist, commencing an action in the Circuit Court of the 20th Judicial Circuit, in and for Collier County, Florida, entitled *James Richards, individually as a unit owner within the "Naples Bay Resort West Parcel" and as the representative of the members of the Naples Bay Resort West Parcel Property Owners Association, Inc., a Florida not-for-profit association v. Naples Bay Resort Holdings LLC, Naples Bay Properties LLC, NBR Manager LLC, Naples Bay Resort Investment Company LLC a/k/a Knightsbridge Partners of Naples, LLC, Sojourn Hospitality Group LLC, Summit Management Group of Florida LLC, Gulfwater Investments LLC, The Club at Naples Bay Resort LLC, The Restaurant at Naples Bay Resort, LLC and other legal entities as of yet unidentified, and Fred*

*Pezeshkan, individually, Thomas MacIvor, individually, I.J. Zand, individually, and Raymond Sehayek, individually*, Case No. 11-2020-CA-002657-0001-XX (the "State Court Action").

2.      On or about September 4, 2020, the Complaint was served upon, among others, certain of the Movants as Defendants in the State Court Action.  A true and correct copy of the Summons and Complaint are attached hereto as **Composite Exhibit A** and are incorporated herein by reference.

3.      On October 4, 2020, Plaintiff filed his *Amended Complaint for Damages and for Declaratory, Injunctive and Supplemental Relief* (the "Amended Complaint"). A true and correct copy of the Amended Complaint is attached hereto as **Exhibit B** and incorporated herein by reference. Attached as **Composite Exhibit C** are copies of papers on file with the State Court. *See* Local Rule 9027-1(a).

4.      By the Amended Complaint, Plaintiff asserts claims for injunctive relief, declaratory relief, breach of contract – Master Declaration, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty and usurpation of business opportunity as against all named Defendants, including Movants, jointly and severally.

**BASIS FOR REMOVAL**

5.      On August 29, 2014, the Debtors, Antaramian Properties, LLC, n/k/a Naples Bay Properties, LLC ("NBR"), Antaramian Family, LLC and Antaramian Family Trust (collectively, the "Debtors") each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), commencing Case Nos. 9:14-bk-10145-CED, 9:14-bk-10146-CED and 9:14-bk-10148-CED, respectively. The Debtors' Chapter 11 cases were jointly administered on September 3,

10047298-4

2014, with the case of Antaramian Properties, LLC, Case No. 9:14-bk-10145-CED being the lead case.

6.     By Order dated April 1, 2015 [ECF No. 493] (the "Confirmation Order"), the Court confirmed the *Final Modified Joint Plan of Reorganization for Antaramian Properties, LLC, Antaramian Family, LLC, and Antaramian Family Trust Submitted By: (1) Debtors, (2) Naples Bay Financial Holdings, LLC, (3) NBR Shoppes, LLC, and (4) F. Fred Pezeshkan, Iraj Zand and Raymond Sehayek* [ECF No. 487] (the "Confirmed Plan"), proposed by the Debtors, Naples Bay Financial Holdings, LLC, NBR Shoppes, LLC, and F. Fred Pezeshkan, Iraj Zand and Raymond Sehayek.

7.     The State Court Action is a civil proceeding which, as to NBR and its properties, implicates the discharge injunction provided for in the Confirmed Plan, the Confirmation Order and Section 1141(d) of the Bankruptcy Code, 11 U.S.C. § 1141(d), as well as the release provisions in Confirmed Plan and the Confirmation Order, core matters directly impacting property of the estate.  *See* 28 U.S.C. § 157(b)(2)(A) and (O).  The subject matter of the State Court Action arises under title 11 of the United States Code or arises in or is related to a case under title 11 and over which the Bankruptcy Court has original jurisdiction under 28 U.S.C. § 1334(b).

8.     Pursuant to 28 U.S.C. § 157(b) all cases arising under title 11 of the United States Code, and proceedings arising in or related to cases under title 11 of the United States Code, are referred to this Court.

9.     Accordingly, the State Court Action may be removed to this Court by Movants pursuant to the provisions of 28 U.S.C. § 1452(a) and Local Rule 9027-1.

10.     Upon removal of the State Court Action, Movants allege that the claims constitute core matters under 28 U.S.C. § 157(b)(2).

## REMOVAL REQUIREMENTS SATISFIED

11.     Movants' notice of removal is procedurally correct.

12.     Pursuant to Federal Rules of Bankruptcy Procedure 9027(a) and 9001(3), Movants file this notice with the Clerk of Court for the United States Bankruptcy Court for the Middle District of Florida.

13.     The Movants have filed this Notice within the 30-day time period required by Federal Rule of Bankruptcy Procedure 9027(a)(3).

14.     Venue is proper in this district under 28 U.S.C. § 1441(a) because this district and division embrace the place in which the State Court Action was commenced.

15.     Pursuant to Federal Rule of Bankruptcy Procedure 9027(c), Movants will promptly file a copy of this Notice with the Clerk of the Collier County Circuit Court.

## RELIEF REQUESTED

Accordingly, based on this Court's jurisdiction over the claim asserted in the State Court Action, Movants request that the State Court Action be removed to this Court and the State Court Action be placed upon the docket of this Court as an adversary proceeding for further proceedings as though originally instituted in this Court.

[INTENTIONALLY LEFT BLANK]

10047298-4

Dated:  October 5, 2020                          Respectfully submitted,

                                                 BERGER SINGERMAN, LLP
                                                 1450 Brickell Avenue, Ste. 1900
                                                 Miami, FL  33131
                                                 Telephone: (305) 755-9500
                                                 Facsimile: (305) 714-4340

                                                 By:    _/s/ Jordi Guso_____
                                                        Jordi Guso
                                                        Florida Bar No. 863580
                                                        jguso@bergersingerman.com
                                                        Paul A. Avron
                                                        Florida Bar No. 50814
                                                        pavron@bergersingerman.com

                                                        -and-

                                                 GRANT FRIDKIN PEARSON, P.A.
                                                 5551 Ridgewood Drive, Ste. 501
                                                 Naples, FL 34108
                                                 Telephone: (239) 514-1000
                                                 Facsimile: (239) 514-0377
                                                 Richard Grant
                                                 Florida Bar No. 156041
                                                 Jeffrey Fridkind
                                                 Florida Bar No. 490245

                                                 *Co-counsel for Movants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Electronic Mail on this 5th day of October, 2020, upon all parties on the attached Service List.

                                                 By:    _/s/ Jordi Guso_____
                                                        Jordi Guso

6

10047298-4

## <u>SERVICE LIST</u>

Elliott Goldberg, Esq.
DiGiacomo & Goldberg, P.A.
*Attorneys for Plaintiff*
One East Broward Boulevard
Suite 700
Fort Lauderdale, FL 33301
ELLIOTTGLAW@HOTMAIL.COM

Arthur S. Weitzner, Esq.
Law Offices of Arthur S. Weitzner, P.A.
P.O. Box 18028
Sarasota, FL 34276
arthur@weitzner.com

10047298-4

**<u>EXHIBIT A</u>**

Filing # 112229134 E-Filed 08/23/2020 02:46:36 PM

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

      Plaintiff,

vs.                               CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

      Defendants.

_____/

Informed **person served of contents**
Date/Time: _9/4/20 @ 13:45_
Server Initials: _DC_
Server ID#: _205G_

## SUMMONS – PERSONAL SERVICE ON A NATURAL PERSON
### IMPORTANT

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**THOMAS MACIVOR**
1500 Fifth Avenue South, Suite 111
Naples, FL 34102

    A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court.  A phone call will not protect you. Your written response, including the above case number and names parties, must be filed if you want the Court to hear your case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.  There are other legal

money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiffs' Attorney" named below.

Elliott Goldberg, Esquire
Florida Bar No. 0133770
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel. (954) 493-7400

DATED on August 25 , 2020

As Clerk of the Court

By: _Leorna Hackler_

Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado immediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiffs/Plaintiffs' Attorney". (Demandate o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la data de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que la Tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans de relai requis, vous risquez de la perdre la cause ainsi que vote salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ultrerieur du Tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en memo temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiffs/Plaintiffs' Attorney" (Plaignant ou a so avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
COLLIER COUNTY, FLORIDA                                        CIVIL ACTION

James Richards
James Richards As Representative Of
      Plaintiff(s),

vs.                                    CASE NO: 11-2020-CA-002657-0001-XX

The Restaurant At Naples Bay Resort Llc
Naples Bay Resort Holdings Llc
Naples Bay Properties Llc
Nbr Manager Llc
Naples Bay Resort Investment Company Llc
Knightsbridge Partners Of Naples Llc
Sojourn Hospitality Group Llc
Summit Management Group Of Florida Llc
Gulfwater Investments Llc
The Club At Naples Bay Resort Llc
The Shoppes At Naples Bay Resort Llc
Fred Pezeshkan
Thomas Macivor
I J Zand
Raymond Sehayek
      Defendant(s).

## STANDING ORDER IN CIVIL CASES IN THE TWENTIETH JUDICIAL CIRCUIT

   PURSUANT to Florida Rule of Civil Procedure 1.200(a), Florida Rule of Judicial
Administration 2.545, and Administrative Order 1.13 entered by the Chief Judge of this Circuit,
the parties are ordered to adhere to the following information and procedures applicable to civil
lawsuits:

   1.  **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order
       with each Summons issued in this case. One copy of this Order is to be filed with the
       Clerk of the Circuit Court with proof of service. The Plaintiff shall pay the appropriate
       statutory clerk's fees on copies for each Standing Order issued and attached to the
       Summons.

   2.  **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has
       established guidelines for the prompt processing and resolution of civil cases. This
       Court has adopted a case management system to help meet those guidelines. In
       contested cases (other than foreclosures, involuntary commitment of sexually violent
       predators and eminent domain cases), the parties are required to participate in the case
       management system. The case management system requires early consultation and
       cooperation among the parties for the preparation and submission of an Agreed Case
       Management Plan, early interaction with a Civil Case Manager and early involvement
       by the Court. The Agreed Case Management Plan requires the parties to identify a
       case track, confer in good faith, attempt to narrow the matters in controversy, identify
       the issues that require direct involvement by the Court and establish a schedule for

addressing those issues.[1]  The Agreed Case Management Plan may be accessed at the Court's website at: [www.ca.cjis20.org].

Unless all of the Defendants have been served and have defaulted, an Agreed Case Management Plan will be submitted to the Civil Case Manager c/o Magistrate's Office (ATTENTION: Sherry), Collier County Courthouse, 3315 Tamiami Trail E., Suite 509, Naples, FL 34112 on or before 150 days from the date of filing the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan, a case management conference will be scheduled by the Court. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

3.  **ALTERNATIVE DISPUTE RESOLUTION (ADR).**  ADR provides parties with an out-of-court alternative to settling disagreements. The Court requires the parties to participate in ADR prior to trial. Mediation is mandatory unless the parties agree to another form of ADR. Mediation is a conference at which an independent third party attempts to arrange a settlement between the parties.

4.  **RULES OF PROFESSIONALISM.**  The Twentieth Judicial Circuit has adopted Administrative Order 2.20, which sets forth standards of professional courtesy and conduct for all counsel or pro-se litigants practicing within the Circuit. The Court requires that all familiarize themselves and comply with Administrative Order 2.20. Administrative Order 2.20 may be viewed on the Court's website at: [www.ca.cjis20.org].

**DONE AND ORDERED** in Chambers at Naples, Collier County, Florida, on this 21st of August, 2020

*Hugh D. Hayes*
_____
Hugh D Hayes, Circuit Judge

---

[1] Case Track options include Expedited, Standard or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of Judicial Administration 2.250(a)(1)B.

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.                                  CASE NO:

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
GULFWATER INVESTMENTS LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## COMPLAINT FOR DAMAGES AND FOR DECLARATORY, INJUNCTIVE AND SUPPLEMENTAL RELIEF

AND NOW, August 19, 2020, Plaintiff JAMES RICHARDS ("Richards")

sues Defendants and alleges:

## Parties

### Plaintiff

1.      Plaintiff Richards is *sui juris*, a unit owner within the Naples Bay Resort West Parcel ("NBR West Parcel") as that property is described within a Master Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel" ("Master Declaration – West Parcel") recorded at Official Records Book 4121, Pages 3092 - 3181 of the Collier County Public Records, Collier County, Florida.

2.      By virtue of said ownership, Richards is also a member of the Naples Bay Resort West Parcel Property Owners Association, Inc. ("NBR West Parcel Association"), a Florida not-for-profit corporation organized and existing under the provisions of Chapter 617, Florida Statutes, as well as a member of the Naples Bay Resort Hotel Condominium Association, Inc. ("NBR Condominium Association") a condominium association charged with all duties and responsibilities of condominium associations pursuant to Chapter 718, Florida Statutes, with respect to the Naples Bay Resort Hotel Condominium.

3.  Plaintiff brings this action on behalf of himself and for the benefit of the independent unit owners ("IUOs") within the Naples Bay Resort -- West Parcel.

### Defendants

4.      Defendant NAPLES BAY RESORT HOLDINGS, LLC ("NBR Holdings") is an administratively dissolved Florida limited liability company, with a last known address c/o Summit Management Group of Florida, LLC, 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. NBR Holdings was the Manager

2

Member of Basil Street Partners, LLC, original Developer of the Naples Bay Resort (the "Resort") and all its component parts.

5.     Defendant NAPLES BAY PROPERTIES, LLC ("NB Properties") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. NB Properties purports to be the operator of the Resort Rental Management Program ("Rental Program"). Its principals include Individual Defendants Thomas MacIvor ("MacIvor") and Fred Pezeshkan ("Pezeshkan") and its Manager Member is Defendant Naples Bay Resort Investment Company, LLC ("NB Investment"). NB Properties is believed to be owner of the underlying Resort property, and is the Commercial Component Owner ("CCO") including Hotel, shared facilities, restaurant, commercial spaces, meeting rooms, etc.

6.     Defendant NBR MANAGER, LLC ("NBR Manager") is an administratively dissolved Florida limited liability company, with a last known address c/o Summit Management Group of Florida, LLC, 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals were Defendants Pezeshkan, I.J. Zand ("Zand") and MacIvor.

7.     Defendant NAPLES BAY RESORT INVESTMENT COMPANY, LLC ("NBR Investment") is a limited liability company, state of organization unknown, but which is listed as Managing Member of Defendants NB Properties, Sojourn Hospitality LLC and Knightsbridge Partners of Naples, LLC, with an address at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

8.     Defendant KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC.

("Knightsbridge Partners") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals are Defendants NB Investment, MacIvor and Pezeshkan.  It is believed Knightsbridge Partners, among other things, owns the "Club."

9.   Defendant SOJOURN HOSPITALITY GROUP LLC ("Sojourn Hospitality") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals are Defendant NB Investment, MacIvor and Pezeshkan. Sojourn Hospitality is believed to operate the rental program for the Resort.

10.   Defendant SUMMIT MANAGEMENT GROUP OF FLORIDA, LLC ("Summit Management") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.  Its principals Defendants Pezeshkan, Zand and MacIvor. Summit Management is believed to be the overall manager of the Naples Bay Resort.

11.   Defendant GULFWATER INVESTMENTS LLC ("Gulfwater"), is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.  It is reportedly the owner of 47 IOUs in the Naples Bay West Parcel. Its principals are PZ, LLC [Alexander Pezeshkan and MacIvor], Sanibel Investments Enterprises, LLC [MacIvor, Zand and Defendant Raymond Sehayek ("Sehayek"] and European Investments Enterprises, LLC [Zand, MacIvor and Sehayek].

12.   Defendant THE CLUB AT NAPLES BAY RESORT, LLC ("NB Club") is a Florida limited liability company, with its principal place of business at

4

1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

13.    Defendant THE RESTAURANT AT NAPLES BAY RESORT LLC ("NB Restaurant") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

14.    Defendant THE SHOPPES AT NAPLES BAY RESORT, LLC ("NB Shoppes"), is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

15.    Defendant FRED PEZESHKAN ("Pezeshkan") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

16.    Defendant THOMAS MACIVOR ("MacIvor") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

17.    Defendant IRA J. ZAND ("Zand") is *sui juris*, whose residence a address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

18.    Defendant RAYMOND SEHAYEK ("Sehayek") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

### Jurisdiction and Venue

19.    This is an action for damages in excess of the jurisdictional limits of the Court and for declaratory judgment, injunctive and supplemental relief that

the Court is authorized to grant pursuant to Sections 86.011 and 86.061. Florida Statutes (2019).

20.   Venue is proper as the claims sued upon all arose in Collier County, Florida and the Defendant business entities and individual defendants reside in and/or conduct business in Collier County, Florida.

21.   All conditions precedent and necessary to the bringing of this action have either been performed, have occurred, have been waived, or have otherwise been excused.

### General Allegations

### Naples Bay Resort and its West Parcel

22.   The Naples Bay Resort (the "Resort") is a mixed use and facilities development established pursuant to a Master Declaration on September 18, 2006 by its Developer, BASIL STREET PARTNERS, LLC, a Delaware limited liability company ("Basil Street" or "Developer"), by NBR Holdings, its sole member and NBR Manager, as its Manager. The Resort consists of many "components" including, *inter alia*, a hotel, multiple buildings containing hotel condominium units, commercial-retail space, meeting rooms, residences, club and a marina.

23.   Basil Street filed for bankruptcy in or about 2013 – shortly after it established the Resort and particularly the West Parcel condominium where Richards' hotel condominium unit ("unit") is located -- and which bankruptcy administration was concluded in or about December 2015. Its authority as a LLC was "Revoked for Annual Report on September 27, 2013."

6

24.    As stated, Richards' unit is located in Building 2 of the West Parcel which is specifically governed by the Master Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel ("Master Declaration – West Parcel"), Bylaws and Articles of Incorporation (collectively "condo documents") whose provisions apply to Richards, all IUOs and the Successor(s) to the Developer.  The relevant provisions of Chapter 718, Florida Statutes (2018) aka the Florida Condominium Act ("Florida Condominium Act") also apply to Richards, all IOUs and to the Successor to the Developer. The Master Declaration -- West Parcel is recorded in the Official Records of Collier County in OR: 4121 at Pg: 3092, et seq.[1] and its provisions are incorporated herein by reference.

25.    The NBR West Parcel is comprised of 85 units/suites which are separately owned by Richards and other IUOs  who, in turn, are members of the Hotel at Naples Bay Resort Condominium Association, Inc. ("Hotel Condo Association").

26.    The Developer marketed the Resort and the individual hotel condominium units as a prospective good financial investment. The marketing

- expressly represented that the IUOs had the option of participating in the Resort's rental program or renting their units themselves – with no penalty for opting out.

27.    The IUOs purchased their individual hotel condominium units based upon a supposed sound financial investment and anticipating a reasonable flow of

---

[1] The Master Declaration is voluminous and as such is not appended hereto. However, it is incorporated by reference and the Court can take judicial notice of its content.

income as a return on their investment.

28.    NBR Holdings had as its principal, Managing Member Defendant

NBR Manager. NBR Holdings had its authority "Revoked for Annual Report" on

September 22, 2017."

29.    NBR Manager had as its principals, Defendants Pezeshkan,

Zand and MacIvor. NBR Manager had its authority "Revoked for Annual Report"

likewise on September 22, 2017.

30.    The Master Declaration -- West Parcel, where Richards' Unit is

located, provides in its "Background" Section as follows:

> "C.    In order to (i) ensure that such general plan of development
> is adhered to; (ii) establish certain continuing relationships in the form of
> mutual rights and obligations between Developer and the persons who
> acquire ownership in Naples Bay Resort West Parcel, and their respective
> successors; (iii) ensure that the provisions of applicable resolutions are
> adhered to; and (iv) protect, preserve, enhance the value of the
> property within the Naples Bay Resort West Parcel, Developer has
> determined that this Declaration, establishing certain easements,
> servitudes, restrictions, reservations, and conditions in the form of
> covenants running with the land shall be binding upon, enforceable against
> and inure to the benefit of all present and future owners of property
> developed within Naples Bay Resort West Parcel and shall run with title to
> the land hereby and hereafter subjected to it..." [Emphasis added]

31.    Upon information and belief, following the bankruptcy proceedings

of Basil Street, the principals and members of that now defunct entity reacquired

control over the NBR West Parcel through their participation and ownership in

one or more of the legal business entities ("LLCs" or "entities") identified above.

32.    The Master Declaration – West Parcel in Article I, Section 1 (l)

provides,

> "'Developer' means Basil Street Partners, LLC, a Delaware limited
> liability company, ("BSP" or "Developer"), as aforesaid, and its

8

**successors and assigns who acquire title to any portion of Naples Bay Resort West Parcel** for the purpose of development so long as BSP assigns its rights hereunder to such persons by express assignment or by operation of law." [Emphasis added]

33.    Richards is informed, believes and alleges that NB Properties, NBR Investment, Knightsbridge Partners, Sojourn Hospitality, Summit Management and Gulfwater are all successors to Basil Street in one aspect of the development or another in terms of function and are therefore bound by the provisions of the Master Declaration -- West Parcel and condo documents as a whole as Successors to the Developer.

34.    Richards is informed, believes and therefore alleges the individual Defendants, Pezeshken, MacIvor, and Zand, as principals of the Basil Street, original Developer, engineered a take-over of successor ownership from Basil Street after its bankruptcy through a created maze of LLC entities -- more appropriately characterized as "fronts" -- noted in Paragraph 33 above. As such they are likewise individual successors to the Developer.

35.    Richards believes and therefore alleges that the Defendant entities, NB Properties, NBR Investment, Knightsbridge Partners , Sojourn Hospitality, Summit Management and Gulfwater are all owned and/or controlled by -- whether individually or through other named LLC entities ("fronts') -- which are *actually* the alter egos of Pezeshkan, MacIvor and Zand.

36.    NB Properties is believed to be the principal controlling entity of the Resort and is referred to as commercial component owner ("CCO") in the condo documents. NBR Investment, Knightsbridge Partners, Gulfwater, Sojourn Hospitality and Summit Management control specific functions in the Resort.

37.    There are at least 17 LLCs constituting the "maze" of interrelated and interlocking business entities as "fronts" for the core of individual Defendants herein.

## Pattern of the Abusive Actions and Improper Charges[2]

38.    The CCO as principal successor to the Developer, in conjunction and conspiracy with the other LLC entities, and controlled by the individual Defendants -- has engaged in a long term, continuing pattern of abusive actions designed and intended to oppress the IUOs, including Richards, by imposing unilateral, excessive and improper charges, whether they are in the Resort's Rental Program or have opted-out.  These may be, *inter alia*, identified as:

A.  Arbitrary and excessive charges (with no rational bearing to the CCO's tasks for a guest rental) threatened to be levied on IUO's who opt-out of the Rental Management Program, charging a daily rental fee payable the CCO of $250.00 -- effectively making it impossible for Non-Rental Program IUOs to net any income, let alone cover their expenses, from their rentals;

B.  Levying a grossly excessive daily "administrative charge" over and above the $250 fee -- arbitrarily increased from 10% to 20% -- which is further reduces the IUOs' ability to net any income from rentals of their units;

C.  Requiring IUOs to pay an excessive "Club dues" to NB Resort for guests to use the pool and spa (owned by an LLC entity) which approximates $4,000.00 per year -- this being over and above the $39/per day "resort fee" that the CCO charges the guest for use of the same facilities. The IUOs bear all the

---

[2] These are not all inclusive.

expense of the "Club" but receive no share of the income or set off of expenses from the guest fees;

D. Requiring anyone purchasing a condominium to pay an initial $40,000.00 as a "Club Fee", which makes it effectively impossible for IUOs to sell their units at anywhere near a fair value for the investment;

E. In sum, requiring a collage of fees to include:

- West Condo Association
- NB Resort for Club Dues (doubled since inception)
- NB Properties for a "Hotel Services Fund",
- NB Properties for Buildings 1, 2 and 3 which includes the hotel lobby, commercial spaces and meeting rooms
- West Parcel Master Property Owners Association, Inc. (controlled exclusively by the CCO) which includes the commercial units and residences for landscaping, hotel garages and fountain/turn-around at hotel front.

F. In all the foregoing instances, the IUOs effectively pay the CCO's expenses without deriving any financial benefit from the income generated from the meeting rooms and commercial space;

G. Levying of excessive dues based on forecasted budget, without IUO access to actual year end numbers to validate the propriety of the dues.

39. Recently, the CCO has informed Richards and the IUOs that their fees would be increased to cover [supposed] restaurant losses from the carona

virus Pandemic when the IUOs have no ownership interest therein, nor do they get any income from its operations.

40.    Recently, the CCO similarly informed Richards and the other IUOs that it was "suspending" distributions of their rightfully due rental income to cover its losses from the Pandemic.

41.    The Resort's standard rental management agreement ('RMA") was rolled over from original developer after the bankruptcy proceeding.

A.    The Property Owners Association and Hotel Condominium Association informally challenged whether the CCO had the right to own and operate the rental management company as it was not transferable. Hotel Condominium Association Board Members specifically challenged the CCO's right to own and operate the rental management program in 2016.

B.    The CCO threatened the Board Members and the Hotel Condominium Association's manager with claims of slander and defamation, both personally and as Board Members. Due to the CCO's threat, the challenge was withdrawn.

42.    The CCO has engaged in retaliatory tactics against IUOs -- specifically Richards and another IUO, Russ Reed -- by terminating their inclusion in the Rental Management Program -- for challenging and criticizing the CCO. A true copy of the notice is attached hereto as Exhibit "1" and incorporated by reference.

43.    The CCO has refused to be transparent in disclosing its actual expenses

12

and disbursements, as well as the inter-LLC transactions and expense allocations, upon which the many aforesaid charges are based.

44.    Upon information and belief, the CCO and other successor-developer entities are charging excessive expenses in non-arms length transactions.

45.    In the one instance where the CCO permitted the IUOs' accountant to have limited access to the books and records of the CCO, the CCO, through its Sojourn Hospitality, retaliated 2 years thereafter by invoicing the IUOs $39,125 for its staff to assist the accountant.  A true copy is attached hereto as Exhibit "2" and incorporated by reference.

46.    Recently, the successor Developer, through its Gulfwater entity, purchased 47 hotel condominium units (at distressed prices) to obtain a majority ownership in units and summarily recalled all the duly elected directors by the IUOs and installed their own minions. A true copy is attached hereto as Exhibit "3" and incorporated by reference.

## COUNT I
### Declaratory, Injunctive and Supplemental Relief

47.    Plaintiff re-alleges paragraphs 1 – 46 as though fully set forth herein at length.

48.    This is an action for declaratory, injunctive and supplemental relief.

49.    A case of actual controversy exists as Plaintiff and the IUOs require a declaration of their rights and an injunction against the CCO's abusive actions and improper charges as comprehensively detailed in paragraphs 38-43 above.

50.    The CCO and other of the Defendants contend that its actions and charges are authorized by the Master Declaration – West Parcel and other condo documents, including the Mast Declaration for the Resort, referenced above, while Plaintiff Richards and other IUOs contend that it does not but rather that said actions and charges expressly violate the foregoing enabling documents and the RMA. A copy of the RMA is attached as Exhibit "4" and incorporated by reference.

51.    The general tenor, as well as specific provisions of the Master Declaration – West Parcel are *unconscionable as outrageously one-sided* to the point they permit the CCO and other Defendant Successor LLC entities to illegally gouge Richards and the other IUOs, examples of which include, *inter alia*, the following:

A.    Article I, Section I (a) "Shared Expenses"

"…and the costs of any other expenses incurred by, the Association *for any reason whatsoever* in connection with any Component, the Shared Facilities or the Marina for the benefit of all of the Owners."

B.    Article VIII, Section 3 "Powers of the Association, Relating to Components and Sub-Associations"

"The Association shall have the power, but not the obligation, *to veto any action taken*, or contemplated to be taken by any Sub-Association which the Board reasonably determines to be adverse. . ."

C.    Article XIII, Section 16 "Administrative Charge"

",…each Hotel Unit Owner…by acceptance of a deed or other conveyance of a Charged Unit, shall be deemed to agree to pay a daily "Administrative Charge", which may be imposed, and paid to the Commercial Component Owner as part of the operation of the Hotel Condominium…any time a Charged Unit is occupied by persons who are not deemed to be Permitted Occupants…*with respect to the administration expenses associated with such occupant's charging*

*privileges with the Commercial Component Owner and other Administrative Charge shall be in such amount as determined from time to time by the Commercial Component Owner, **in its sole and absolute discretion**...*" [Emphasis added above]

52.    In the Declaration of Buildings 1, 2 and 3 of the West Parcel

[Richards' Unit is in Building 3], the following, *inter alia*,

Section 4.7 Reallocations.

"...the *Commercial Component Owner may* **unilaterally change** the nature, scope, extent and type of services and **the manner and percentage of allocating the costs and expenses** if, in its good faith judgment, the nature and types of services and cost change as needs and demand changes and the manner or percentage by which such costs and expenses are shared has become inequitable based on such criteria. *So long as the Commercial Component owner acts in good faith, uses objective criteria in making such relocations, and **without taking advantage of any conflict of interest, its decision may not be questioned. The Commercial Component owner may unilaterally amend** this Declaration for that purpose.*" [Emphasis added]

53.    The overall provisions of the foregoing documents are

unconscionable, unreasonable and unfair to Richards and the other IUOs *per se*,

and the CCO and other numerous LLC entities' application and interpretation of

the provisions has exacerbated the actions to nothing short of arbitrary,

unreasonable and outrageous.

55.    Plaintiff is entitled to declaratory relief because,

A.    There is a bona fide, actual, present practical need for the

declaration;

B.    The declaration sought deals with a present, ascertained or

ascertainable state of facts or present controversy as to a state of facts;

15

C.     Plaintiff's right as the complaining party is dependent upon the facts or the law applicable to the facts;

D.     The CCO has, or reasonably may have, an actual, present, adverse and antagonistic interests in the subject matter, either in fact or law;

E.     The antagonistic and adverse interests are all before the Court by proper process and the relief sought by Plaintiff is not merely giving of legal advice by the Court or the answer to questions propounded from curiosity.

56.     Plaintiff Richards has retained the undersigned counsel to prosecute this action on behalf of himself and other IUOs and has agreed to pay him a reasonable fee for his services.  CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes, the Master Declaration and/or the RMA.

WHEREFORE, Plaintiff JAMES RICHARDS on his behalf and on behalf of the IUOs prays that the Court will grant declaratory, injunctive and supplemental relief as may be appropriate under the circumstances of this case against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT II
### Declaratory, Injunctive and Supplemental Relief

57.     Plaintiff re-alleges 1 – 43 as though fully set forth herein at length.

58.     This is an action for declaratory, injunctive and supplemental relief

59.    The CCO and other Defendant LLC business entities, control, manage and are currently responsible for multiple parts and components of the Resort property, including what are defined as "Shared Facilities."

60.    The CCO has engaged specific Defendant LLC business entities to "manage" or control various components, for example Defendant Summit Management, the general management and Defendant Sojourn Hospitality being the manager of the Rental Program.

60.    The maze or web of interrelated Defendant LLC business entities, as well as the individuals that control them, limits what each is *actually* responsible for -- the complexity of which is not entirely ascertainable by Richards and the other IUOs.

61.    Richards believes and alleges that the maze or web of interrelated LLCs is designed and intended to perpetrate a fraud on Richard and the other IUOs.

62.    Richards and the IUOs believe that these specified actual and/or threatened actions and charges are unconscionable, unreasonable and violate the letter and spirit of the Master Declaration – West Parcel and the RMA and shock equity's conscience and thus entitle the Plaintiff and IUO to an injunction, both temporary and permanent, restraining the CCO from taking such actions.

63.    There is a present, active controversy between on the one hand the Defendant CCO and other LLC business entities and on the other Richards and the other IUOs pertaining to the precise responsibilities of each of the

17

Defendants regarding control, oversight, services provided and financial obligations which Richards and the others are required to bear.

64.    Throughout the condo documents, the CCO, as successor to the Developer is given the unlimited power to levy assessments regarding the Shared Facilities and any other costs the CCO desires to foist on the Richards and the other IUOs. On the other hand, there are only vague and limited accountability for Richards and the IUOs to verify the accuracy and propriety of such charges.

65.    For example, the Master Declaration at Article 9. "Annual Statements and Accounting, provides,

> "The Board shall cause to be prepared an annual balance sheet and operating statement reflecting income and expenditures of the Association for each fiscal year, and shall cause a copy of each such statement to be distributed to each member... As and when specified in the Bylaws, the Board shall prepare and distribute to the membership of the Association a written, itemized (budget) of the expenses to be incurred by the Association ..."

66.    The disputes herein reference are that notwithstanding persistent demands of Richards and fellow IUOs for full disclosure and inspection of the underlying documents supporting the expenditures, upon which the assessments are based and levied,  the CCO has failed and refused to allow them to fully review and assess the important financial aspects.

67.    Such information is possessed solely by the Defendants and is part of the West Parcel Associations reporting obligations to its members, including Richards and the other IUOs, and is being wrongfully withheld from the Association and its members.

18

68.    More pertinently, Richards and other IUOs, are entitled to be provided an understanding and accounting of the interrelationships and payments between them that impact financially on Richards and the other IOUs. See *Gardens Suburbs Golf & Country Club, Inc. v. Pruitt*, 24 So.2d 898 (Fla. 1946); cited with approval by the Fourth DCA in *The Resort at Singer Island Hotel Condominium Association, Inc. vs. Urgo Hotels LP*, 267 So 3d 452 (Fla. 4th DCA 2019 (closely analogous transparency case between the unit owners' association and hotel lot owner's refusal to provide supporting documentation for shared facilities assessments).

63.    Richards believes and therefore alleges that the Defendant web of LLCs is designed and intended to perpetrate a fraud on Richards and the other IUOs to gouge them on fees charged.

64.    The only occasion that the CCO allowed the IUOs' accountant to inspect financial records, such permission was a charade and the CCO withheld critical records regarding employee payroll and inter-entity payments. Moreover, the CCO then invoiced (2 years later) the IUOs for $39,125.00. A true copy is attached as Exhibit "2" and incorporated by reference.

WHEREFORE, Richard is requesting the Court to grant declaratory relief and supplemental relief in the following manner and Order:

A.    All Defendants to provide Richards and the other IUOs with full, complete and perfect disclosure of financial and accounting records, including supporting documents and allocations regarding costs incurred for the operation, management and maintenance of the Shared Facilities upon which assessment

against IUOs are based;

## COUNT III
### Breach of Contract – Master Declaration

65.    Plaintiff re-alleges paragraphs 1 – 43 as though fully set forth herein at length.

66.    This is an action for breach of contract.

67.    The Master Declaration for the Resort, Master Declaration – West Parcel and other cited condo documents and associations above constitute contracts between the Developer and Successors to the Developer and Richards and other IUOs.

68.    By its actions and/or threatened actions as comprehensively detailed elsewhere in this Complaint, CCO and all other Successors to the Developer, have breached both the letter and spirit of the Master Declaration and all other condo documents.

69.    Richards believes and therefore alleges that all the foregoing LLCs are creating excessive and duplicative expenses being borne by the IUOs which effectively drains all potential income

70.    The foregoing is graphically illustrated by a spreadsheet depicting the losses sustained by Richards individually. A true copy is attached hereto as Exhibit "5" and incorporated by reference.

71.    The net result of the aforesaid pattern of abusive actions has been to artificially depress and devalue the fair market value of the hotel condominium units, due to exorbitant expenses, dues and other charges which eviscerate any ability for an IOU to realize a return on investment.

72.     Plaintiff Richards and the other IUOs have performed all of their obligations under the contracts . *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2dDCA 2006).

73.     Plaintiff and the other IUOs have suffered damages as a direct and

74.     Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services . CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes and the Master Declaration.

WHEREFORE, Plaintiff JAMES RICHARDS on his behalf and on behalf of the IUO demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT III
### Breach of the Implied Covenant of
### Good Faith and Fair Dealing

75.     Plaintiff re-alleges paragraphs 1 – 74 as though fully set forth herein at length.

76.     Plaintiff Richards and the other IUOs are parties to written contracts in the nature of the various condo documents, both as the Resort as a whole and those related to the West Parcel and the RMAs.

77.     The foregoing contracts are ambiguous as to the permissibility or scope of the conduct in question.

78.     The LLC Defendants which are the alter egos of the Individual Defendants who control them, through conscious and deliberate acts, fail and

refuse to discharge contractual responsibilities which unfairly frustrate the contracts' purposes and disappoint Plaintiff Richards' and the other IOUs' expectations and what was represented to them when they were solicited to purchase hotel condominium units in the Resort.

79.    Moreover, by their conscious, deliberate and unreasonable acts, the Defendants, by the direction given on the part of the Individual Defendants prejudicially skew the provisions against Richards and the other IUOs such as to deprive them of any meaningful return on their investments.

80.    The foregoing breaches deprive Plaintiff Richards and the other IUOs of the contracts' benefits.

81.    Plaintiff Richards and the other IUOs suffered damages.

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of the IUO demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT IV
### Breach of Fiduciary Duty

82.    Plaintiff re-alleges paragraphs 1 – 81 above as though fully set forth herein.

82.    This is an action for breach of fiduciary duty.

83.    The Developer and all the Defendant LLC entities and Individual Defendants as successors to the Developer had a fiduciary duty to Richards and the other IUOs in their operating the Resort for the benefit of Richards and the IUOs.

84.    The CCO through its principals and related Defendant LLC entities have caused IUOs to be removed and replaced by CCO's principals and members as directors of the West Parcel Association, Inc. and the NBR Hotel Condominium Association, Inc. in order to facilitate their self-dealing vis-à-vis the devaluation of the IUO's residential units and the usurpation of the IUO's investment value and the return thereon. A true copy of the Notice of such action to the IUOs is attached as Exhibit "3".

85.    By its actions or threatened actions as comprehensively detailed elsewhere in this complaint and specifically by its self-dealing and usurpation of investment value and the return thereon, CCO and other Defendants have breached their implicit fiduciary duties to Plaintiff and the IUO, as well as their express fiduciary duty to preserve the value of the hotel condominium units as components of the Resort .

86.    Plaintiff Richards and the other IUOs have suffered damages as a result of the Defendants' breaches of their fiduciary duties.

87.    Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services. CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes and the Master Declaration.

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of the IUOs demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

23

## COUNT V
### Usurpation of a Business Opportunity

88. Plaintiff re-alleges paragraphs 1 – 87 above as though fully set forth herein.

89. The hotel condominium units purchased by Richards and the IUOs were created and intended to be a business opportunity to rent them out for short term guest and derive profit and a reasonable return on their investment.

90. The foregoing purpose fit into the overall purpose for the Resort development and the West Parcel in particular.

91. The intentional and malicious actions by the Defendants to artificially depress the value of the units owned by Richards and the other IUOs for their – and particularly Defendant Gulfwater's financial benefit – constituted a usurpation of the business opportunities the Richards and the others bought into.

92. The Defendants, in conjunction and conspiracy with each other, acted in concert to facilitate Gulfwater's purchase of units at artificially depressed values.

93. For the most part units purchased by investors, including Richards, have been reduced in fair market value from $700,000 down to $100,000, so they have accordingly sustained damages

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of the IUO demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

Date: August 19, 2020

s/ Elliott Goldberg

By:_____

Elliott Goldberg, Esq.
Attorney for Plaintiff
Florida Bar No. 133770
One East Broward Boulevard - #700
Ft. Lauderdale, FL 33301
Tel. (954) 493-7400
E-mail: elliottglaw@hotmail.com

EXHIBIT "1"

**From:** Cheryl Hastings <CHastings@gfpac.com>
**Subject: Your Complaint to the Better Business Bureau; Case No. 6744770**
**Date:** April 29, 2020 at 11:45:15 AM EDT
**To:** "jim.richards2@me.com" <jim.richards2@me.com>

Dear Mr. Richards:

As you are aware, this law firm represents Naples Bay Properties, LLC, a Florida limited liability company. This email concerns the above referenced complaint made by you. By our client's letter dated April 6, 2020 our client responded. Our client has now received from the Better Business Bureau ("BBB") a further letter from you to it dated April 18, 2020 which responds to our client's April 6, 2020 letter. Please see my response to the BBB attached hereto. We will not debate or discuss this further with or through the BBB.

Be advised that your April 18, 2020 letter is factually incorrect, just plain wrong, and factually irrelevant in several cases. It is also defamatory and portrays our client, its business, and the operations of some of its affiliates in a false light. This may and can cause damage to our client, as well as damage to the other hotel unit owners for which you have liability. Demand is hereby made for you to immediately refrain from making any further false and disparaging statements concerning our client and its affiliates. If you fail to do so, our client will avail itself of all available legal remedies, including, but not limited to, causes of action for defamation, portraying information in a false light, tortious interference with business relationships and related tort and statutory theories.

As a unit owner you have the right to certain information. The opportunity to schedule an appointment with our client to obtain that information has been previously made known and available to all hotel unit owners. It remains available to you should you wish to schedule it.

If you are as unhappy as you seem to be, our client is willing to release you from and terminate your Rental Management Agreement. In the event you do not choose to terminate your Rental Management Agreement, please consider this as notice that our client does not intend to renew your RMA when it next terminates.

You should govern yourself accordingly.

Cheryl Hastings

EXHIBIT "2"

# Sojourn Hospitality Group LLC

1500 Fifth Avenue South, Suite 111
Naples, Florida 34102
239.434.6222

## Invoice # 100

Date: 2/3/2020

**Bill To:**
Independent Hotel Unit Owners
Attn: Joe & Gail Soboloski, Russ Reed, Jim & Michelle Richards, John
Diaz, Neal & Matt Westendorf, Maria Leone, Hank Miller, & Raleigh
Truitt

**For**
Professional Services

| Item Description | Amount |
|---|---|
| Services provided to assist consultant of Hotel unit owners to perform a review of financial records. | |
| Jim Veil (80 hours at $200 per hour) | $16,000.00 |
| Tom MacIvor (80 hours at $150 per hour) | $12,000.00 |
| Nikki Watt (50 hours at $100 per hour) | $5,000.00 |
| Resort Staff (60 hours at $100 per hour - includes John Reilly, Ingrid Hernandez and Jennifer Mateu) | $6,000.00 |

| | |
|---|---|
| Subtotal | $39,000.00 |
| Other Costs - copies and supplies | $125.00 |
| **Total Cost** | $39,125.00 |

Make all checks payable to Sojourn Hospitality Group, LLC
Thank you for your business!

EXHIBIT "3"

*1500 Fifth Avenue South, Suite 111*
*Naples, Florida 34102*

February 24, 2020

**VIA EMAIL & CERTIFIED MAIL**
Board of Directors of Hotel at Naples Bay Resort Condominium Association, Inc.
c/o Hamilton Mikes, PA
9130 Galleria Court
Suite 330
Naples, FL 34109

Re: Recall of Board Members

Dear Board Members:

I write as a representative of Gulfwater Investments, LLC, the owner of forty-seven (47) units in the Hotel at Naples Bay Resort (Hotel), for the purpose of demanding the recall of the board members listed below. Pursuant to Section 718.112(2)(j), Florida Statutes, any member of the board of administration may be recalled and removed from office with or without cause by the vote or agreement in writing by a majority of all the voting interests. Rule 61B-23.0028, Florida Administrative Code, governs recall by written agreement.

The Board members subject to recall are as follows:

1) Gail Soboloski
2) Raleigh Truitt
3) Russ Reed
4) James Richards

The individuals listed below have indicated their willingness to replace the recalled board members:

1) Nikki Watt
2) Thomas A. MacIvor
3) Iraj Zand
4) Jim Veil

By signing this letter, I affirm that I am authorized in the manner required by the condominium documents to cast this vote on behalf of all forty-seven (47) units.

Regards,
GULFWATER INVESTMENTS, LLC

Thomas A. MacIvor, CPA  MBA
Vice President

cc: Cheryl L. Hastings, Esq.

EXHIBIT "4"

May 1, 2007

## THE HOTEL AT NAPLES BAY RESORT

## HOTEL UNIT RENTAL MANAGEMENT AGREEMENT

This **HOTEL UNIT RENTAL MANAGEMENT AGREEMENT** (the "Agreement") is made as of the _____ day of _____, 200___, between BASIL STREET PARTNERS, LLC, a Delaware limited liability company, its successors and assigns ("Hotel Owner"), and

Name of Unit Owner _____ ("Unit Owner")
Billing and Correspondence
Address of Unit Owner _____
                              STREET

_____
CITY            STATE        ZIP

Home Phone _____ Office Phone _____
E-Mail Address _____
SSN/Federal Fax ID Number _____

NOTE: THE PERSON TO WHOM BILLING AND PAYMENTS SHOULD BE ADDRESSED MUST APPEAR ABOVE. ANY CHANGE TO THE BILLING ADDRESS SHOULD BE SENT TO THE HOTEL OWNER BY UNIT OWNER. IF JOINTLY OWNED, ONE OWNER MUST BE IDENTIFIED TO RECEIVE STATEMENTS AND ACT AS THE PRIMARY CONTACT. ANY ADDITIONAL OWNERS SHOULD BE LISTED ON THE LAST PAGE OF THIS AGREEMENT.

## RECITALS:

A.    Unit Owner has acquired, or will acquire, ownership of Unit #_____ (the "Unit") in "The Hotel at Naples Bay Resort, a Condominium" in the City of Naples, Florida (the "Condominium"). The Condominium has been, or will be, established pursuant to that certain Declaration of Condominium for The Hotel at Naples Bay Resort, a Condominium (the "Condominium Declaration") recorded, or to be recorded, in the Public Records of Collier County, Florida. The Unit is also subject to the terms and conditions of and assessments imposed by that certain Declaration of Restrictive Covenants, Conditions, Reservations and Easements for Buildings 1, 2 and 3 of the Naples Bay Resort West Parcel (the "Building Declaration") and that certain Master

Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel (the "Master Declaration").

B.    The Condominium has been, or will be, established and created in buildings, a portion of which comprise a hotel owned by Hotel Owner and to be known as "The Hotel at Naples Bay Resort" (the "Hotel").

C.    Hotel Owner or its delegates will manage the Hotel and a voluntary rental program for units within the Condominium (the "Rental Program") for the purpose of making the units available to third parties for transient lodging as part of the Hotel operation.

D.    Unit Owner desires to make the Unit available for participation in the Rental Program on the terms set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Hotel Owner and Unit Owner hereby agree that the Recitals are incorporated herein by reference and further agree as follows:

1.    UNIT OWNER ACKNOWLEDGMENTS.    UNIT OWNER ACKNOWLEDGES THAT:  (A) NO INDUCEMENTS OR REPRESENTATIONS OF ANY KIND HAVE BEEN MADE DIRECTLY OR INDIRECTLY TO UNIT OWNER BY OR ON BEHALF OF ANY OPERATOR OF THE HOTEL, HOTEL OWNER, ITS AGENTS OR EMPLOYEES AS TO ANY TAX OR OTHER ECONOMIC BENEFITS OR IMPLICATIONS WHICH MAY OR MAY NOT BE REALIZED FROM OWNING AND/OR LEASING THE UNIT AS PART OF THE RENTAL PROGRAM;  (B) UNIT OWNER HAS NOT BEEN REQUIRED TO PLACE THE UNIT IN THE RENTAL PROGRAM OR TO RETAIN HOTEL OWNER OR ANY OPERATOR OF THE HOTEL OR ANY OTHER DESIGNEE OF HOTEL OWNER TO RENT THE UNIT TO THIRD PARTIES, AND UNIT OWNER HAS BEEN FREE TO USE ANY OTHER RENTAL AGENT FOR THAT PURPOSE OR TO LEASE THE UNIT ON UNIT OWNER'S OWN OR TO NOT LEASE THE UNIT AT ALL; (C) NEITHER HOTEL OWNER, NOR ANY OF ITS AGENTS OR EMPLOYEES

(INCLUDING ANY OPERATOR OF THE HOTEL) MAKES, OR HAS MADE, ANY GUARANTEES OR REPRESENTATIONS REGARDING RENTAL INCOME WITH RESPECT TO THE RENTAL OF THE UNIT AND/OR THE RENTAL PROGRAM; (D) TO THE EXTENT ANY SALES AGENT OR REPRESENTATIVE OF HOTEL OWNER HAS MADE, SUGGESTED OR PERMITTED AN INFERENCE WITH RESPECT TO, OR IMPLIED ANY PROJECTION OF, RATE, OCCUPANCY, PROFIT OR LOSS IN CONNECTION WITH THE RENTAL PROGRAM, SUCH INFORMATION DOES NOT CONSTITUTE A REPRESENTATION OF HOTEL OWNER OR ANY OPERATOR OF THE HOTEL OR ANY OTHER DESIGNEE OF HOTEL OWNER AND HAS NOT BEEN RELIED ON, OR CONSIDERED, BY UNIT OWNER IN MAKING THE DECISION TO ENTER INTO THIS AGREEMENT; (E) INCOME FROM THE UNITS IN THE RENTAL PROGRAM IS NOT AND WILL NOT BE POOLED, AND EACH OWNER OF A UNIT IN THE RENTAL PROGRAM WILL RECEIVE INCOME OR LOSSES (AS APPLICABLE) ATTRIBUTABLE TO THE ACTUAL RENTAL OF HIS OR HER UNIT AS SET FORTH IN THIS AGREEMENT; (F) THERE MAY BE A DELAY BETWEEN THE DATE THE UNIT OWNER ACQUIRES THE UNIT AND THE DATE THE HOTEL OPENS FOR BUSINESS; AND (G) UNIT OWNER HAS BEEN ADVISED TO CONSULT WITH TAX AND LEGAL ADVISORS OF HIS OR HER OWN CHOOSING REGARDING PARTICIPATION IN THE RENTAL PROGRAM.

2.    **Engagement of Hotel Owner.**  Unit Owner hereby engages Hotel Owner and grants to Hotel Owner the exclusive right to rent, manage and control the Unit during the Term (as defined in Section 4 below) pursuant to the terms of this Agreement.  Subject to the terms of this Agreement, including, without limitation, Section 9 (pertaining to the Standards), Hotel Owner hereby accepts such engagement.  Hotel Owner reserves the right, but shall not be obligated, to retain an operator or other person or entity to perform Hotel Owner's duties pursuant to this Agreement, as more fully described in Section 3 below.

3.   **Hotel Owner May Retain an Operator**.

(a)     Hotel Owner may assign or delegate its rights and obligations under this Agreement, in whole or in part, and in Hotel Owner's sole discretion, without notice to or consent from Unit Owner, to (i) the operator of the Hotel from time to time, if any (the "Hotel Operator"), (ii) an affiliate of Hotel Owner, (iii) any third party designated by Hotel Owner, or (iv) a successor Hotel Owner.  In the event that the agreement by which this Agreement is assigned by Hotel Owner, or pursuant to which the responsibilities of Hotel Owner are delegated, shall expire or otherwise terminate such that the assignee or delegate is no longer associated with the Hotel, this Agreement will (at the Hotel Owner's option): (a) terminate upon delivery of notice to Unit Owner, or (b) be assigned to the Hotel Owner, another Hotel Operator engaged for the Hotel, or other person or entity designated by Hotel Owner, in which event the Hotel Owner or such other Hotel Operator, person or entity will perform the functions of the Hotel Owner hereunder.  Unit Owner acknowledges that there is no guarantee that:   (i) any agreement for management of the Hotel will remain in place for the stated duration of this Agreement; (ii) the Hotel, this Agreement or the Rental Program will be managed by any particular Hotel Operator or any other operator for the duration of the term of this Agreement, or (iii) any operation or identification of the Hotel as a certain brand, in whole or in part, will remain in place for the stated duration of this Agreement. Unit Owner further acknowledges that any person or entity to which Hotel Owner assigns or delegates its rights and obligations under this Agreement may, but shall not be required to, be experienced in the operation of hotels and may or may not be a so called "branded" operator.

(b)     The Hotel Operator may impose standards for the operation of the Hotel which shall become the "Standards" for the Hotel as the same are described in Section 9.

4.   **Term**.  This Agreement shall have a term commencing on the later of the date set forth on the first page of this Agreement, or the date Unit Owner takes title to the Unit (but in no event earlier than the opening of the Hotel as determined by Hotel Owner

(the "Hotel Opening")), and expiring on the last day of the third full calendar year following the Hotel Opening (the "Term") (as such Term may be extended as provided in this section, or earlier terminated as otherwise provided in this Agreement). Upon expiration of the initial Term (the "Initial Term"), the Term shall automatically renew for successive three (3) year periods (each a "Renewal Term") from and after the expiration of the Initial Term, unless Hotel Owner or Unit Owner gives written notice to the other party of its election not to extend the Term, at least one hundred eighty (180) days prior to the effective date of any Renewal Term. Notwithstanding the foregoing, this Agreement shall remain in full force and effect for any reservations of the Unit that have been confirmed prior to written notice of termination of this Agreement (subject to Hotel Owner's good faith efforts to transfer any such confirmed reservation to another unit in the Rental Program), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy.

5.    **Rental Procedures and Rates**. Hotel Owner shall use good faith efforts to rent the Unit to guests of the Hotel (including, but not limited to guests with complimentary or promotional use, "Hotel Guests") in accordance with the following provisions:

(a)    **Rental Rates**. Rates for rental of the Unit shall be determined by Hotel Owner in accordance with the rate schedule established by Hotel Owner from time to time in its sole discretion. The rate schedule may be revised by Hotel Owner from time to time without notice to Unit Owner to reflect changes in operating costs and rates of comparable properties, special discounts and other conditions and matters deemed relevant by Hotel Owner, including, but not limited to, consideration of customer bases, market segments and seasonal variations.

(b)    **Financial Risk**. Hotel Owner does not guarantee that Unit Owner will (i) receive any minimum amount of payments hereunder, or (ii) receive rental income equivalent to that generated by any other unit in the Rental Program, or (iii) receive rental income in excess of assessments and other costs associated with the Unit.

(c)    **Rental System**. Hotel Owner agrees that a reservation system will be maintained through which the reservations for the units in the Rental Program may be

processed. Hotel Owner further agrees to rent the Unit in accordance with a fair and equitable process to be established by Hotel Owner in order to ensure that all of the units in the Rental Program are fairly and equitably offered for rental, but taking into account (i) Hotel Guest requests, and (ii) factors which differentiate units within the Rental Program, such as size, location, view, type of unit, and other relevant factors.

Unit Owner acknowledges that despite the efforts of Hotel Owner, the Unit may not be rented for the same or substantially the same number of nights, and may not receive the same or substantially the same net rental income, as other units in the Rental Program and within the same room class, for any time period. Hotel Owner does not guarantee any particular period or periods of rental, nor any specific level of rental receipts, and acknowledges that both the ability of the Hotel Owner to rent units and the selection of a particular unit within the Rental Program for rental will be subject to, among other things, the wishes and preferences of the Hotel Guests.

(d)     **Promotional and Other Complimentary Use**.  Hotel Owner shall have the right to use the Unit for promotional and other complimentary purposes in Hotel Owner's discretion; however, such use will be prohibited during Prime Peak Season (as hereinafter defined) and shall be limited to a maximum of five (5) nights during Peak Season (as hereinafter defined) and ten (10) nights outside of Prime Peak Season and Peak Season. Hotel Owner shall endeavor to equitably allocate such stays among all units in the Rental Program.  Hotel Owner shall not charge a rental rate for the complimentary usage of the Unit, and no rental income shall be paid to Unit Owner with respect to such use.

(e)     **Smoking**.  Unit Owner shall designate on **Schedule A** of this Agreement whether smoking shall be permitted in the Unit.  Such election shall govern the Unit during periods of Owner Occupancy as well as during periods of occupancy by Hotel Guests.

(f)     **Hotel Owner has Exclusive Use**.  Unit Owner agrees that, during the Term, Unit Owner shall not rent or use the Unit except pursuant to the terms of this Agreement.  Hotel Owner may from time to time establish additional rules and

regulations with respect to use of the Unit by Hotel Guests and/or Owner Occupants (as defined in Section 10).

6.     **Adjusted Unit Revenues and Deductions; Payments to Unit Owner and Hotel Owner.**

(a)     **Unit Owner's Payment.**  The payment made to Unit Owner in respect of rental revenue from the Unit, if any, shall be equal to one hundred (100%) percent of the Adjusted Unit Revenue (as defined below in subsection (b)):

(b)     **Adjusted Unit Revenue.**  The term "Adjusted Unit Revenue" shall mean and refer to the amount resulting after deducting the following costs and expenses from the gross rental revenues (net of discounts, rebates or credits) collected from the rental of the Unit, but excluding sales, use, occupancy and other similar taxes and Hotel employee gratuities collected in connection therewith ("Gross Unit Revenues"):

i.     **Administrative Charge.**  Any applicable "Administrative Charges" as defined in and pursuant to the Master Declaration.

ii.     **Management Fee.**  A "Management Fee" payable to Hotel Owner or Hotel Operator (as designated by Hotel Owner) in the amounts equal to the following percentages of Gross Unit Revenues:

(1)     Three percent (3%) for the first year from the Hotel Opening,

(2)     Four percent (4%) for the second year from the Hotel Opening, and

(3)     Five percent (5%) for the third and each successive year from the Hotel Opening.

iii.     **Rental Program Expenses.**  The "Expense Deduction" as follows: On an annual or more frequent basis, Hotel Owner shall estimate all expenses of the Hotel with respect to the Rental Program and its facilities, equipment, and personnel, including, without limitation, costs and expenses with respect (but not limited) to the following: (i) providing daily housekeeping services, consumable guest supplies and other standard

Hotel services to Hotel Guests, (ii) operating, administrative, accounting/bookkeeping, collection and reporting expenses, including, without limitation, employee costs and expenses, and (iii) charges and fees for reservations, sales and marketing services, other centralized services required by the Hotel Owner or Hotel Operator, credit cards, travel agents and other rental-related commissions, and operating licenses and permits ("Gross Rental Program Expenses"). Hotel Owner shall reasonably allocate a portion of the Gross Rental Program Expenses to the Unit based on the approximate Hotel Guest usage of the Unit as compared to all other units in the Rental Program, and such allocation shall be the "Expense Deduction". To the extent the actual costs and expenses are less than or greater than the Expense Deduction, any overpayment shall be returned to Unit Owner, and any underpayment shall be charged to Unit Owner pursuant to the procedure outlined in subsection (c) below. Hotel Owner reserves the right to adjust the Expense Deduction as appropriate in respect of the actual Gross Rental Program Expenses as reasonably allocated to the Unit or this Agreement.

iv.     **Other Expenses.** Unpaid obligations of Unit Owner for expenses referred to in Section 7, including those more particularly described in Sections 8, 9, and 10.

v.     **Tax Withholding.** Payments to Unit Owner may be subject to income tax withholding requirements under United States tax laws. Payments made to Unit Owner may be reduced by any applicable withholding taxes required to be withheld and paid under applicable United States tax laws. Unit Owner agrees to provide Hotel Owner a valid Taxpayer Identification Number Certification (IRS Form W-9 or acceptable substitute) or, if Unit Owner is not a U.S. Person (as defined under applicable law), a certification of foreign status on IRS Form W-8BEN, W-8ECI or other applicable IRS form. In the event that Hotel Owner is required by applicable U.S. tax laws to withhold any amounts on account

of taxes payable, it shall provide Unit Owner with documentation confirming the amount of taxes withheld, together with all other reporting forms necessary to evidence the payment of such tax amounts.

(c)    **Reporting to Unit Owner and Payment**.  Within thirty (30) days of the end of each month, Hotel Owner shall deliver or cause to be delivered to Unit Owner a statement of account and a payment of the portion of the Adjusted Unit Revenue derived from the use of the Unit by Hotel Guests remaining after deduction of the amounts described in clause (a) of this Section 6 (the "Unit Owner's Payment"), if any. If such statement of account reflects a negative balance, Unit Owner shall pay such balance to Hotel Owner within fifteen (15) business days of receipt of such statement. Any excess payments shall be distributed to Unit Owner promptly following delivery of the statement of account.

7.    **Unit Owner's Obligations for Expenses Attributable to the Unit.**

(a)    **Fixed Expenses**.  Unit Owner covenants to timely and fully pay the following obligations with respect to its Unit directly to the applicable payee:  (i) all assessments and other amounts due pursuant to the Condominium Declaration, the Building Declaration and the Master Declaration (the "Assessments"); (ii) the Reserve amount and all other fees and charges to Hotel Owner pursuant to Section 9; (iii) all utilities with respect to its Unit to the extent not otherwise included in the Assessments; (iv) real estate and personal property taxes with respect to its Unit; (v) debt service with respect to any mortgage or other financing, or both, of the Unit and its contents; and (vi) all insurance costs with respect to the insurance required to be maintained and obtained pursuant to Section 8 ("Insurance Cost").

(b)    **Unit Owner Charges**.  Unit Owner also covenants to timely and fully pay and be responsible for the payment of the following amounts to Hotel Owner:  (i) all amounts required to be paid by Unit Owner in this Agreement, or any amounts otherwise advanced or funded on Unit Owner's behalf; (ii) all fees and charges for Hotel Services used during an Owner Occupancy Period but which are not otherwise collected at check-out pursuant to Section 10 (including, without limitation, for payment

of voluntary Owner Occupancy Daily Housekeeping); (iii) a Departure Cleaning Charge after each Owner Occupancy Period pursuant to Section 10; and (iv) an "Additional Owner Occupancy Use Charge" relative to each night of "Additional Owner Occupancy", as those terms are defined in Section 10.

(c) **Deduction of Payments.** The payments due under subsections 7(a) and (b) herein may, at the election of Hotel Owner, be deducted from Unit Owner's Payment and applied by Hotel Owner for the purpose for which such payment is required pursuant to this Agreement, so long as Unit Owner is notified of Hotel Owner's election to pay same on Unit Owner's behalf. Upon request of Hotel Owner, Unit Owner shall deliver to Hotel Owner appropriate evidence of payment of any expenses of the type referred to in subsections 7(a) and (b) herein to the extent such payments are not made by Hotel Owner on Unit Owner's behalf. Initially, Hotel Owner may deduct from Unit Owner's Payment (to the extent available): (i) all Assessments and pay same to the applicable payee, and (ii) all Reserves pursuant to Section 9, and pay the same to the Hotel.

8. **Condominium Unit Insurance.** At Unit Owner's sole cost and expense, Unit Owner agrees to maintain, with an insurance company and on terms acceptable to Hotel Owner, a HO-6 condominium package policy or equivalent, or such other policy or policies as may be specified by Hotel Owner from time to time. Such policies shall include liability coverage, and property insurance covering its personal contents and fixtures within the Unit that the Unit Owner is solely responsible for, including any upgrades permitted by Hotel Owner. The property policy shall be on a so-called "all-risk" or "special risk" form on a 100% replacement cost basis and include deductibles that are usual and customary for similar type risks.

To the extent attainable at a reasonable cost, Unit Owner shall request from its insurer that the above insurance name the Hotel Owner Parties (as defined in Section 13 hereof) as additional insureds, and all policies shall contain an endorsement waiving any rights of subrogation against Hotel Owner Parties.

Unit Owner agrees to provide a certificate of insurance evidencing the above coverages prior to the commencement of the Term and all expirations/renewals of such insurance. The certificate of insurance shall provide notice that the policy is not cancelable or can be materially changed without at least thirty (30) days prior written notice to the Hotel Owner Parties. If Hotel Owner offers insurance packages to units in the Rental Program at rates equal to or below rates generally available in the insurance market, Unit Owner shall obtain such coverage through Hotel Owner and the costs thereof shall be deducted pursuant to Section 7. The amount of insurance contained in any of the aforementioned insurance coverages shall not be construed to be a limitation of the liability on the part of Unit Owner.

9.    **Maintenance of Standards.**

(a)    **Standards for Unit.**    Unit Owner acknowledges and agrees that acceptance of the Unit for inclusion in the Rental Program shall be subject to (i) the Unit (and all furnishings, furniture, finishes and equipment, and operating supplies and equipment therein, collectively the "Furnishings and Supplies") being as of the commencement of the Term, and remaining thereafter throughout the Term, at Unit Owner's sole cost and expense, in compliance with the standards of the Hotel in effect from time to time as determined in Hotel Owner's sole discretion (the "Standards"). Unit Owner agrees that once the Unit is accepted into the Rental Program, there shall be no change to the Unit or the Furnishings and Supplies (other than replacements of the same as needed, with comparable Furnishings and Supplies meeting the Standards) without the prior written consent of Hotel Owner.

(b)    **Maintenance of Standards; Reserve.**    Unit Owner agrees that upon being accepted into the Rental Program, the Unit must at all times during the Term be maintained, furnished, finished, supplied and equipped in accordance with the Standards, and that Unit Owner shall be solely responsible for payment of the cost of maintaining the Standards within the Unit (inclusive of all Furnishings and Supplies therein). In furtherance of the foregoing, Unit Owner hereby agrees that Hotel Owner shall deduct from the Unit Owner's Payment (and to the extent of insufficient funds from

Unit Owner's Payment, Unit Owner shall pay to Hotel Owner) on a monthly basis an amount equal to five percent (5%) of the Gross Unit Revenue for the previous month to fund a reserve account (the "Reserve") for the Unit. The Reserve shall be applied by Hotel Owner to the costs of maintenance, supply, repair, replacement and refurbishing of the Unit and all Furnishings and Supplies therein, as necessary or appropriate (as determined by Hotel Owner in its sole discretion), to meet the Standards (and including, without limitation, payment of periodic deep cleanings), but excluding in all events payment of the costs of maintenance, supply, repair, replacement and refurbishing of the Unit after an Owner Occupancy Period to the extent that Departure Cleaning Charges imposed and collected pursuant to Section 10(f) are adequate for the payment thereof. To the extent that the amounts in the Reserve are at any time insufficient to maintain the Unit (inclusive of all Furnishings and Supplies therein) in accordance with the Standards pursuant to this subsection (b), as determined by Hotel Owner in its sole discretion, then Unit Owner will be notified of the amount of additional funds necessary to correct such deficiencies and Unit Owner shall supply such additional funds to Hotel Owner within ten (10) business days of such notice, so that Hotel Owner can correct such deficiencies on Unit Owner's behalf and at Unit Owner's sole cost and expense. If Unit Owner does not timely provide such funds, Hotel Owner may, in its sole discretion, elect to correct any such deficiency on Unit Owner's behalf and at Unit Owner's cost and expense by deduction of such amounts from current and future Unit Owner's Payment or otherwise billing Unit Owner for same. Hotel Owner reserves the right to adjust the percentage of Gross Unit Revenue applied to the reserve from time to time in order to provide adequate funding of the same.

Unit Owner agrees and understands that the Hotel may charge a fee for performance of the foregoing maintenance, cleaning, supply, repair, replacement and refurbishing services, including, without limitation, a procurement charge for purchasing Furnishings and Supplies for the Unit, a refurbishing fee for the Unit requiring refurbishment or capital improvement, and/or a service fee for coordinating any repairs or scheduled maintenance or cleaning with respect to the Unit or items therein. To the extent that such services and costs are appropriately funded from the Reserve, Hotel Owner shall deduct sufficient funds therefrom for the payment of the applicable services

and costs and any remaining balance shall be billed to Unit Owner or deducted from Unit Owner's Payment.

Any replacement Furnishings and Supplies added to the Unit (and paid from the Reserve, from deductions to Unit Owner's Payment or from funds provided by Unit Owner) shall be the property of Unit Owner. All amounts in the Reserve shall be the property of Unit Owner and, subject to Section 11(e) herein, any amounts remaining in the Reserve shall be delivered to Unit Owner at the later to occur of the expiration of the Term or the final Renewal Term, or upon the earlier termination of this Agreement. All proceeds (if any) from the sale of any replaced or obsolete Furnishings and Supplies within the Unit shall be deposited into the Reserve.

(c) **Personal Storage.** Unit Owner shall not store private property in the Unit other than in a locked Unit Owner's closet specifically designated for that purpose. The Hotel Owner Parties shall not be responsible for any private property left in the Unit. Unit Owner hereby grants Hotel Owner access to the interior of the Unit Owner's closet and shall provide Hotel Owner with a copy of the key to the Unit Owner's closet. Hotel Owner shall be entitled to access the Unit Owner's closet in its sole discretion to remove and discard any contents that are considered by Hotel Owner as a health or safety hazard or which interfere with the maintenance of the Standards.

(d) **Failure to Comply with Standards.** Unit Owner acknowledges and agrees that the failure of the Unit or any Furnishings and Supplies therein to be in compliance with the Standards at any time during the Term shall be a default by Unit Owner under this Agreement entitling Hotel Owner (in addition to any and all other remedies available to it) to immediately suspend the rental of the Unit and the provision of other services under this Agreement until such time as the default is cured by Unit Owner to Hotel Owner's satisfaction, and if the same is not so cured within thirty (30) days of written notice to Unit Owner, to terminate this Agreement.

10. **Unit Owner Occupancy.**

(a)    **General.**   Occupancy of a Unit shall be afforded to Unit Owner in accordance with the provisions of this Section 10. Unit Owner shall be entitled to the Basic Owner Occupancy and Additional Owner Occupancy as described in this Agreement.   Notwithstanding anything to the contrary contained in this Agreement, neither Unit Owner nor its guests (in either instance, an "Owner Occupant") may use, occupy or enter the Unit for any period of time without a confirmed reservation obtained in accordance with this Section 10 (the duration of such reservation period being an "Owner Occupancy Period" and the use of such Unit by an Owner Occupant being referred to as "Owner Occupancy").  In no event shall Unit Owner accept payment or other consideration for the use of the Unit during an Owner Occupancy Period.

(b)    **Reservation Policy.**   If Unit Owner desires to schedule an Owner Occupancy Period in the Unit, Unit Owner shall submit a reservation request to the Unit Owner Reservations Department at the Hotel, by a dedicated Unit Owner's reservation telephone number for this purpose. All Owner Occupancy Period reservation requests received from Unit Owner through such Unit Owner's reservation number will be free of any reservation charges.  Reservations for an Owner Occupancy Period should be made at least forty five (45) days in advance, with the exception of reservations for Peak Season Usage, as to which reservations should be made at least ninety (90) days in advance, and Prime Peak Season Usage, as to which reservations should be made at least one (1) year in advance.  Provided that Unit Owner is in compliance with the material terms of this Agreement, reservations for Owner Occupancy Periods shall be accepted by Hotel Owner subject to prior confirmed reservation of the Unit, subject to "Blackout Periods" (as defined below) announced prior to such requests, and absent extraordinary circumstances preventing Hotel Owner from accepting such reservation. All other requests for reservations for Owner Occupancy Periods made outside of the time frames outlined (including those requests made on notice that is less than the time frames outlined hereinabove) will also be accepted by Hotel Owner subject to prior confirmed reservations of the Unit.   Unit Owner acknowledges that there is no guarantee that the Unit will be available for a requested Owner Occupancy Period regardless of when the Owner Occupancy reservation request is made.

(c)    **Basic Owner Occupancy**.  Unit Owner shall have the following Owner Occupancy with respect to the Unit:  a total of sixty (60) days of annual usage in any calendar year, of which no more than thirty (30) days may be consecutively, and no more than fourteen (14) days thereof may be Peak Season Usage or Prime Peak Season Usage ("Basic Owner Occupancy").

For the purpose of this Agreement:

"**Prime Peak Season Usage**" shall refer to a period of Owner Occupancy that includes any of the following: Christmas Eve or Christmas Day, New Year's Eve or New Year's Day, President's Day, or Easter Sunday ("Prime Peak Season").  Owner Occupancy of less than seven (7) days that includes any such date shall be deemed to be seven (7) days of Owner Occupancy Prime Peak Season Usage for the purpose of computing Unit Owner's remaining Base Unit Owner Occupancy.

"**Peak Season Usage**" shall refer to a period of Owner Occupancy that includes any day between November 15 of each year and April 30 of the following year ("Peak Season").  Owner Occupancy during Peak Season shall be for a period of not less than seven (7) days.

"**Blackout Periods**" shall refer to periods designated as such by Hotel Operator, or, if no Hotel Operator exists, by Hotel Owner, during which Unit Owner may be prohibited from making a reservation for Owner Occupancy that would occur during such Blackout Periods.  Blackout Periods will be announced on or before November 30 of each year for the following year's Blackout Periods.

(d)    **Housekeeping; Other Services**.  During any Owner Occupancy Period, Unit Owner may request daily housekeeping services for the Unit at such rates as are determined by Hotel Owner from time to time ("Owner Occupancy Daily Housekeeping").  An Owner Occupant may use any other service or amenity provided by Hotel Owner to a Unit or otherwise provided at the Hotel or Condominium, including (without limitation) mini bar, internet, telephone, business center, food and beverage and/or room service (the foregoing along with Owner Occupancy Daily Housekeeping

are hereinafter referred to as the "Hotel Services") during an Owner Occupancy Period. Hotel Owner shall provide such Hotel Services at such rates and on other terms as are determined by Hotel Owner from time to time. Owner Occupant shall pay for all the foregoing Hotel Services at the time of check-out, and if not then paid the same shall be the obligation of the Unit Owner. At the election of Hotel Owner, delivery of Hotel Services to Owner Occupants may be subject to the Unit Owner's execution of a separate hotel services agreement confirming Unit Owner's agreement to pay for such services.

(e)    **Departure Cleaning Charge.**  At the end of each Owner Occupancy Period, Unit Owner shall pay a departure cleaning charge when the Unit is returned to Hotel Owner for rental pursuant to this Agreement ("Departure Cleaning Charge"). The amount of the Departure Cleaning Charge shall be determined by Hotel Owner in its discretion after the end of each Owner Occupancy Period. The Departure Cleaning Charge is intended to cover the costs incurred by Hotel Owner to clean, supply and prepare the Unit (and all Furnishings and Supplies therein, including any additional cleaning required due to Owner Occupant or its guests permitting smoking or due to the presence of pets in the Unit) for rental under the Rental Program in accordance with the Standards, and to replace and repair any all Furnishings and Supplies in the Unit to the Standards. The Departure Cleaning Charge shall be collected at check-out from Unit Owner.

(f)    **Additional Owner Occupancy.**  In addition to Basic Owner Occupancy, Unit Owner may, subject to the reservation policy set forth in subsection (b) of this Section 10, reserve a Unit for such additional Owner Occupancy as it chooses, including, without limitation, Prime Peak Season Usage and Peak Season Usage, provided that Unit Owner pays an Additional Owner Occupancy Use Charge (as defined below) in connection with each night of such "Additional Owner Occupancy". The "Additional Owner Occupancy Use Charge" shall be a per night charge established and adjusted from time to time by Hotel Owner for each night of Additional Owner Occupancy, and the amount of same may vary depending on the time of year of such Additional Owner Occupancy.

11.   <u>Termination and Default.</u>

(a)   **Termination; Notice of Default; Right to Cure.**  A non-defaulting party shall have the right to terminate this Agreement if (i) the other party fails to pay an amount due to the non-defaulting party hereunder for a period of five (5) days after the date on which notice of such failure has been given to the defaulting party by the non-defaulting party, or (ii) the other party fails to perform, keep or fulfill any of the material covenants, obligations, or conditions set forth in this Agreement (other than a failure to pay an amount of money due hereunder, which is subject to the preceding <u>clause (i)</u>) and such failure continues for a period of thirty (30) days after receipt by the defaulting party of written notice from the non-defaulting party specifying such failure.

(b)   **Use of Unit During Unit Owner Default.**  In the event Unit Owner shall be in default hereunder, Hotel Owner may elect (in addition or as an alternative to any other remedies provided for in this Agreement) to suspend the rental of the Unit and the provision of other services under this Agreement until such time as Unit Owner has cured the default to Hotel Owner's reasonable satisfaction.

(c)   **Possible Termination upon Change in Operator.**  Unit Owner also agrees that Hotel Owner may terminate this Agreement at any time immediately upon notice to Unit Owner if any agreement for management of the Hotel terminates or otherwise expires.

(d)   **Termination upon Sale of Unit.**  This Agreement shall automatically terminate upon the sale or other conveyance or transfer of title (be it voluntary or involuntary) of the Unit from Unit Owner, unless Hotel Owner expressly waives such termination and approves an assignment of this Agreement to the subsequent Unit Owner of the Unit (a "<u>Subsequent Unit Owner</u>"). Unit Owner shall provide Hotel Owner with at least thirty (30) days prior written notice of any proposed sale or other conveyance or transfer of title of the Unit.  In the event that Hotel Owner waives such termination of this Agreement and approves the assignment of this Agreement to the Subsequent Unit Owner, then the amounts then remaining in the Reserve shall not be delivered to Unit Owner and shall be retained by the Hotel (for the benefit of the

Subsequent Unit Owner) for use with respect to the Unit in accordance with this Agreement (as assigned to such Subsequent Unit Owner).

(e)    **Post-Termination Use of Unit**.    Notwithstanding any termination of this Agreement, this Agreement shall survive and remain in full force and effect for any Unit reservations that have been confirmed prior to termination of this Agreement (subject to Hotel Owner's right to transfer any such confirmed reservation to another Rental Program unit, in its sole discretion), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy. The foregoing Unit Owner obligation shall survive termination or expiration of this Agreement.

(f)    **Final Accounting**.    Within thirty (30) days following the termination or expiration of this Agreement, Hotel Owner shall deliver to Unit Owner a final report with respect to any remaining unreported Gross Unit Revenue or payments due to or from Unit Owner, the Reserve balance and the final Unit Owner's Payment.  Hotel Owner shall be entitled to deduct from the final Unit Owner's Payment (prior to delivery of same to Unit Owner) and from any amounts remaining in the Reserve, any and all amounts otherwise due and payable to Hotel Owner pursuant to this Agreement; provided that if the foregoing amounts shall not be sufficient to pay same, Unit Owner shall pay any such difference to Hotel Owner within no more than five (5) days after Unit Owner's receipt of the foregoing final report. The foregoing shall survive termination or expiration of this Agreement.

12.    **Set-Off; Advancing Funds.**    In the event that Hotel Owner incurs any charge, fee, cost or expense with respect to the Unit pursuant to this Agreement or otherwise at the request or with the consent of Unit Owner, Hotel Owner shall have the right to deduct such expenditures from Unit Owner's Payment or other funds of Unit Owner that are available to Hotel Owner, such as the Reserve.   The foregoing shall survive termination or expiration of this Agreement.  In the event that Hotel Owner or any Hotel Operator advances funds to fulfill Unit Owner's obligations under this Agreement, the same shall be repaid to the advancing party with interest at an annual rate of interest

equal to the lesser of (a) the prime or base rate of interest quoted by Citibank, N.A. plus five percent, or (b) the highest lawful rate.

13.    **Indemnity.** The term "Hotel Owner Parties" shall include (without limitation) the Hotel Owner, any operator, manager, licensor, franchisor, contract vendee or service provider to Hotel Owner in connection with the Hotel or Rental Program, and their affiliates and successors, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents, and each and every assignee or other party who may claim to have rights in this Agreement by, through or under the Hotel Owner Parties, and such party's affiliates and successors, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents. "Liabilities" means claims, demands, civil or criminal actions, suits, proceedings, losses, damages, costs, expenses, penalties, and other liabilities (including, without limitation, all reasonable attorneys' fees, experts' fees, court costs, and other costs incurred in investigating, defending or prosecuting any litigation or proceeding), of any nature, kind or description, whether known or unknown, whether predating this Agreement or not, or whether arising out of contract, tort, strict liability, misrepresentation, or violation of applicable law. Unit Owner shall indemnify, defend, and hold the Hotel Owner Parties harmless for, from and against, any and all Liabilities directly or indirectly arising out of, caused by, in connection with, related to, or resulting from (in whole or in part) (i) any maintenance, renovation, replacement, repair, condition, rental, management or operation of the Hotel, the Unit (and all property therein) or the Rental Program, or (ii) the performance of this Agreement by Hotel Owner Parties; except to the extent such Liabilities are caused by the gross negligence, willful misconduct or fraud of Hotel Owner during the Term. The obligations of Unit Owner under this Section shall apply to Liabilities even if such Liabilities are caused in whole or in part by the sole, joint or concurrent ordinary negligence, fault or strict liability of any Hotel Owner Party, whether or not such sole or concurrent ordinary negligence, fault, or strict liability is active or passive.

Each party, including the Hotel Owner Parties, (each, a "Releasing Party") hereby releases the other, including the Hotel Owner Parties, (each, a "Released Party") from

any liability that the Released Party would, but for this Section, have had to the Releasing Party arising out of or in connection with any accident or occurrence, or casualty to the extent that proceeds are received from insurance being carried by or otherwise covering the Releasing Party, its officers, agents or employees, provided that this release will become inoperative if the provisions of this Section invalidate any insurance maintained by the Releasing Party.

The provisions of this Section shall survive any termination or expiration of this Agreement, whether by lapse of time or otherwise, and shall be binding upon the parties hereto and their respective heirs, successors and assigns.

14.    **Miscellaneous.**

    (a)    **Force Majeure.**  None of the Hotel Owner Parties shall be liable for, nor shall they be deemed to be in default of their obligations under this Agreement due to, any delay or other inability to perform this Agreement attributable to a force majeure event, including, without limitation fire, earthquake, storm or other casualty; performance of capital improvements adversely affecting the Unit, a material portion of the income-generating areas of the Hotel or any other area material to the operation of the Hotel; strikes, lockouts, or other labor interruptions; war, rebellion, riots, acts of terrorism, or other civil unrest; acts of God or of any government; disruption to local, national or international transport services; epidemics, quarantine or any other public health restrictions or public health advisories; or any other event beyond the parties' reasonable control.

    (b)    **Modification and Changes.**  This Agreement cannot be changed or modified except by another agreement in writing signed by Hotel Owner and Unit Owner.

    (c)    **Understandings and Agreements.**  This agreement constitutes all of the understandings and agreements of whatsoever nature or kind existing between the parties with respect to the subject matter hereof.  This agreement supersedes all prior, whether oral or written, agreements between the parties.

(d)    **Headings and Section References**. The article and paragraph headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement. All references in this Agreement to Sections or subsections shall, unless otherwise noted, refer to the Sections or subsections of this Agreement.

(e)    **Cost of Enforcement**. Except as otherwise provided in this Agreement, in any proceeding to enforce this Agreement, to collect damages, or to collect any indemnity provided for herein, the prevailing party shall also be entitled to collect all its costs in such action, including the costs of investigation, settlement, expert witnesses and reasonable attorneys' fees, together with all additional costs incurred in enforcing or collecting any judgment rendered. The foregoing shall survive termination or expiration of this Agreement.

(f)    **Arbitration**. Notwithstanding anything to the contrary in this Agreement, all claims for monetary damages and disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be resolved by final and binding arbitration, before a single arbitrator, under the commercial arbitration rules of the American Arbitration Association in Collier County, Florida. The arbitrator shall be selected by the parties pursuant to the standards set forth in the next sentence of this paragraph, and if the parties are unable to reach agreement on selection of the arbitrator within ten (10) days after the notice of arbitration is served, then the arbitrator will be selected by the American Arbitration Association. The Arbitrator shall be a person working for a nationally recognized hospitality industry consulting or accounting firm, and shall have not less than ten (10) years' experience in the area of expertise on which the dispute is based (*e.g.*, with respect to operational matters, experience in the management of hotels of generally the same class and category as the Hotel, as a consultant or otherwise, or, with respect to financial matters, experience in the financial or economic evaluation or appraisal of such first-class hotels as a consultant or otherwise); provided that either party may elect the use of a commercial arbitrator in lieu of the foregoing hospitality industry arbitration, in which event the Arbitrator shall be an American Arbitration Association qualified commercial arbitrator having at least five (5)

years' experience in the hospitality industry. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than sixty (60) days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or court proceeding that may arise, and shall not otherwise be disclosed. No arbitrator shall have authority to award any punitive, exemplary, statutory or treble damages or to vary or ignore the terms of this Agreement, and shall be bound by controlling law and the terms of this Agreement. The arbitrator shall NOT have subject matter jurisdiction to decide any issues relating to the statute of limitations or to any request for injunctive relief, and the parties hereby stipulate to stay the arbitration proceeding (without the need of a bond) until any such issues in dispute are resolved. Judgment upon the award rendered by the arbitrator shall be final, binding and conclusive upon the parties and their respective administrators, personal representatives, legal representatives, heirs, successors and permitted assigns, and may be entered in any court of competent jurisdiction. The non-prevailing party in an arbitration proceeding shall pay for all reasonable fees, costs and expenses (including reasonable attorney's fees and expenses) of the other party incurred in connection with the dispute resolution process, along with all arbitrator's and arbitration fees, costs and expenses. This subsection shall survive termination or expiration of this Agreement.

(g)     **Governing Law, Jurisdiction and Venue.**   This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without regard to principles of conflicts of laws.   The parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Collier County, Florida. Subject to the subsection (f) above, any permitted civil action, arbitration or legal proceeding with respect to this Agreement shall be brought only in the courts of record of the State of Florida in Collier County or the United States

District Court, Middle District of Florida. Each party consents to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court. Service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules. The foregoing shall survive termination or expiration of this Agreement.

(h)     **Third Parties**. The provisions of this Agreement are solely for the benefit of the parties hereto and the Hotel Owner Parties, and nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies under or by reason of this Agreement. The foregoing shall survive termination or expiration of this Agreement.

(i)     **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be considered an original for all purposes.

(j)     **Successors and Assigns**. The rights and obligations of Hotel Owner may be assigned or delegated pursuant to Section 3 of this Agreement. The rights and obligations of Unit Owner under this Agreement may not be assigned without the prior written consent of Hotel Owner (which may be granted or withheld in Hotel Owner's sole discretion). The terms, provisions, covenants, agreements, and obligations of this Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assigns of the parties hereto.

(k)     **Invalid Provisions**. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never been a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

(l)   **No Waiver.** No failure of any party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder shall constitute a waiver of any party's right to demand strict compliance with the terms of this Agreement unless otherwise specifically provided in this Agreement.

(m)   **Notices.**   Whenever any notice, demand, or request is required or permitted under this Agreement, such notice, demand, or request shall be made in writing and shall be given by personal delivery, or sent via overnight delivery service, prepaid courier or facsimile, or deposited in the U.S. mail, registered or certified, return receipt requested, airmail postage prepaid.  Any notice, demand, or request that is served upon any party shall be deemed sufficiently given to, and received by, such party for all purposes under this Agreement, (i) if sent via overnight delivery service, courier or personal delivery, at the time such notice, demand or request is personally delivered, to the address specified by the party to receive such notice, (ii) if sent via U.S. mail, registered or certified, return receipt requested, airmail postage prepaid, five (5) days from the date so deposited in the mail, or (iii) if sent via facsimile, at the time of confirmed receipt by such party.  The notification addresses of the parties are specified on the signature page of this Agreement.  Each party may change its address on at least ten (10) days' prior written notice to the other party.  For purposes of this Agreement, statements, invoices and other correspondence from Hotel Owner relating to the Unit shall not constitute a notice, demand or request and shall be deemed to be sufficiently given to Unit Owner if sent by regular U.S. mail.

(n)   **Radon Gas.** In accordance with the requirements of Florida Statutes Section 404.056(5), the following notice is given:

RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME.  LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA.  ADDITIONAL INFORMATION REGARDING

RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY HEALTH DEPARTMENT.

(o)    **Cumulative Remedies.** Except as otherwise provided in this Agreement (including, without limitation, in subsection (o) below) or otherwise set forth in subsection (f) above, the remedies provided in this Agreement are cumulative and not exclusive of the remedies provided by law or in equity. The foregoing shall survive termination or expiration of this Agreement.

(p)    **LIMITATION ON REMEDIES. ANYTHING IN THIS AGREEMENT AND ANYTHING AT LAW OR IN EQUITY TO THE CONTRARY NOTWITHSTANDING, IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES (INCLUDING, WITHOUT LIMITATION, ANY ARBITRATION PROCEEDING) ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT OR IN ANY MANNER PERTAINING TO THE HOTEL, THE UNIT, THE RENTAL PROGRAM, ANY CLAIMED BREACH OF FIDUCIARY DUTIES OR TO THE RELATIONSHIP OF THE PARTIES HEREUNDER, EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY (I) AGREES THAT EACH PARTY WILL ONLY CLAIM AND BE ENTITLED TO RECEIVE FROM THE OTHER PARTY HERETO HIS OR HER ACTUAL DAMAGES, AND (II) WAIVES AND RELEASES ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY HERETO ANY PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES, OR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY LOST PROFITS OR EARNINGS), EACH PARTY ACKNOWLEDGING AND AGREEING THAT THE REMEDIES HEREIN PROVIDED, AND OTHER REMEDIES AT LAW AND IN EQUITY, WILL IN ALL CIRCUMSTANCES BE ADEQUATE. THIS SUBSECTION SHALL SURVIVE TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

(q)    **Effective Date of Agreement.** Notwithstanding the date in which this Agreement is executed, this Agreement shall not become effective until and unless Unit Owner shall have closed on the purchase of the Unit as evidenced by delivery of the deed therefor to the Unit Owner.

**IN WITNESS WHEREOF,** the parties hereto have executed or caused to be executed this Agreement, all as of the day and year first above written.

**HOTEL OWNER:**

Address:                                      BASIL STREET PARTNERS, LLC

_____              a Delaware limited liability company

_____              By: _____

_____              Name: _____

Attention: _____             Title: _____

Facsimile No.: _____


Address:                                      **UNIT OWNER:**

_____              _____

_____              Name: _____

_____

Attention: _____             _____

Facsimile No.: _____             Name: _____

Telephone No.: _____

Soc Sec or Tax I.D. No.: _____

## SCHEDULE A

## SMOKING DESIGNATION

* Smoking [shall] [shall not] be permitted in the Unit.

Unit Owner acknowledges that an election to prohibit smoking in a Unit shall not impose an obligation on Hotel Owner to prevent either smoking or pets within the Unit, it being acknowledged that Hotel Owner will make reasonable efforts to require compliance with this election but that compliance with such restrictions cannot generally be assured.

EXHIBIT "5"

## NBR Year by year comparison

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $43,694.54 | $43,991.26 | $57,628.71 | $60,717.15 | $63,163.82 | $57,389.52 | $68,935.49 | $68,417.93 | $67,888.08 |
| Expense Deduction | $16,222.54 | | $20,893.40 | | | $31,311.81 | $26,667.56 | $26,757.99 | $26,832.55 |
| Administration Fee | $4,273.84 | | $8,505.37 | | | $11,477.87 | $13,285.99 | $13,683.60 | $13,577.80 |
| Management Fee | $2,101.20 | | $2,787.26 | | | $1,721.69 | $2,060.07 | $2,052.55 | $2,036.65 |
| Reserve | $1,282.15 | | $1,729.86 | | | $2,869.47 | $3,446.79 | $3,420.91 | $5,569.32 |
| Total | $23,882.73 | $27,928.15 | $31,920.89 | $34,984.97 | $36,003.38 | $47,280.84 | $45,969.41 | $45,915.05 | $48,016.32 |
| Insurance | $2,391.00 | $1,107.00 | $1,148.00 | $1,658.00 | $3,680.96 | $2,084.00 | $2,084.00 | $1,962.37 | $4,764.05 |
| Property Tax | $4,005.00 | $4,030.53 | $2,748.00 | $2,505.67 | $2,744.81 | $2,956.23 | $1,339.30 | $1,084.94 | $1,086.96 |
| Utilities | $1,799.00 | $2,603.79 | $2,595.00 | $1,933.00 | $2,064.16 | $2,129.41 | $2,146.43 | $1,957.33 | $2,188.55 |
| QTR Dues | $22,803.68 | $26,944.22 | $22,859.00 | $25,270.33 | $25,831.24 | $28,909.64 | $28,139.20 | $29,593.33 | $32,776.13 |
| Total | $30,998.68 | $34,895.54 | $29,350.00 | $31,367.00 | $34,341.17 | $36,079.28 | $33,708.93 | $33,592.97 | $40,815.69 |
| Total Expenses | $54,881.41 | $62,013.69 | $61,270.89 | $66,351.97 | $70,344.55 | $83,360.12 | $79,678.34 | $80,499.02 | $88,832.01 |
| Net | -$11,186.87 | -$18,022.43 | -$3,642.18 | -$5,634.82 | -$7,180.73 | -$25,970.60 | -$10,742.85 | -$12,081.09 | -$20,943.93 |

**EXHIBIT B**

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.                             CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
GULFWATER INVESTMENTS LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.
_____/

## AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY, INJUNCTIVE AND SUPPLEMENTAL RELIEF

AND NOW, October 4, 2020, Plaintiff JAMES RICHARDS ("Richards")

sues Defendants and alleges:

## Parties

**Plaintiff**

1.    Plaintiff Richards is *sui juris*, a unit owner within the Naples Bay Resort West Parcel ("NBR West Parcel") as that property is described within a Master Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel" ("Master Declaration – West Parcel") recorded at Official Records Book 4121, Pages 3092 - 3181 of the Collier County Public Records, Collier County, Florida.

2.    By virtue of said ownership, Richards is also a member of the Naples Bay Resort West Parcel Property Owners Association, Inc. ("NBR West Parcel Association"), a Florida not-for-profit corporation organized and existing under the provisions of Chapter 617, Florida Statutes, as well as a member of the Naples Bay Resort Hotel Condominium Association, Inc. ("NBR Condominium Association"), a condominium association charged with all duties and responsibilities of condominium associations pursuant to Chapter 718, Florida Statutes, with respect to the Naples Bay Resort Hotel Condominium.

3. Plaintiff brings this action on behalf of himself and for the benefit of the independent unit owners ("IUOs") within the Naples Bay Resort -- West Parcel.

**Defendants**

4.    Defendant NAPLES BAY RESORT HOLDINGS, LLC ("NBR Holdings") is an administratively dissolved Florida limited liability company, with a last known address c/o Summit Management Group of Florida, LLC, 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. NBR Holdings was the Manager

Member of Basil Street Partners, LLC, original Developer of the Naples Bay Resort (the "Resort") and all its component parts.

5.     Defendant NAPLES BAY PROPERTIES, LLC ("NB Properties") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. NB Properties purports to be the operator of the Resort Rental Management Program ("Rental Program"). Its principals include Individual Defendants Thomas MacIvor ("MacIvor") and Fred Pezeshkan ("Pezeshkan") and its Manager Member is Defendant Naples Bay Resort Investment Company, LLC ("NB Investment"). NB Properties is believed to be owner of the underlying Resort property, and is the Commercial Component Owner ("CCO") including Hotel, shared facilities, restaurant, commercial spaces, meeting rooms, etc.

6.     Defendant NBR MANAGER, LLC ("NBR Manager") is an administratively dissolved Florida limited liability company, with a last known address c/o Summit Management Group of Florida, LLC, 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals were Defendants Pezeshkan, I.J. Zand ("Zand") and MacIvor.

7.     Defendant NAPLES BAY RESORT INVESTMENT COMPANY, LLC ("NBR Investment") is a limited liability company, state of organization unknown, but which is listed as Managing Member of Defendants NB Properties, Sojourn Hospitality LLC and Knightsbridge Partners of Naples, LLC, with an address at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

8.     Defendant KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,

3

("Knightsbridge Partners") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals are Defendants NB Investment, MacIvor and Pezeshkan. It is believed Knightsbridge Partners, among other things, owns the "Club."

9.      Defendant SOJOURN HOSPITALITY GROUP LLC ("Sojourn Hospitality") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals are Defendant NB Investment, MacIvor and Pezeshkan. Sojourn Hospitality is believed to operate the rental program for the Resort.

10.      Defendant SUMMIT MANAGEMENT GROUP OF FLORIDA, LLC ("Summit Management") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.  Its principals Defendants Pezeshkan, Zand and MacIvor. Summit Management is believed to be the overall manager of the Naples Bay Resort.

11.      Defendant GULFWATER INVESTMENTS LLC ("Gulfwater"), is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.  It is reportedly the owner of 47 IOUs in the Naples Bay West Parcel. Its principals are PZ, LLC [Alexander Pezeshkan and MacIvor], Sanibel Investments Enterprises, LLC [MacIvor, Zand and Defendant Raymond Sehayek ("Sehayek"] and European Investments Enterprises, LLC [Zand, MacIvor and Sehayek].

12.      Defendant THE CLUB AT NAPLES BAY RESORT, LLC ("NB Club") is a Florida limited liability company, with its principal place of business at

4

1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

13.     Defendant THE RESTAURANT AT NAPLES BAY RESORT LLC ("NB Restaurant") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

14.     Defendant THE SHOPPES AT NAPLES BAY RESORT, LLC ("NB Shoppes"), is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

15.     Defendant FRED PEZESHKAN ("Pezeshkan") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

16.     Defendant THOMAS MACIVOR ("MacIvor") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

17.     Defendant IRA J. ZAND ("Zand") is *sui juris*, whose residence a address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

18.     Defendant RAYMOND SEHAYEK ("Sehayek") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

### Jurisdiction and Venue

19.     This is an action for damages in excess of the jurisdictional limits of the Court and for declaratory judgment, injunctive and supplemental relief that

the Court is authorized to grant pursuant to Sections 86.011 and 86.061, Florida Statutes (2019).

20.     It is expressly stated that *all causes of action and claims for damages set forth in the within Amended Complaint arose subsequent to* the Antaramian Properties LLC Chapter 11 Bankruptcy Case No, 9:14-10445-FMD ("Antaramian Petition") and the April 1, 2015 Confirmation Order ("Order") in that case. More specifically, Plaintiff's claims herein are wholly *unrelated* to any issues or aspects or the Debtors in the Antaramian Petition.

21.     Venue is proper as the claims sued upon all arose in Collier County, Florida and the Defendant business entities and individual defendants reside in and/or conduct business in Collier County, Florida.

22.     All conditions precedent and necessary to the bringing of this action have either been performed, have occurred, have been waived, or have otherwise been excused.

### General Allegations

### Naples Bay Resort and its West Parcel

23.     The Naples Bay Resort (the "Resort") is a mixed use and facilities development established pursuant to a Master Declaration on September 18, 2006 by its Developer, BASIL STREET PARTNERS, LLC, a Delaware limited liability company ("Basil Street" or "Developer"), by NBR Holdings, its sole member and NBR Manager, as its Manager. The Resort consists of many "components" including, *inter alia*, a hotel, multiple buildings containing hotel

6

condominium units, commercial-retail space, meeting rooms, residences, club and a marina.

24.     Basil Street filed for bankruptcy in or about 2013 – shortly after it established the Resort and particularly the West Parcel condominium where Richards' hotel condominium unit ("unit") is located -- and which bankruptcy administration was concluded in or about December 2015. Its authority as a LLC was "Revoked for Annual Report on September 27, 2013."

25.     As stated, Richards' unit is located in Building 3 of the West Parcel which is specifically governed by the Master Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel ("Master Declaration – West Parcel"), Bylaws and Articles of Incorporation (collectively "condo documents") whose provisions apply to Richards, all IUOs and the Successor(s) to the Developer.  The relevant provisions of Chapter 718, Florida Statutes (2018) aka the Florida Condominium Act ("Florida Condominium Act") also apply to Richards, all IUOs and to the Successor to the Developer. The Master Declaration -- West Parcel is recorded in the Official Records of Collier County in OR: 4121 at Pg: 3092, et seq.[1] and its provisions are incorporated herein by reference.

26.     The NBR West Parcel is comprised of 85 units/suites which are separately owned by Richards and other IUOs  who, in turn, are members of the Hotel at Naples Bay Resort Condominium Association, Inc. ("Hotel Condo Association").

---

[1] The Master Declaration is voluminous and as such is not appended hereto. However, it is incorporated by reference and the Court can take judicial notice of its content.

27.    The Developer marketed the Resort and the individual hotel condominium units as a prospective good financial investment. The marketing expressly represented that the IUOs had the option of participating in the Resort's rental program or renting their units themselves – with no penalty for opting out.

28.    The IUOs purchased their individual hotel condominium units based upon a sound financial investment and anticipating a reasonable flow of income as a return on their investment.

29.    NBR Holdings had as its principal, Managing Member Defendant NBR Manager. NBR Holdings had its authority "Revoked for Annual Report" on September 22, 2017."

30.    NBR Manager had as its principals, Defendants Pezeshkan, Zand and MacIvor. NBR Manager had its authority "Revoked for Annual Report" likewise on September 22, 2017.

31.    The Master Declaration -- West Parcel, where Richards' Unit is located, provides in its "Background" Section as follows:

"C.    In order to (i) ensure that such general plan of development is adhered to; (ii) establish certain continuing relationships in the form of *mutual rights and obligations between Developer and the persons who acquire ownership* in Naples Bay Resort West Parcel, ***and their respective successors***; (iii) ensure that the provisions of applicable resolutions are adhered to; and (iv) ***protect, preserve, enhance the value of the property*** within the Naples Bay Resort West Parcel, Developer has determined that this Declaration, establishing certain easements, servitudes, restrictions, reservations, and conditions in the form of covenants running with the land *shall be binding upon, enforceable against and inure to the benefit of all present and future owners* of property developed within Naples Bay Resort West Parcel and shall run with title to the land hereby and hereafter subjected to it…" [Emphasis added]

32.    Upon information and belief, following the bankruptcy proceedings

of Basil Street, the principals and members of that now defunct entity reacquired

control over the NBR West Parcel through their participation and ownership in

one or more of the legal business entities ("LLCs" or "entities") identified above.

33.    The Master Declaration – West Parcel in Article I, Section 1 (l)

provides,

> "'Developer' means Basil Street Partners, LLC, a Delaware limited
> liability company, ("BSP" or "Developer"), as aforesaid, and its
> **successors and assigns who acquire title to any portion of Naples
> Bay Resort West Parcel** for the purpose of development so long as
> BSP assigns its rights hereunder to such persons by express
> assignment or by operation of law." [Emphasis added]

34.    Richards is informed, believes and alleges that NB Properties, NBR

Investment, Knightsbridge Partners, Sojourn Hospitality, Summit Management

and Gulfwater are all successors to Basil Street in one aspect of the

development or another in terms of function and are therefore bound by the

provisions of the Master Declaration – West Parcel and condo documents as a

whole as Successors to the Developer.

35.    Richards is informed, believes and therefore alleges the individual

Defendants, Pezeshken, MacIvor, and Zand, as principals of the Basil Street,

original Developer, engineered a take-over of successor ownership from Basil

Street after its bankruptcy through a created maze of LLC entities – more

appropriately characterized as "fronts" -- noted in Paragraph 33 above. As such

they are likewise individual successors to the Developer.

36.    Richards believes and therefore alleges that the Defendant

entities, NB Properties, NBR Investment, Knightsbridge Partners, Sojourn Hospitality, Summit Management and Gulfwater are all owned and/or controlled by – whether individually or through other named LLC entities ("fronts") -- which are *actually* the alter egos of Pezeshkan, MacIvor and Zand.

37.     NB Properties is believed to be the principal controlling entity of the Resort and is referred to as commercial component owner ("CCO") in the condo documents. NBR Investment, Knightsbridge Partners, Gulfwater, Sojourn Hospitality and Summit Management control specific functions in the Resort.

38.     There are at least 17 LLCs constituting the "maze" of interrelated and interlocking business entities as "fronts" for the core of individual Defendants herein.

## Pattern of the Abusive Actions and Improper Charges[2]

39.     The CCO as principal successor to the Developer, in conjunction and conspiracy with the other LLC entities, and controlled by the individual Defendants -- has engaged in a long term, continuing pattern of abusive actions designed and intended to oppress the IUOs, including Richards, by imposing unilateral, excessive and improper charges, whether they are in the Resort's Rental Program or have opted-out.  These may be, *inter alia*, identified as:

A.  Arbitrary and excessive charges (with no rational bearing to the CCO's tasks for a guest rental) threatened to be levied on IUO's who opt-out of the Rental Management Program, charging a daily rental fee payable the CCO of $250.00 – effectively making it impossible for Non-Rental Program IUOs to net any income, let alone cover their expenses, from their rentals;

---

[2] These are not all inclusive.

B.  Levying a grossly excessive daily "administrative charge" over and above the $250 fee – arbitrarily increased from 10% to 20% -- which is further reduces the IUOs' ability to net any income from rentals of their units;

C.  Requiring IUOs to pay an excessive "Club dues" to NB Resort for guests to use the pool and spa (owned by an LLC entity) which approximates $4,000.00 per year – this being  over and above the $39/per day "resort fee" that the CCO charges the guest for use of the same facilities. The IUOs bear all the expense of the "Club" but receive no share of the income or set off of expenses from the guest fees;

D.  Requiring anyone purchasing a condominium to pay an initial $40,000.00 as a "Club Fee", which makes it effectively impossible for IUOs to sell their units at anywhere near a fair value for the investment;

E.  In sum, requiring a collage of fees to include:

- West Condo Association
- NB Resort for Club Dues (doubled since inception)
- NB Properties for a "Hotel Services Fund",
- NB Properties for Buildings 1, 2 and 3 which includes the hotel lobby, commercial spaces and meeting rooms
- West Parcel Master Property Owners Association, Inc. (controlled exclusively by the CCO) which includes the commercial units and residences for landscaping, hotel garages and fountain/turn-around at hotel front.

11

F.      In all the foregoing instances, the IUOs effectively pay the CCO's expenses without deriving any financial benefit from the income generated from the meeting rooms and commercial space;

G.  Levying of excessive dues based on forecasted budget, without IUO access to actual year end numbers to validate the propriety of the dues.

40.      Recently, the CCO has informed Richards and the IUOs that their fees would be increased to cover [supposed] restaurant losses from the corona virus Pandemic when the IUOs have no ownership interest therein, nor do they get any income from its operations.

41.      Recently, the CCO similarly informed Richards and the other IUOs that it was "suspending" distributions of their rightfully due rental income to cover its losses from the Pandemic.

42.      The Resort's standard rental management agreement ("RMA") was rolled over from original developer after the bankruptcy proceeding.

A.      The Property Owners Association and Hotel Condominium Association informally challenged whether the CCO had the right to own and operate the rental management company as it was not transferable.  Hotel Condominium Association Board Members specifically challenged the CCO's right to own and operate the rental management program in 2016.

B.      The CCO threatened the Board Members and the Hotel Condominium Association's manager with claims of slander and defamation, both personally and as Board Members.  Due to the CCO's threat, the challenge was withdrawn.

12

43.     The CCO has engaged in retaliatory tactics against IUOs --
specifically Richards and another IUO, Russ Reed – by terminating their
inclusion in the Rental Management Program – for challenging and criticizing the
CCO. A true copy of the notice is attached hereto as Exhibit "1" and incorporated
by reference.

44.     The CCO has refused to be transparent in disclosing its actual
expenses and disbursements, as well as the inter-LLC transactions and expense
allocations, upon which the many aforesaid charges are based.

45.     Upon information and belief, the CCO and other successor-
developer entities are charging excessive expenses in non-arms length
transactions.

46.     In the one instance where the CCO permitted the IUOs' accountant
to have limited access to the books and records of the CCO, the CCO, through
its Sojourn Hospitality, retaliated 2 years thereafter by invoicing the IUOs
$39,125 for its staff to assist the accountant. A true copy is attached hereto as
Exhibit "2" and incorporated by reference.

47.     Recently, the successor Developer, through its Gulfwater entity,
purchased 47 hotel condominium units (at distressed prices) to obtain a majority
ownership in units and summarily recalled all the duly elected directors by the
IUOs and installed their own minions. A true copy is attached hereto as Exhibit
"3" and incorporated by reference.

## COUNT I
### Declaratory, Injunctive and Supplemental Relief

48.     Plaintiff re-alleges paragraphs 1 – 47 as though fully set forth herein at length.

49.     This is an action for declaratory, injunctive and supplemental relief.

50.     A case of actual controversy exists as Plaintiff and the IUOs require a declaration of their rights and an injunction against the CCO's abusive actions and improper charges as comprehensively detailed in paragraphs 38-43 above.

51.     The CCO and other of the Defendants contend that its actions and charges are authorized by the Master Declaration – West Parcel and other condo documents, including the Mast Declaration for the Resort, referenced above, while Plaintiff Richards and other IUOs contend that it does not but rather that said actions and charges expressly violate the foregoing enabling documents and the RMA.  A copy of the RMA is attached as Exhibit "4" and incorporated by reference.

52.     The general tenor, as well as specific provisions of the Master Declaration – West Parcel are *unconscionable as outrageously one-sided* to the point they permit the CCO and other Defendant Successor LLC entities to illegally gouge Richards and the other IUOs, examples of which include, *inter alia*, the following:

A.  Article I, Section I (a) "Shared Expenses"

"…and the costs of any other expenses incurred by, the Association **for any reason whatsoever** in connection with any Component, the Shared Facilities or the Marina for the benefit of all of the Owners."

B.  Article VIII, Section 3 "Powers of the Association, Relating to Components and Sub-Associations"

"The Association shall have the power, but not the obligation, **to veto**

14

*any action taken*, or contemplated to be taken by any Sub-Association which the Board reasonably determines to be adverse…"

C.   Article XIII, Section 16 "Administrative Charge"

"…each Hotel Unit Owner…by acceptance of a deed or other conveyance of a Charged Unit, shall be deemed to agree to pay a daily "Administrative Charge", which may be imposed, and paid to the Commercial Component Owner as part of the operation of the Hotel Condominium…any time a Charged Unit is occupied by persons who are not deemed to be Permitted Occupants…*with respect to the administration expenses associated with such occupant's charging privileges with the Commercial Component Owner and other Administrative Charge shall be in such amount as determined from time to time by the Commercial Component Owner, **in its sole and absolute discretion**…*" [Emphasis added above]

53.     In the Declaration of Buildings 1, 2 and 3 of the West Parcel

[Richards' Unit is in Building 3], the following, *inter alia*,

Section 4.7 Reallocations.

"…the *Commercial Component Owner may **unilaterally change*** the nature, scope, extent and type of services and ***the manner and percentage of allocating the costs and expenses*** if, in its good faith judgment, the nature and types of services and cost change as needs and demand changes and the manner or percentage by which such costs and expenses are shared has become inequitable based on such criteria. *So long as the Commercial Component owner acts in good faith, uses objective criteria in making such relocations, and **without taking advantage of any conflict of interest, its decision may not be questioned**. **The Commercial Component owner may unilaterally amend** this Declaration for that purpose.*" [Emphasis added]

54.     The overall provisions of the foregoing documents are

unconscionable,  unreasonable and unfair to Richards and the other IUOs *per se*,

and the CCO and other numerous LLC entities' application and interpretation of

the provisions has exacerbated the actions to nothing short of arbitrary,

unreasonable and outrageous.

55.     Plaintiff is entitled to declaratory relief because,

A.     There is a bona fide, actual, present practical need for the declaration;

B.     The declaration sought deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts;

C.     Plaintiff's right as the complaining party is dependent upon the facts or the law applicable to the facts;

D.     The CCO has, or reasonably may have, an actual, present, adverse and antagonistic interests in the subject matter, either in fact or law;

E.     The antagonistic and adverse interests are all before the Court by proper process and the relief sought by Plaintiff is not merely giving of legal advice by the Court or the answer to questions propounded from curiosity.

56.     Plaintiff Richards has retained the undersigned counsel to prosecute this action on behalf of himself and other IUOs and has agreed to pay him a reasonable fee for his services.  CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes, the Master Declaration and/or the RMA.

WHEREFORE, Plaintiff JAMES RICHARDS on his behalf and on behalf of the IUOs prays that the Court will grant declaratory, injunctive and supplemental relief as may be appropriate under the circumstances of this case against the

above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT II
### Declaratory, Injunctive and Supplemental Relief

57.    Plaintiff re-alleges 1 – 47 as though fully set forth herein at length.

58.    This is an action for declaratory, injunctive and supplemental relief.

59.    The CCO and other Defendant LLC business entities, control, manage and are currently responsible for multiple parts and components of the Resort property, including what are defined as "Shared Facilities."

60.    The CCO has engaged specific Defendant LLC business entities to "manage" or control various components, for example Defendant Summit Management, the general management and Defendant Sojourn Hospitality being the manager of the Rental Program.

61.    The maze or web of interrelated Defendant LLC business entities, as well as the individuals that control them, limits what each is *actually* responsible for – the complexity of which is not entirely ascertainable by Richards and the other IUOs.

62.    Richards believes and alleges that the maze or web of interrelated LLCs is designed and intended to perpetrate a fraud on Richards and the other IUOs.

63.    Richards and the IUOs believe that these specified actual and/or threatened actions and charges are unconscionable, unreasonable and violate the letter and spirit of the Master Declaration – West Parcel and the RMA and

shock equity's conscience and thus entitle the Plaintiff and IUOs to an injunction, both temporary and permanent, restraining the CCO from taking such actions.

64.    There is a present, active controversy between on the one hand the Defendant CCO and other LLC business entities and on the other Richards and the other IUOs pertaining to the precise responsibilities of each of the Defendants regarding control, oversight, services provided and financial obligations which Richards and the others are required to bear.

65.    Throughout the condo documents, the CCO, as successor to the Developer is given the unlimited power to levy assessments regarding the Shared Facilities and any other costs the CCO desires to foist on to Richards and the other IUOs. On the other hand, there are only vague and limited accountability for Richards and the IUOs to verify the accuracy and propriety of such charges.

66.    For example, the Master Declaration at Article 9. "Annual Statements and Accounting, provides,

> "The Board shall cause to be prepared an annual balance sheet
> and operating statement reflecting income and expenditures of the
> Association for each fiscal year, and shall cause a copy of each
> such statement to be distributed to each member...As and when
> specified in the Bylaws, the Board shall prepare and distribute to
> the membership of the Association a written, itemized (budget) of
> the expenses to be incurred by the Association ..."

67.    The disputes herein reference are that notwithstanding persistent demands of Richards and fellow IUOs for full disclosure and inspection of the underlying documents supporting the expenditures, upon which the assessments are based and levied,  the CCO has failed and refused to allow them to fully

review and assess the important financial aspects.

68.    Such information is possessed solely by the Defendants and is part of the West Parcel Associations reporting obligations to its members, including Richards and the other IUOs, and is being wrongfully withheld from the Association and its members.

69.    More pertinently, Richards and other IUOs, are entitled to be provided  an understanding and accounting of the interrelationships and payments between them that impact financially on Richards and the other IUOs. See *Gardens Suburbs Golf & Country Club, Inc. v. Pruitt*, 24 So.2d 898 (Fla. 1946); cited with approval by the Fourth DCA in *The Resort at Singer Island Hotel Condominium Association, Inc. vs. Urgo Hotels LP,* 267 So.3d 452 (Fla. 4th DCA 2019 (closely analogous transparency case between the unit owners' association and hotel lot owner's refusal to provide supporting documentation for shared facilities assessments).

70.    Richards believes and therefore alleges that the Defendant web of LLCs is designed and intended to perpetrate a fraud on Richards and the other IUOs to gouge them on fees charged.

71.    The only occasion that the CCO allowed the IUOs' accountant to inspect financial records, such permission was a charade and the CCO withheld critical records regarding employee payroll and inter-entity payments. Moreover, the CCO then invoiced (2 years later) the IUOs for $39,125.00. A true copy is attached as Exhibit "2" and incorporated by reference.

WHEREFORE, Richard is requesting the Court to grant declaratory relief

and supplemental relief in the following manner and Order: All Defendants to provide Richards and the other IUOs with full, complete and perfect disclosure of financial and accounting records, including supporting documents and allocations regarding costs incurred for the operation, management and maintenance of the Shared Facilities upon which assessment against IUOs are based;

**COUNT III**
**Breach of Contract – Master Declaration**

72.    Plaintiff re-alleges paragraphs 1 – 47 as though fully set forth herein at length.

73.    This is an action for breach of contract.

74.    The Master Declaration for the Resort, Master Declaration – West Parcel and other cited condo documents and associations above constitute contracts between the Developer and Successors to the Developer and Richards and other IUOs.

75.    By its actions and/or threatened actions as comprehensively detailed elsewhere in this Complaint, the CCO and all other Successors to the Developer, have breached both the letter and spirit of the Master Declaration and all other condo documents.

76.    Richards believes and therefore alleges that all the foregoing LLCs are creating excessive and duplicative expenses being borne by the IUOs which effectively drains all potential income

77.    The foregoing is graphically illustrated by a spreadsheet depicting the losses sustained by Richards individually. A true copy is attached hereto as Exhibit "5" and incorporated by reference.

20

78.     The net result of the aforesaid pattern of abusive actions has been to artificially depress and devalue the fair market value of the hotel condominium units, due to exorbitant expenses, dues and other charges which eviscerate any ability for the IUOs to realize a return on their investment.

79.     Plaintiff Richards and the other IUOs have performed all of their obligations under the contracts . *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2dDCA 2006).

80.     Plaintiff and the other IUOs have suffered damages as a direct and

81.     Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services.  The CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes and the Master Declaration.

WHEREFORE, Plaintiff JAMES RICHARDS on his behalf, and on behalf of the IUOs, demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT IV
### Breach of the Implied Covenant of
### Good Faith and Fair Dealing

82.     Plaintiff re-alleges paragraphs 1 – 81 as though fully set forth herein at length.

83.     Plaintiff Richards and the other IUOs are parties to written contracts in the nature of the various condo documents, both as the Resort as a whole and those related to the West Parcel and the RMAs.

84.     The foregoing contracts are ambiguous as to the permissibility or scope of the conduct in question.

85.     The LLC Defendants which are the alter egos of the Individual Defendants who control them, through conscious and deliberate acts, fail and refuse to discharge contractual responsibilities which unfairly frustrate the contracts' purposes and disappoint Plaintiff Richards' and the other IOUs' expectations and what was represented to them when they were solicited to purchase hotel condominium units in the Resort.

86.     Moreover, by their conscious, deliberate and unreasonable acts, the Defendants, by the direction given on the part of the Individual Defendants prejudicially skew the provisions against Richards and the other IUOs such as to deprive them of any meaningful return on their investments.

87.     The foregoing breaches deprive Plaintiff Richards and the other IUOs of the contracts' benefits.

88.     Plaintiff Richards and the other IUOs suffered damages.

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf, and on behalf of the IUOs, demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of its reasonable attorney's fees and taxable costs.

**COUNT V**
**Breach of Fiduciary Duty**

89.     Plaintiff re-alleges paragraphs 1 – 88 above as though fully set forth herein.

90.     This is an action for breach of fiduciary duty.

22

91.     The Developer and all the Defendant LLC entities and Individual Defendants as successors to the Developer had a fiduciary duty to Richards and the other IUOs in their operating the Resort for the benefit of Richards and the IUOs.

92.     The CCO through its principals and related Defendant LLC entities have caused IUOs to be removed and replaced by CCO's principals and members as directors of the West Parcel Association, Inc. and the NBR Hotel Condominium Association, Inc. in order to facilitate their self-dealing vis-à-vis the devaluation of the IUO's residential units and the usurpation of the IUO's investment value and the return thereon. A true copy of the Notice of such action to the IUOs is attached as Exhibit "3".

93.     By its actions or threatened actions as comprehensively detailed elsewhere in this complaint and specifically by its self-dealing and usurpation of investment value and the return thereon, CCO and other Defendants have breached their implicit fiduciary duties to Plaintiff and the IUO, as well as their express fiduciary duty to preserve the value of the hotel condominium units as components of the Resort .

94.     Plaintiff Richards and the other IUOs have suffered damages as a result of the Defendants' breaches of their fiduciary duties.

95.     Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services.  CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes and the Master Declaration.

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of the IUO demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of its reasonable attorney's fees and taxable costs.

### COUNT VI
**Usurpation of a Business Opportunity**

96.    Plaintiff re-alleges paragraphs 1 – 88 above as though fully set forth herein.

97.    The hotel condominium units purchased by Richards and the IUOs were created and intended to be a business opportunity to rent them out for short term guest and derive profit and a reasonable return on their investment.

98.    The foregoing purpose fit into the overall purpose for the Resort development and the West Parcel in particular.

99.    The intentional and malicious actions by the Defendants to artificially depress the value of the units owned by Richards and the other IUOs for their – and particularly Defendant Gulfwater's -- financial benefit constituted a usurpation of the business opportunity that Richards and the other IUOs bought into.

100.    The Defendants, in conjunction and conspiracy with each other, acted in concert to facilitate Gulfwater's purchase of units at artificially depressed values.

101.    For the most part units purchased by investors, including Richards', have been reduced in fair market value from $700,000 down to $100,000 or less, so they have accordingly sustained damages

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of

the IUOs demands compensatory damages against the above-named

Defendants, jointly and severally, together with an award of its reasonable

attorney's fees and taxable costs.

Date:  October 4, 2020

*s/ Elliott Goldberg*

By:_____

Elliott Goldberg, Esq.
Attorney for Plaintiff
Florida Bar No. 133770
One East Broward Boulevard - #700
Ft. Lauderdale, FL 33301
Tel. (954) 493-7400
E-mail: elliottglaw@hotmail.com

**COMPOSITE EXHIBIT C**

Filing # 112134542 E-Filed 08/20/2020 02:45:21 PM

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting <u>data</u> pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.    CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>TWENTIETH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>COLLIER</u>   COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>Elliott David Goldberg, James Richards</u>
Plaintiff
           vs.
<u>Naples Bay Resort Holdings LLC, Naples Bay Properties LLC, NBR Manager LLC, Naples Bay Resort Investment Company LLC, Knightsbridge Partners of Naples LLC, Sojourn Hospitality Group LLC, Summit Management Group of Florida LLC, Gulfwater Investments LLC, The Club at Naples Bay Resort LLC, The Shoppes at Naples Bay Resort LLC, Fred Pezeshkan, Thomas MacIvor, I J Zand, Raymond Sehayek</u>
Defendant

**II.    AMOUNT OF CLAIM**
       Please indicate the estimated amount of the claim rounded to the nearest dollar $<u>3,000,000</u>

**III.    TYPE OF CASE**     (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

| | |
|---|---|
| ☒ Condominium | ☐ Professional malpractice |
| ☐ Contracts and indebtedness | ☐   Malpractice – business |
| ☐ Eminent domain | ☐   Malpractice – medical |
| ☐ Auto negligence | ☐   Malpractice – other professional |
| ☐ Negligence – other | ☐ Other |
| ☐   Business governance | ☐   Antitrust/Trade Regulation |
| ☐   Business torts | ☐   Business Transaction |
| ☐   Environmental/Toxic tort | ☐   Circuit Civil - Not Applicable |
| ☐   Third party indemnification | ☐   Constitutional challenge-statute or ordinance |
| ☐   Construction defect | ☐   Constitutional challenge-proposed amendment |
| ☐   Mass tort | ☐   Corporate Trusts |
| ☐   Negligent security | ☐   Discrimination-employment or other |
| ☐   Nursing home negligence | ☐   Insurance claims |
| ☐   Premises liability – commercial | ☐   Intellectual property |
| ☐   Premises liability – residential | ☐   Libel/Slander |
| ☐ Products liability | ☐   Shareholder derivative action |
| ☐ Real Property/Mortgage foreclosure | ☐   Securities litigation |
| ☐   Commercial foreclosure | ☐   Trade secrets |
| ☐   Homestead residential foreclosure | ☐   Trust litigation |
| ☐   Non-homestead residential foreclosure | |
| ☐   Other real property actions | ☐ County Civil |
| | ☐   Small Claims up to $8,000 |

- ☐ Civil
- ☐ Replevins
- ☐ Evictions
- ☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.  REMEDIES SOUGHT** (check all that apply):
☒  Monetary;
☒  Non-monetary declaratory or injunctive relief;
☒  Punitive

**V.  NUMBER OF CAUSES OF ACTION:**
(Specify)

<u>5</u>

**VI.  IS THIS CASE A CLASS ACTION LAWSUIT?**
☒ Yes
☐ No

**VII.  HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ No
☐ Yes – If "yes" list all related cases by name, case number and court:

**VIII.  IS JURY TRIAL DEMANDED IN COMPLAINT?**
☐ Yes
☒ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature:   <u>s/ Elliott David Goldberg</u>
Attorney or party
FL Bar No.: <u>133770</u>
(Bar number, if attorney)
<u>Elliott David Goldberg</u>
(Type or print name)
Date:  <u>08/20/2020</u>

Filing # 112134542 E-Filed 08/20/2020 02:45:21 PM

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.

                                            CASE NO:

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
GULFWATER INVESTMENTS LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## COMPLAINT FOR DAMAGES AND FOR DECLARATORY, INJUNCTIVE AND SUPPLEMENTAL RELIEF

      AND NOW, August 19, 2020, Plaintiff JAMES RICHARDS ("Richards")

sues Defendants and alleges:

## Parties

### Plaintiff

1.      Plaintiff Richards is *sui juris*, a unit owner within the Naples Bay Resort West Parcel ("NBR West Parcel") as that property is described within a Master Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel" ("Master Declaration – West Parcel") recorded at Official Records Book 4121, Pages 3092 - 3181 of the Collier County Public Records, Collier County, Florida.

2.      By virtue of said ownership, Richards is also a member of the Naples Bay Resort West Parcel Property Owners Association, Inc. ("NBR West Parcel Association"), a Florida not-for-profit corporation organized and existing under the provisions of Chapter 617, Florida Statutes, as well as a member of the Naples Bay Resort Hotel Condominium Association, Inc. ("NBR Condominium Association") a condominium association charged with all duties and responsibilities of condominium associations pursuant to Chapter 718, Florida Statutes, with respect to the Naples Bay Resort Hotel Condominium.

3. Plaintiff brings this action on behalf of himself and for the benefit of the independent unit owners ("IUOs") within the Naples Bay Resort -- West Parcel.

### Defendants

4.      Defendant NAPLES BAY RESORT HOLDINGS, LLC ("NBR Holdings") is an administratively dissolved Florida limited liability company, with a last known address c/o Summit Management Group of Florida, LLC, 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. NBR Holdings was the Manager

Member of Basil Street Partners, LLC, original Developer of the Naples Bay Resort (the "Resort") and all its component parts.

5.      Defendant NAPLES BAY PROPERTIES, LLC ("NB Properties") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. NB Properties purports to be the operator of the Resort Rental Management Program ("Rental Program"). Its principals include Individual Defendants Thomas MacIvor ("MacIvor") and Fred Pezeshkan ("Pezeshkan") and its Manager Member is Defendant Naples Bay Resort Investment Company, LLC ("NB Investment"). NB Properties is believed to be owner of the underlying Resort property, and is the Commercial Component Owner ("CCO") including Hotel, shared facilities, restaurant, commercial spaces, meeting rooms, etc.

6.      Defendant NBR MANAGER, LLC ("NBR Manager") is an administratively dissolved Florida limited liability company, with a last known address c/o Summit Management Group of Florida, LLC, 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals were Defendants Pezeshkan, I.J. Zand ("Zand") and MacIvor.

7.      Defendant NAPLES BAY RESORT INVESTMENT COMPANY, LLC ("NBR Investment") is a limited liability company, state of organization unknown, but which is listed as Managing Member of Defendants NB Properties, Sojourn Hospitality LLC and Knightsbridge Partners of Naples, LLC, with an address at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

8.      Defendant KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,

3

("Knightsbridge Partners") is a Florida limited liability company, with its principal

place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its

principals are Defendants NB Investment, MacIvor and Pezeshkan.  It is believed

Knightsbridge Partners, among other things, owns the "Club."

9.      Defendant SOJOURN HOSPITALITY GROUP LLC ("Sojourn

Hospitality") is a Florida limited liability company, with its principal place of

business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102. Its principals

are Defendant NB Investment, MacIvor and Pezeshkan. Sojourn Hospitality is

believed to operate the rental program for the Resort.

10.      Defendant SUMMIT MANAGEMENT GROUP OF FLORIDA, LLC

("Summit Management") is a Florida limited liability company, with its principal

place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.  Its

principals Defendants Pezeshkan, Zand and MacIvor. Summit Management is

believed to be the overall manager of the Naples Bay Resort.

11.      Defendant GULFWATER INVESTMENTS LLC ("Gulfwater"), is a

Florida limited liability company, with its principal place of business at 1500 Fifth

Avenue South, Suite 111, Naples, FL 34102.  It is reportedly the owner of 47

IOUs in the Naples Bay West Parcel. Its principals are PZ, LLC [Alexander

Pezeshkan and MacIvor], Sanibel Investments Enterprises, LLC [MacIvor, Zand

and Defendant Raymond Sehayek ("Sehayek"] and European Investments

Enterprises, LLC [Zand, MacIvor and Sehayek].

12.      Defendant THE CLUB AT NAPLES BAY RESORT, LLC ("NB

Club") is a Florida limited liability company, with its principal place of business at

4

1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

13.    Defendant THE RESTAURANT AT NAPLES BAY RESORT LLC ("NB Restaurant") is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

14.    Defendant THE SHOPPES AT NAPLES BAY RESORT, LLC ("NB Shoppes"), is a Florida limited liability company, with its principal place of business at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

15.    Defendant FRED PEZESHKAN ("Pezeshkan") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

16.    Defendant THOMAS MACIVOR ("MacIvor") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

17.    Defendant IRA J. ZAND ("Zand") is *sui juris*, whose residence a address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

18.    Defendant RAYMOND SEHAYEK ("Sehayek") is *sui juris*, whose residence address is unknown, but who can be addressed at 1500 Fifth Avenue South, Suite 111, Naples, FL 34102.

## Jurisdiction and Venue

19.    This is an action for damages in excess of the jurisdictional limits of the Court and for declaratory judgment, injunctive and supplemental relief that

the Court is authorized to grant pursuant to Sections 86.011 and 86.061, Florida Statutes (2019).

20.     Venue is proper as the claims sued upon all arose in Collier County, Florida and the Defendant business entities and individual defendants reside in and/or conduct business in Collier County, Florida.

21.     All conditions precedent and necessary to the bringing of this action have either been performed, have occurred, have been waived, or have otherwise been excused.

### General Allegations

### Naples Bay Resort and its West Parcel

22.     The Naples Bay Resort (the "Resort") is a mixed use and facilities development established pursuant to a Master Declaration on September 18, 2006 by its Developer, BASIL STREET PARTNERS, LLC, a Delaware limited liability company ("Basil Street" or "Developer"), by NBR Holdings, its sole member and NBR Manager, as its Manager. The Resort consists of many "components" including, *inter alia*, a hotel, multiple buildings containing hotel condominium units, commercial-retail space, meeting rooms, residences, club and a marina.

23.     Basil Street filed for bankruptcy in or about 2013 – shortly after it established the Resort and particularly the West Parcel condominium where Richards' hotel condominium unit ("unit") is located -- and which bankruptcy administration was concluded in or about December 2015. Its authority as a LLC was "Revoked for Annual Report on September 27, 2013."

24.     As stated, Richards' unit is located in Building 3 of the West Parcel which is specifically governed by the Master Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel ("Master Declaration – West Parcel"), Bylaws and Articles of Incorporation (collectively "condo documents") whose provisions apply to Richards, all IUOs and the Successor(s) to the Developer.  The relevant provisions of Chapter 718, Florida Statutes (2018) aka the Florida Condominium Act ("Florida Condominium Act") also apply to Richards, all IUOs and to the Successor to the Developer. The Master Declaration -- West Parcel is recorded in the Official Records of Collier County in OR: 4121 at Pg: 3092, et seq.[1] and its provisions are incorporated herein by reference.

25.     The NBR West Parcel is comprised of 85 units/suites which are separately owned by Richards and other IUOs  who, in turn, are members of the Hotel at Naples Bay Resort Condominium Association, Inc. ("Hotel Condo Association").

26.     The Developer marketed the Resort and the individual hotel condominium units as a prospective good financial investment. The marketing expressly represented that the IUOs had the option of participating in the Resort's rental program or renting their units themselves – with no penalty for opting out.

---

[1] The Master Declaration is voluminous and as such is not appended hereto. However, it is incorporated by reference and the Court can take judicial notice of its content.

27.    The IUOs purchased their individual hotel condominium units based upon a sound financial investment and anticipating a reasonable flow of income as a return on their investment.

28.    NBR Holdings had as its principal, Managing Member Defendant NBR Manager. NBR Holdings had its authority "Revoked for Annual Report" on September 22, 2017."

29.    NBR Manager had as its principals, Defendants Pezeshkan, Zand and MacIvor. NBR Manager had its authority "Revoked for Annual Report" likewise on September 22, 2017.

30.    The Master Declaration -- West Parcel, where Richards' Unit is located, provides in its "Background" Section as follows:

> "C.    In order to (i) ensure that such general plan of development is adhered to; (ii) establish certain continuing relationships in the form of *mutual rights and obligations between Developer and the persons who acquire ownership* in Naples Bay Resort West Parcel, ***and their respective successors***; (iii) ensure that the provisions of applicable resolutions are adhered to; and (iv) ***protect, preserve, enhance the value of the property*** within the Naples Bay Resort West Parcel, Developer has determined that this Declaration, establishing certain easements, servitudes, restrictions, reservations, and conditions in the form of covenants running with the land *shall be binding upon, enforceable against and inure to the benefit of all present and future owners* of property developed within Naples Bay Resort West Parcel and shall run with title to the land hereby and hereafter subjected to it..." [Emphasis added]

31.    Upon information and belief, following the bankruptcy proceedings of Basil Street, the principals and members of that now defunct entity reacquired control over the NBR West Parcel through their participation and ownership in one or more of the legal business entities ("LLCs" or "entities") identified above.

32.    The Master Declaration – West Parcel in Article I, Section 1 (I) provides,

> "'Developer' means Basil Street Partners, LLC, a Delaware limited liability company, ("BSP" or "Developer"), as aforesaid, and its ***successors and assigns who acquire title to any portion of Naples Bay Resort West Parcel*** for the purpose of development so long as BSP assigns its rights hereunder to such persons by express assignment or by operation of law." [Emphasis added]

33.    Richards is informed, believes and alleges that NB Properties, NBR Investment, Knightsbridge Partners, Sojourn Hospitality, Summit Management and Gulfwater are all successors to Basil Street in one aspect of the development or another in terms of function and are therefore bound by the provisions of the Master Declaration – West Parcel and condo documents as a whole as Successors to the Developer.

34.    Richards is informed, believes and therefore alleges the individual Defendants, Pezeshken, MacIvor, and Zand, as principals of the Basil Street, original Developer, engineered a take-over of successor ownership from Basil Street after its bankruptcy through a created maze of LLC entities – more appropriately characterized as "fronts" -- noted in Paragraph 33 above. As such they are likewise individual successors to the Developer.

35.    Richards believes and therefore alleges that the Defendant entities, NB Properties, NBR Investment, Knightsbridge Partners, Sojourn Hospitality, Summit Management and Gulfwater are all owned and/or controlled by – whether individually or through other named LLC entities ("fronts") -- which are *actually* the alter egos of Pezeshkan, MacIvor and Zand.

36.   NB Properties is believed to be the principal controlling entity of the Resort and is referred to as commercial component owner ("CCO") in the condo documents. NBR Investment, Knightsbridge Partners, Gulfwater, Sojourn Hospitality and Summit Management control specific functions in the Resort.

37.   There are at least 17 LLCs constituting the "maze" of interrelated and interlocking business entities as "fronts" for the core of individual Defendants herein.

### Pattern of the Abusive Actions and Improper Charges[2]

38.   The CCO as principal successor to the Developer, in conjunction and conspiracy with the other LLC entities, and controlled by the individual Defendants -- has engaged in a long term, continuing pattern of abusive actions designed and intended to oppress the IUOs, including Richards, by imposing unilateral, excessive and improper charges, whether they are in the Resort's Rental Program or have opted-out.  These may be, *inter alia*, identified as:

A.   Arbitrary and excessive charges (with no rational bearing to the CCO's tasks for a guest rental) threatened to be levied on IUO's who opt-out of the Rental Management Program, charging a daily rental fee payable the CCO of $250.00 – effectively making it impossible for Non-Rental Program IUOs to net any income, let alone cover their expenses, from their rentals;

B.   Levying a grossly excessive daily "administrative charge" over and above the $250 fee – arbitrarily increased from 10% to 20% -- which is further reduces the IUOs' ability to net any income from rentals of their units;

---

[2] These are not all inclusive.

C.  Requiring IUOs to pay an excessive "Club dues" to NB Resort for guests to use the pool and spa (owned by an LLC entity) which approximates $4,000.00 per year – this being  over and above the $39/per day "resort fee" that the CCO charges the guest for use of the same facilities. The IUOs bear all the expense of the "Club" but receive no share of the income or set off of expenses from the guest fees;

D.  Requiring anyone purchasing a condominium to pay an initial $40,000.00 as a "Club Fee", which makes it effectively impossible for IUOs to sell their units at anywhere near a fair value for the investment;

E.  In sum, requiring a collage of fees to include:

- West Condo Association

-  NB Resort for Club Dues (doubled since inception)

- NB Properties for a "Hotel Services Fund",

-  NB Properties for Buildings 1, 2 and 3 which includes the hotel lobby, commercial spaces and meeting rooms

- West Parcel Master Property Owners Association, Inc. (controlled exclusively by the CCO) which includes the commercial units and residences for landscaping, hotel garages and fountain/turn-around at hotel front.

F.      In all the foregoing instances, the IUOs effectively pay the CCO's expenses without deriving any financial benefit from the income generated from the meeting rooms and commercial space;

G.  Levying of excessive dues based on forecasted budget, without

11

IUO access to actual year end numbers to validate the propriety of the dues.

39.     Recently, the CCO has informed Richards and the IUOs that their fees would be increased to cover [supposed] restaurant losses from the corona virus Pandemic when the IUOs have no ownership interest therein, nor do they get any income from its operations.

40.     Recently, the CCO similarly informed Richards and the other IUOs that it was "suspending" distributions of their rightfully due rental income to cover its losses from the Pandemic.

41.     The Resort's standard rental management agreement ("RMA") was rolled over from original developer after the bankruptcy proceeding.

A.     The Property Owners Association and Hotel Condominium Association informally challenged whether the CCO had the right to own and operate the rental management company as it was not transferable.  Hotel Condominium Association Board Members specifically challenged the CCO's right to own and operate the rental management program in 2016.

B.     The CCO threatened the Board Members and the Hotel Condominium Association's manager with claims of slander and defamation, both personally and as Board Members.  Due to the CCO's threat, the challenge was withdrawn.

42.     The CCO has engaged in retaliatory tactics against IUOs -- specifically Richards and another IUO, Russ Reed – by terminating their inclusion in the Rental Management Program – for challenging and criticizing the

CCO. A true copy of the notice is attached hereto as Exhibit "1" and incorporated by reference.

43.    The CCO has refused to be transparent in disclosing its actual expenses and disbursements, as well as the inter-LLC transactions and expense allocations, upon which the many aforesaid charges are based.

44.    Upon information and belief, the CCO and other successor-developer entities are charging excessive expenses in non-arms length transactions.

45.    In the one instance where the CCO permitted the IUOs' accountant to have limited access to the books and records of the CCO, the CCO, through its Sojourn Hospitality, retaliated 2 years thereafter by invoicing the IUOs $39,125 for its staff to assist the accountant. A true copy is attached hereto as Exhibit "2" and incorporated by reference.

46.    Recently, the successor Developer, through its Gulfwater entity, purchased 47 hotel condominium units (at distressed prices) to obtain a majority ownership in units and summarily recalled all the duly elected directors by the IUOs and installed their own minions. A true copy is attached hereto as Exhibit "3" and incorporated by reference.

## COUNT I
### Declaratory, Injunctive and Supplemental Relief

47.    Plaintiff re-alleges paragraphs 1 – 46 as though fully set forth herein at length.

48.    This is an action for declaratory, injunctive and supplemental relief.

49.    A case of actual controversy exists as Plaintiff and the IUOs require

a declaration of their rights and an injunction against the CCO's abusive actions and improper charges as comprehensively detailed in paragraphs 38-43 above.

50.     The CCO and other of the Defendants contend that its actions and charges are authorized by the Master Declaration – West Parcel and other condo documents, including the Mast Declaration for the Resort, referenced above, while Plaintiff Richards and other IUOs contend that it does not but rather that said actions and charges expressly violate the foregoing enabling documents and the RMA.  A copy of the RMA is attached as Exhibit "4" and incorporated by reference.

51.     The general tenor, as well as specific provisions of the Master Declaration – West Parcel are *unconscionable as outrageously one-sided* to the point they permit the CCO and other Defendant Successor LLC entities to illegally gouge Richards and the other IUOs, examples of which include, *inter alia*, the following:

A.  Article I, Section I (a) "Shared Expenses"

> "...and the costs of any other expenses incurred by, the Association *for any reason whatsoever* in connection with any Component, the Shared Facilities or the Marina for the benefit of all of the Owners."

B.  Article VIII, Section 3 "<u>Powers of the Association, Relating to Components and Sub-Associations</u>"

> "The Association shall have the power, but not the obligation, *to veto any action taken*, or contemplated to be taken by any Sub-Association which the Board reasonably determines to be adverse..."

C.  Article XIII, Section 16 "Administrative Charge"

> "...each Hotel Unit Owner...by acceptance of a deed or other conveyance of a Charged Unit, shall be deemed to agree to pay a daily "Administrative Charge", which may be imposed, and paid to the

Commercial Component Owner as part of the operation of the Hotel Condominium...any time a Charged Unit is occupied by persons who are not deemed to be Permitted Occupants...*with respect to the administration expenses associated with such occupant's charging privileges with the Commercial Component Owner and other Administrative Charge shall be in such amount as determined from time to time by the Commercial Component Owner, **in its sole and absolute discretion**...*" [Emphasis added above]

52.    In the Declaration of Buildings 1, 2 and 3 of the West Parcel

[Richards' Unit is in Building 3], the following, *inter alia*,

Section 4.7 <u>Reallocations</u>.

"...the *Commercial Component Owner may **<u>unilaterally change</u>** the nature, scope, extent and type of services and **the manner and percentage of allocating the costs and expenses** if, in its good faith judgment, the nature and types of services and cost change as needs and demand changes and the manner or percentage by which such costs and expenses are shared has become inequitable based on such criteria. *So long as the Commercial Component owner acts in good faith, uses objective criteria in making such relocations, and* **without taking advantage of any conflict of interest, <u>its decision may not be questioned</u>. The Commercial Component owner may <u>unilaterally amend</u>** this Declaration for that purpose." [Emphasis added]

53.    The overall provisions of the foregoing documents are

unconscionable,  unreasonable and unfair to Richards and the other IUOs *per se*,

and the CCO and other numerous LLC entities' application and interpretation of

the provisions has exacerbated the actions to nothing short of arbitrary,

unreasonable and outrageous.

54.    Plaintiff is entitled to declaratory relief because,

A.    There is a bona fide, actual, present practical need for the

declaration;

B.    The declaration sought deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts;

C.    Plaintiff's right as the complaining party is dependent upon the facts or the law applicable to the facts;

D.    The CCO has, or reasonably may have, an actual, present, adverse and antagonistic interests in the subject matter, either in fact or law;

E.    The antagonistic and adverse interests are all before the Court by proper process and the relief sought by Plaintiff is not merely giving of legal advice by the Court or the answer to questions propounded from curiosity.

55.    Plaintiff Richards has retained the undersigned counsel to prosecute this action on behalf of himself and other IUOs and has agreed to pay him a reasonable fee for his services.  CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes, the Master Declaration and/or the RMA.

WHEREFORE, Plaintiff JAMES RICHARDS on his behalf and on behalf of the IUOs prays that the Court will grant declaratory, injunctive and supplemental relief as may be appropriate under the circumstances of this case against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT II
### Declaratory, Injunctive and Supplemental Relief

56.    Plaintiff re-alleges 1 – 43 as though fully set forth herein at length.

16

57.     This is an action for declaratory, injunctive and supplemental relief.

58.     The CCO and other Defendant LLC business entities, control, manage and are currently responsible for multiple parts and components of the Resort property, including what are defined as "Shared Facilities."

59.     The CCO has engaged specific Defendant LLC business entities to "manage" or control various components, for example Defendant Summit Management, the general management and Defendant Sojourn Hospitality being the manager of the Rental Program.

60.     The maze or web of interrelated Defendant LLC business entities, as well as the individuals that control them, limits what each is *actually* responsible for – the complexity of which is not entirely ascertainable by Richards and the other IUOs.

61.     Richards believes and alleges that the maze or web of interrelated LLCs is designed and intended to perpetrate a fraud on Richards and the other IUOs.

62.     Richards and the IUOs believe that these specified actual and/or threatened actions and charges are unconscionable, unreasonable and violate the letter and spirit of the Master Declaration – West Parcel and the RMA and shock equity's conscience and thus entitle the Plaintiff and IUOs to an injunction, both temporary and permanent, restraining the CCO from taking such actions.

63.     There is a present, active controversy between on the one hand the Defendant CCO and other LLC business entities and on the other Richards and the other IUOs pertaining to the precise responsibilities of each of the

Defendants regarding control, oversight, services provided and financial obligations which Richards and the others are required to bear.

64.     Throughout the condo documents, the CCO, as successor to the Developer is given the unlimited power to levy assessments regarding the Shared Facilities and any other costs the CCO desires to foist on to Richards and the other IUOs. On the other hand, there are only vague and limited accountability for Richards and the IUOs to verify the accuracy and propriety of such charges.

65.     For example, the Master Declaration at Article 9. "Annual Statements and Accounting, provides,

> "The Board shall cause to be prepared an annual balance sheet and operating statement reflecting income and expenditures of the Association for each fiscal year, and shall cause a copy of each such statement to be distributed to each member…As and when specified in the Bylaws, the Board shall prepare and distribute to the membership of the Association a written, itemized (budget) of the expenses to be incurred by the Association …"

66.     The disputes herein reference are that notwithstanding persistent demands of Richards and fellow IUOs for full disclosure and inspection of the underlying documents supporting the expenditures, upon which the assessments are based and levied,  the CCO has failed and refused to allow them to fully review and assess the important financial aspects.

67.     Such information is possessed solely by the Defendants and is part of the West Parcel Associations reporting obligations to its members, including Richards and the other IUOs, and is being wrongfully withheld from the Association and its members.

18

68.    More pertinently, Richards and other IUOs, are entitled to be provided an understanding and accounting of the interrelationships and payments between them that impact financially on Richards and the other IUOs. See *Gardens Suburbs Golf & Country Club, Inc. v. Pruitt*, 24 So.2d 898 (Fla. 1946); cited with approval by the Fourth DCA in *The Resort at Singer Island Hotel Condominium Association, Inc. vs. Urgo Hotels LP*, 267 So.3d 452 (Fla. 4th DCA 2019 (closely analogous transparency case between the unit owners' association and hotel lot owner's refusal to provide supporting documentation for shared facilities assessments).

69.    Richards believes and therefore alleges that the Defendant web of LLCs is designed and intended to perpetrate a fraud on Richards and the other IUOs to gouge them on fees charged.

70.    The only occasion that the CCO allowed the IUOs' accountant to inspect financial records, such permission was a charade and the CCO withheld critical records regarding employee payroll and inter-entity payments. Moreover, the CCO then invoiced (2 years later) the IUOs for $39,125.00. A true copy is attached as Exhibit "2" and incorporated by reference.

WHEREFORE, Richard is requesting the Court to grant declaratory relief and supplemental relief in the following manner and Order: All Defendants to provide Richards and the other IUOs with full, complete and perfect disclosure of financial and accounting records, including supporting documents and allocations regarding costs incurred for the operation, management and maintenance of the Shared Facilities upon which assessment against IUOs are based;

19

## COUNT III
## Breach of Contract – Master Declaration

71.    Plaintiff re-alleges paragraphs 1 – 43 as though fully set forth herein at length.

72.    This is an action for breach of contract.

73.    The Master Declaration for the Resort, Master Declaration – West Parcel and other cited condo documents and associations above constitute contracts between the Developer and Successors to the Developer and Richards and other IUOs.

74.    By its actions and/or threatened actions as comprehensively detailed elsewhere in this Complaint, the CCO and all other Successors to the Developer, have breached both the letter and spirit of the Master Declaration and all other condo documents.

75.    Richards believes and therefore alleges that all the foregoing LLCs are creating excessive and duplicative expenses being borne by the IUOs which effectively drains all potential income

76.    The foregoing is graphically illustrated by a spreadsheet depicting the losses sustained by Richards individually. A true copy is attached hereto as Exhibit "5" and incorporated by reference.

77.    The net result of the aforesaid pattern of abusive actions has been to artificially depress and devalue the fair market value of the hotel condominium units, due to exorbitant expenses, dues and other charges which eviscerate any ability for the IUOs to realize a return on their investment.

78.    Plaintiff Richards and the other IUOs have performed all of their

20

obligations under the contracts . *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2dDCA 2006).

79.    Plaintiff and the other IUOs have suffered damages as a direct and

80.    Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services.  The CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes and the Master Declaration.

WHEREFORE, Plaintiff JAMES RICHARDS on his behalf, and on behalf of the IUOs, demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of his reasonable attorney's fees and taxable costs.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing

81.    Plaintiff re-alleges paragraphs 1 – 80 as though fully set forth herein at length.

82.    Plaintiff Richards and the other IUOs are parties to written contracts in the nature of the various condo documents, both as the Resort as a whole and those related to the West Parcel and the RMAs.

83.    The foregoing contracts are ambiguous as to the permissibility or scope of the conduct in question.

84.    The LLC Defendants which are the alter egos of the Individual Defendants who control them, through conscious and deliberate acts, fail and refuse to discharge contractual responsibilities which unfairly frustrate the

contracts' purposes and disappoint Plaintiff Richards' and the other IOUs' expectations and what was represented to them when they were solicited to purchase hotel condominium units in the Resort.

85.    Moreover, by their conscious, deliberate and unreasonable acts, the Defendants, by the direction given on the part of the Individual Defendants prejudicially skew the provisions against Richards and the other IUOs such as to deprive them of any meaningful return on their investments.

86.    The foregoing breaches deprive Plaintiff Richards and the other IUOs of the contracts' benefits.

87.    Plaintiff Richards and the other IUOs suffered damages.

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf, and on behalf of the IUOs, demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of its reasonable attorney's fees and taxable costs.

## COUNT IV
### Breach of Fiduciary Duty

88.    Plaintiff re-alleges paragraphs 1 – 87 above as though fully set forth herein.

89.    This is an action for breach of fiduciary duty.

90.    The Developer and all the Defendant LLC entities and Individual Defendants as successors to the Developer had a fiduciary duty to Richards and the other IUOs in their operating the Resort for the benefit of Richards and the IUOs.

91.    The CCO through its principals and related Defendant LLC entities have caused IUOs to be removed and replaced by CCO's principals and members as directors of the West Parcel Association, Inc. and the NBR Hotel Condominium Association, Inc. in order to facilitate their self-dealing vis-à-vis the devaluation of the IUO's residential units and the usurpation of the IUO's investment value and the return thereon. A true copy of the Notice of such action to the IUOs is attached as Exhibit "3".

92.    By its actions or threatened actions as comprehensively detailed elsewhere in this complaint and specifically by its self-dealing and usurpation of investment value and the return thereon, CCO and other Defendants have breached their implicit fiduciary duties to Plaintiff and the IUO, as well as their express fiduciary duty to preserve the value of the hotel condominium units as components of the Resort .

93.    Plaintiff Richards and the other IUOs have suffered damages as a result of the Defendants' breaches of their fiduciary duties.

94.    Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services.  CCO is obligated to pay Plaintiff his reasonable attorney's fees pursuant to the Florida Statutes and the Master Declaration.

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of the IUO demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of its reasonable attorney's fees and taxable costs.

## COUNT V
### Usurpation of a Business Opportunity

95.    Plaintiff re-alleges paragraphs 1 – 87 above as though fully set forth herein.

96.    The hotel condominium units purchased by Richards and the IUOs were created and intended to be a business opportunity to rent them out for short term guest and derive profit and a reasonable return on their investment.

97.    The foregoing purpose fit into the overall purpose for the Resort development and the West Parcel in particular.

98.    The intentional and malicious actions by the Defendants to artificially depress the value of the units owned by Richards and the other IUOs for their – and particularly Defendant Gulfwater's -- financial benefit constituted a usurpation of the business opportunity that Richards and the other IUOs bought into.

99.    The Defendants, in conjunction and conspiracy with each other, acted in concert to facilitate Gulfwater's purchase of units at artificially depressed values.

100.    For the most part units purchased by investors, including Richards', have been reduced in fair market value from $700,000 down to $100,000 or less, so they have accordingly sustained damages

WHEREFORE, Plaintiff JAMES RICHARDS on HIS behalf and on behalf of the IUOs demands compensatory damages against the above-named Defendants, jointly and severally, together with an award of its reasonable attorney's fees and taxable costs.

Date:  August 19, 2020

*s/ Elliott Goldberg*

By:_____

Elliott Goldberg, Esq.
Attorney for Plaintiff
Florida Bar No. 133770
One East Broward Boulevard - #700
Ft. Lauderdale, FL 33301
Tel. (954) 493-7400
E-mail: elliottglaw@hotmail.com

Filing # 112134542 E-Filed 08/20/2020 02:45:21 PM

# EXHIBIT "1"

**From:** Cheryl Hastings <CHastings@gfpac.com>
**Subject: Your Complaint to the Better Business Bureau; Case No. 6744770**
**Date:** April 29, 2020 at 11:45:15 AM EDT
**To:** "jim.richards2@me.com" <jim.richards2@me.com>

Dear Mr. Richards:

As you are aware, this law firm represents Naples Bay Properties, LLC, a Florida limited liability company.  This email concerns the above referenced complaint made by you.   By our client's letter dated April 6, 2020 our client responded.  Our client has now received from the Better Business Bureau ("BBB") a further letter from you to it dated April 18, 2020 which responds to our client's April 6, 2020 letter.  Please see my response to the BBB attached hereto. We will not debate or discuss this further with or through the BBB.

Be advised that your April 18, 2020 letter is factually incorrect, just plain wrong, and factually irrelevant in several cases. It is also defamatory and portrays our client, its business, and the operations of some of its affiliates in a false light. This may and can cause damage to our client, as well as damage to the other hotel unit owners for which you have liability. Demand is hereby made for you to immediately refrain from making any further false and disparaging statements concerning our client and its affiliates.  If you fail to do so, our client will avail itself of all available legal remedies, including, but not limited to, causes of action for defamation, portraying information in a false light, tortious interference with business relationships and related tort and statutory theories.

As a unit owner you have the right to certain information. The opportunity to schedule an appointment with our client to obtain that information has been previously made known and available to all hotel unit owners. It remains available to you should you wish to schedule it.

If you are as unhappy as you seem to be, our client is willing to release you from and terminate your Rental Management Agreement.  In the event you do not choose to terminate your Rental Management Agreement, please consider this as notice that our client does not intend to renew your RMA when it next terminates.

You should govern yourself accordingly.

Cheryl Hastings

# EXHIBIT "2"



# Sojourn Hospitality Group LLC

1500 Fifth Avenue South, Suite 111
Naples, Florida 34102
239.434.6222

# Invoice # 100
Date: 2/3/2020

## Bill To
Independent Hotel Unit Owners
Attn: Joe & Gail Soboloski, Russ Reed, Jim & Michelle Richards, John
Diaz, Neal & Matt Westendorf, Maria Leone, Hank Miller, & Raleigh
Truitt

## For
Professional Services

| Item Description | Amount |
|---|---|
| Services provided to assist consultant of Hotel unit owners to perform a review of financial records: | |
| Jim Veil (80 hours at $200 per hour) | $16,000.00 |
| Tom MacIvor (80 hours at $150 per hour) | $12,000.00 |
| Nikki Watt (50 hours at $100 per hour) | $5,000.00 |
| Resort Staff (60 hours at $100 per hour - includes John Reilly, Ingrid Hernandez and Jennifer Mateu) | $6,000.00 |

| | |
|---|---|
| Subtotal | $39,000.00 |
| Other Costs - copies and supplies | $125.00 |
| Total Cost | $39,125.00 |

Make all checks payable to Sojourn Hospitality Group, LLC
Thank you for your business!

# EXHIBIT "3"

# GULFWATER INVESTMENTS, LLC
## 1500 Fifth Avenue South, Suite 111
## Naples, Florida 34102

February 24, 2020

**VIA EMAIL & CERTIFIED MAIL**
Board of Directors of Hotel at Naples Bay Resort Condominium Association, Inc.
c/o Hamilton Mikes, PA
9130 Galleria Court
Suite 330
Naples, FL 34109

Re: Recall of Board Members

Dear Board Members:

I write as a representative of Gulfwater Investments, LLC, the owner of forty-seven (47) units in the Hotel at Naples Bay Resort (Hotel), for the purpose of demanding the recall of the board members listed below.  Pursuant to Section 718.112(2)(j), Florida Statutes, any member of the board of administration may be recalled and removed from office with or without cause by the vote or agreement in writing by a majority of all the voting interests. Rule 61B-23.0028, Florida Administrative Code, governs recall by written agreement.

The Board members subject to recall are as follows:

1) Gail Soboloski
2) Raleigh Truitt
3) Russ Reed
4) James Richards

The individuals listed below have indicated their willingness to replace the recalled board members:

1) Nikki Watt
2) Thomas A. MacIvor
3) Iraj Zand
4) Jim Veil

By signing this letter, I affirm that I am authorized in the manner required by the condominium documents to cast this vote on behalf of all forty-seven (47) units.

Regards,
GULFWATER INVESTMENTS, LLC

Thomas A. MacIvor, CPA  MBA
Vice President

cc: Cheryl L. Hastings, Esq.

Filing # 112134542 E-Filed 08/20/2020 02:45:21 PM

# EXHIBIT "4"

<u>May 1, 2007</u>

## <u>THE HOTEL AT NAPLES BAY RESORT</u>

### <u>HOTEL UNIT RENTAL MANAGEMENT AGREEMENT</u>

This **HOTEL UNIT RENTAL MANAGEMENT AGREEMENT** (the "<u>Agreement</u>") is made as of the \_\_\_\_ day of _____, 200\_\_\_, between BASIL STREET PARTNERS, LLC, a Delaware limited liability company, its successors and assigns ("<u>Hotel Owner</u>"), and

Name of Unit Owner _____ ("<u>Unit Owner</u>")
Billing and Correspondence
Address of Unit Owner _____
                            STREET

            _____
            CITY         STATE    ZIP
Home Phone _____ Office Phone _____
E-Mail Address _____
SSN/Federal Fax ID Number _____

NOTE:   THE PERSON TO WHOM BILLING AND PAYMENTS SHOULD BE ADDRESSED MUST APPEAR ABOVE.  ANY CHANGE TO THE BILLING ADDRESS SHOULD BE SENT TO THE HOTEL OWNER BY UNIT OWNER.  IF JOINTLY OWNED, ONE OWNER MUST BE IDENTIFIED TO RECEIVE STATEMENTS AND ACT AS THE PRIMARY CONTACT.  ANY ADDITIONAL OWNERS SHOULD BE LISTED ON THE LAST PAGE OF THIS AGREEMENT.

### <u>RECITALS:</u>

A.    Unit Owner has acquired, or will acquire, ownership of Unit #_____ (the "<u>Unit</u>") in "The Hotel at Naples Bay Resort, a Condominium" in the City of Naples, Florida (the "<u>Condominium</u>").   The Condominium has been, or will be, established pursuant to that certain Declaration of Condominium for The Hotel at Naples Bay Resort, a Condominium (the "<u>Condominium Declaration</u>") recorded, or to be recorded, in the Public Records of Collier County, Florida.  The Unit is also subject to the terms and conditions of and assessments imposed by that certain Declaration of Restrictive Covenants, Conditions,  Reservations and Easements for  Buildings 1, 2 and 3 of the Naples Bay Resort West Parcel  (the "Building Declaration") and that certain Master

Declaration of Restrictive Covenants, Conditions, Reservations and Easements for the Naples Bay Resort West Parcel (the "Master Declaration").

B.     The Condominium has been, or will be, established and created in buildings, a portion of which comprise a hotel owned by Hotel Owner and to be known as "The Hotel at Naples Bay Resort" (the "Hotel").

C.     Hotel Owner or its delegates will manage the Hotel and a voluntary rental program for units within the Condominium (the "Rental Program") for the purpose of making the units available to third parties for transient lodging as part of the Hotel operation.

D.     Unit Owner desires to make the Unit available for participation in the Rental Program on the terms set forth below.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Hotel Owner and Unit Owner hereby agree that the Recitals are incorporated herein by reference and further agree as follows:

1.     **UNIT OWNER ACKNOWLEDGMENTS.   UNIT OWNER ACKNOWLEDGES THAT:   (A) NO INDUCEMENTS OR REPRESENTATIONS OF ANY KIND HAVE BEEN MADE DIRECTLY OR INDIRECTLY TO UNIT OWNER BY OR ON BEHALF OF ANY OPERATOR OF THE HOTEL, HOTEL OWNER, ITS AGENTS OR EMPLOYEES AS TO ANY TAX OR OTHER ECONOMIC BENEFITS OR IMPLICATIONS WHICH MAY OR MAY NOT BE REALIZED FROM OWNING AND/OR LEASING THE UNIT AS PART OF THE RENTAL PROGRAM;   (B) UNIT OWNER HAS NOT BEEN REQUIRED TO PLACE THE UNIT IN THE RENTAL PROGRAM OR TO RETAIN HOTEL OWNER OR ANY OPERATOR OF THE HOTEL OR ANY OTHER DESIGNEE OF HOTEL OWNER TO RENT THE UNIT TO THIRD PARTIES, AND UNIT OWNER HAS BEEN FREE TO USE ANY OTHER RENTAL AGENT FOR THAT PURPOSE OR TO LEASE THE UNIT ON UNIT OWNER'S OWN OR TO NOT LEASE THE UNIT AT ALL; (C) NEITHER HOTEL OWNER, NOR ANY OF ITS AGENTS OR EMPLOYEES**

(INCLUDING ANY OPERATOR OF THE HOTEL) MAKES, OR HAS MADE, ANY GUARANTEES OR REPRESENTATIONS REGARDING RENTAL INCOME WITH RESPECT TO THE RENTAL OF THE UNIT AND/OR THE RENTAL PROGRAM; (D) TO THE EXTENT ANY SALES AGENT OR REPRESENTATIVE OF HOTEL OWNER HAS MADE, SUGGESTED OR PERMITTED AN INFERENCE WITH RESPECT TO, OR IMPLIED ANY PROJECTION OF, RATE, OCCUPANCY, PROFIT OR LOSS IN CONNECTION WITH THE RENTAL PROGRAM, SUCH INFORMATION DOES NOT CONSTITUTE A REPRESENTATION OF HOTEL OWNER OR ANY OPERATOR OF THE HOTEL OR ANY OTHER DESIGNEE OF HOTEL OWNER AND HAS NOT BEEN RELIED ON, OR CONSIDERED, BY UNIT OWNER IN MAKING THE DECISION TO ENTER INTO THIS AGREEMENT; (E) INCOME FROM THE UNITS IN THE RENTAL PROGRAM IS NOT AND WILL NOT BE POOLED, AND EACH OWNER OF A UNIT IN THE RENTAL PROGRAM WILL RECEIVE INCOME OR LOSSES (AS APPLICABLE) ATTRIBUTABLE TO THE ACTUAL RENTAL OF HIS OR HER UNIT AS SET FORTH IN THIS AGREEMENT; (F) THERE MAY BE A DELAY BETWEEN THE DATE THE UNIT OWNER ACQUIRES THE UNIT AND THE DATE THE HOTEL OPENS FOR BUSINESS; AND (G) UNIT OWNER HAS BEEN ADVISED TO CONSULT WITH TAX AND LEGAL ADVISORS OF HIS OR HER OWN CHOOSING REGARDING PARTICIPATION IN THE RENTAL PROGRAM.

2.    **Engagement of Hotel Owner**.  Unit Owner hereby engages Hotel Owner and grants to Hotel Owner the exclusive right to rent, manage and control the Unit during the Term (as defined in Section 4 below) pursuant to the terms of this Agreement.  Subject to the terms of this Agreement, including, without limitation, Section 9 (pertaining to the Standards), Hotel Owner hereby accepts such engagement.  Hotel Owner reserves the right, but shall not be obligated, to retain an operator or other person or entity to perform Hotel Owner's duties pursuant to this Agreement, as more fully described in Section 3 below.

3.   **Hotel Owner May Retain an Operator.**

(a)    Hotel Owner may assign or delegate its rights and obligations under this Agreement, in whole or in part, and in Hotel Owner's sole discretion, without notice to or consent from Unit Owner, to (i) the operator of the Hotel from time to time, if any (the "Hotel Operator"), (ii) an affiliate of Hotel Owner, (iii) any third party designated by Hotel Owner, or (iv) a successor Hotel Owner.  In the event that the agreement by which this Agreement is assigned by Hotel Owner, or pursuant to which the responsibilities of Hotel Owner are delegated, shall expire or otherwise terminate such that the assignee or delegate is no longer associated with the Hotel, this Agreement will (at the Hotel Owner's option): (a) terminate upon delivery of notice to Unit Owner, or (b) be assigned to the Hotel Owner, another Hotel Operator engaged for the Hotel, or other person or entity designated by Hotel Owner, in which event the Hotel Owner or such other Hotel Operator, person or entity will perform the functions of the Hotel Owner hereunder.  Unit Owner acknowledges that there is no guarantee that:    (i) any agreement for management of the Hotel will remain in place for the stated duration of this Agreement; (ii) the Hotel, this Agreement or the Rental Program will be managed by any particular Hotel Operator or any other operator for the duration of the term of this Agreement; or (iii) any operation or identification of the Hotel as a certain brand, in whole or in part, will remain in place for the stated duration of this Agreement. Unit Owner further acknowledges that any person or entity to which Hotel Owner assigns or delegates its rights and obligations under this Agreement may, but shall not be required to, be experienced in the operation of hotels and may or may not be a so called "branded" operator.

(b)    The Hotel Operator may impose standards for the operation of the Hotel which shall become the "Standards" for the Hotel as the same are described in Section 9.

4.    **Term**.  This Agreement shall have a term commencing on the later of the date set forth on the first page of this Agreement, or the date Unit Owner takes title to the Unit (but in no event earlier than the opening of the Hotel as determined by Hotel Owner

(the "Hotel Opening")), and expiring on the last day of the third full calendar year following the Hotel Opening (the "Term") (as such Term may be extended as provided in this section, or earlier terminated as otherwise provided in this Agreement).   Upon expiration of the initial Term (the "Initial Term"), the Term shall automatically renew for successive three (3) year periods (each a "Renewal Term") from and after the expiration of the Initial Term, unless Hotel Owner or Unit Owner gives written notice to the other party of its election not to extend the Term, at least one hundred eighty (180) days prior to the effective date of any Renewal Term.   Notwithstanding the foregoing, this Agreement shall remain in full force and effect for any reservations of the Unit that have been confirmed prior to written notice of termination of this Agreement (subject to Hotel Owner's good faith efforts to transfer any such confirmed reservation to another unit in the Rental Program), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy.

5.    **Rental Procedures and Rates.**  Hotel Owner shall use good faith efforts to rent the Unit to guests of the Hotel (including, but not limited to guests with complimentary or promotional use, "Hotel Guests") in accordance with the following provisions:

(a)    **Rental Rates.**  Rates for rental of the Unit shall be determined by Hotel Owner in accordance with the rate schedule established by Hotel Owner from time to time in its sole discretion.  The rate schedule may be revised by Hotel Owner from time to time without notice to Unit Owner to reflect changes in operating costs and rates of comparable properties, special discounts and other conditions and matters deemed relevant by Hotel Owner, including, but not limited to, consideration of customer bases, market segments and seasonal variations.

(b)    **Financial Risk.**  Hotel Owner does not guarantee that Unit Owner will (i) receive any minimum amount of payments hereunder, or (ii) receive rental income equivalent to that generated by any other unit in the Rental Program, or (iii) receive rental income in excess of assessments and other costs associated with the Unit.

(c)    **Rental System.**  Hotel Owner agrees that a reservation system will be maintained through which the reservations for the units in the Rental Program may be

processed. Hotel Owner further agrees to rent the Unit in accordance with a fair and equitable process to be established by Hotel Owner in order to ensure that all of the units in the Rental Program are fairly and equitably offered for rental, but taking into account (i) Hotel Guest requests, and (ii) factors which differentiate units within the Rental Program, such as size, location, view, type of unit, and other relevant factors.

Unit Owner acknowledges that despite the efforts of Hotel Owner, the Unit may not be rented for the same or substantially the same number of nights, and may not receive the same or substantially the same net rental income, as other units in the Rental Program and within the same room class, for any time period. Hotel Owner does not guarantee any particular period or periods of rental, nor any specific level of rental receipts, and acknowledges that both the ability of the Hotel Owner to rent units and the selection of a particular unit within the Rental Program for rental will be subject to, among other things, the wishes and preferences of the Hotel Guests.

(d)    **Promotional and Other Complimentary Use.**  Hotel Owner shall have the right to use the Unit for promotional and other complimentary purposes in Hotel Owner's discretion; however, such use will be prohibited during Prime Peak Season (as hereinafter defined) and shall be limited to a maximum of five (5) nights during Peak Season (as hereinafter defined) and ten (10) nights outside of Prime Peak Season and Peak Season. Hotel Owner shall endeavor to equitably allocate such stays among all units in the Rental Program.  Hotel Owner shall not charge a rental rate for the complimentary usage of the Unit, and no rental income shall be paid to Unit Owner with respect to such use.

(e)    **Smoking.**  Unit Owner shall designate on **Schedule A** of this Agreement whether smoking shall be permitted in the Unit.  Such election shall govern the Unit during periods of Owner Occupancy as well as during periods of occupancy by Hotel Guests.

(f)    **Hotel Owner has Exclusive Use.**  Unit Owner agrees that, during the Term, Unit Owner shall not rent or use the Unit except pursuant to the terms of this Agreement.  Hotel Owner may from time to time establish additional rules and

regulations with respect to use of the Unit by Hotel Guests and/or Owner Occupants (as defined in Section 10).

6. **Adjusted Unit Revenues and Deductions; Payments to Unit Owner and Hotel Owner.**

(a) **Unit Owner's Payment.** The payment made to Unit Owner in respect of rental revenue from the Unit, if any, shall be equal to one hundred (100%) percent of the Adjusted Unit Revenue (as defined below in subsection (b)):

(b) **Adjusted Unit Revenue.** The term "Adjusted Unit Revenue" shall mean and refer to the amount resulting after deducting the following costs and expenses from the gross rental revenues (net of discounts, rebates or credits) collected from the rental of the Unit, but excluding sales, use, occupancy and other similar taxes and Hotel employee gratuities collected in connection therewith ("Gross Unit Revenues"):

    i. **Administrative Charge.** Any applicable "Administrative Charges" as defined in and pursuant to the Master Declaration.

    ii. **Management Fee.** A "Management Fee" payable to Hotel Owner or Hotel Operator (as designated by Hotel Owner) in the amounts equal to the following percentages of Gross Unit Revenues:

        (1) Three percent (3%) for the first year from the Hotel Opening,

        (2) Four percent (4%) for the second year from the Hotel Opening, and

        (3) Five percent (5%) for the third and each successive year from the Hotel Opening.

    iii. **Rental Program Expenses.** The "Expense Deduction" as follows: On an annual or more frequent basis, Hotel Owner shall estimate all expenses of the Hotel with respect to the Rental Program and its facilities, equipment, and personnel, including, without limitation, costs and expenses with respect (but not limited) to the following: (i) providing daily housekeeping services, consumable guest supplies and other standard

Hotel services to Hotel Guests, (ii) operating, administrative, accounting/bookkeeping, collection and reporting expenses, including, without limitation, employee costs and expenses, and (iii) charges and fees for reservations, sales and marketing services, other centralized services required by the Hotel Owner or Hotel Operator, credit cards, travel agents and other rental-related commissions, and operating licenses and permits ("Gross Rental Program Expenses"). Hotel Owner shall reasonably allocate a portion of the Gross Rental Program Expenses to the Unit based on the approximate Hotel Guest usage of the Unit as compared to all other units in the Rental Program, and such allocation shall be the "Expense Deduction". To the extent the actual costs and expenses are less than or greater than the Expense Deduction, any overpayment shall be returned to Unit Owner, and any underpayment shall be charged to Unit Owner pursuant to the procedure outlined in subsection (c) below. Hotel Owner reserves the right to adjust the Expense Deduction as appropriate in respect of the actual Gross Rental Program Expenses as reasonably allocated to the Unit or this Agreement.

iv.     **Other Expenses.** Unpaid obligations of Unit Owner for expenses referred to in Section 7, including those more particularly described in Sections 8, 9, and 10.

v.     **Tax Withholding.** Payments to Unit Owner may be subject to income tax withholding requirements under United States tax laws. Payments made to Unit Owner may be reduced by any applicable withholding taxes required to be withheld and paid under applicable United States tax laws. Unit Owner agrees to provide Hotel Owner a valid Taxpayer Identification Number Certification (IRS Form W-9 or acceptable substitute) or, if Unit Owner is not a U.S. Person (as defined under applicable law), a certification of foreign status on IRS Form W-8BEN, W-8ECI or other applicable IRS form. In the event that Hotel Owner is required by applicable U.S. tax laws to withhold any amounts on account

of taxes payable, it shall provide Unit Owner with documentation confirming the amount of taxes withheld, together with all other reporting forms necessary to evidence the payment of such tax amounts.

(c)    **Reporting to Unit Owner and Payment**.  Within thirty (30) days of the end of each month, Hotel Owner shall deliver or cause to be delivered to Unit Owner a statement of account and a payment of the portion of the Adjusted Unit Revenue derived from the use of the Unit by Hotel Guests remaining after deduction of the amounts described in clause (a) of this Section 6 (the "Unit Owner's Payment"), if any. If such statement of account reflects a negative balance, Unit Owner shall pay such balance to Hotel Owner within fifteen (15) business days of receipt of such statement. Any excess payments shall be distributed to Unit Owner promptly following delivery of the statement of account.

7.    **Unit Owner's Obligations for Expenses Attributable to the Unit**.

(a)    **Fixed Expenses**.  Unit Owner covenants to timely and fully pay the following obligations with respect to its Unit directly to the applicable payee:  (i) all assessments and other amounts due pursuant to the Condominium Declaration, the Building Declaration and the Master Declaration (the "Assessments"); (ii) the Reserve amount and all other fees and charges to Hotel Owner pursuant to Section 9; (iii) all utilities with respect to its Unit to the extent not otherwise included in the Assessments; (iv) real estate and personal property taxes with respect to its Unit; (v) debt service with respect to any mortgage or other financing, or both, of the Unit and its contents; and (vi) all insurance costs with respect to the insurance required to be maintained and obtained pursuant to Section 8 ("Insurance Cost").

(b)    **Unit Owner Charges**.  Unit Owner also covenants to timely and fully pay and be responsible for the payment of the following amounts to Hotel Owner:  (i) all amounts required to be paid by Unit Owner in this Agreement, or any amounts otherwise advanced or funded on Unit Owner's behalf; (ii) all fees and charges for Hotel Services used during an Owner Occupancy Period but which are not otherwise collected at check-out pursuant to Section 10 (including, without limitation, for payment

of voluntary Owner Occupancy Daily Housekeeping); (iii) a Departure Cleaning Charge after each Owner Occupancy Period pursuant to <u>Section 10</u>; and (iv) an "Additional Owner Occupancy Use Charge" relative to each night of "Additional Owner Occupancy", as those terms are defined in <u>Section 10</u>.

(c) **Deduction of Payments.** The payments due under <u>subsections 7(a) and (b)</u> herein may, at the election of Hotel Owner, be deducted from Unit Owner's Payment and applied by Hotel Owner for the purpose for which such payment is required pursuant to this Agreement, so long as Unit Owner is notified of Hotel Owner's election to pay same on Unit Owner's behalf. Upon request of Hotel Owner, Unit Owner shall deliver to Hotel Owner appropriate evidence of payment of any expenses of the type referred to in <u>subsections 7(a) and (b)</u> herein to the extent such payments are not made by Hotel Owner on Unit Owner's behalf. Initially, Hotel Owner may deduct from Unit Owner's Payment (to the extent available): (i) all Assessments and pay same to the applicable payee, and (ii) all Reserves pursuant to <u>Section 9</u>, and pay the same to the Hotel.

8. **Condominium Unit Insurance.** At Unit Owner's sole cost and expense, Unit Owner agrees to maintain, with an insurance company and on terms acceptable to Hotel Owner, a HO-6 condominium package policy or equivalent, or such other policy or policies as may be specified by Hotel Owner from time to time. Such policies shall include liability coverage, and property insurance covering its personal contents and fixtures within the Unit that the Unit Owner is solely responsible for, including any upgrades permitted by Hotel Owner. The property policy shall be on a so-called "all-risk" or "special risk" form on a 100% replacement cost basis and include deductibles that are usual and customary for similar type risks.

To the extent attainable at a reasonable cost, Unit Owner shall request from its insurer that the above insurance name the Hotel Owner Parties (as defined in Section 13 hereof) as additional insureds, and all policies shall contain an endorsement waiving any rights of subrogation against Hotel Owner Parties.

Unit Owner agrees to provide a certificate of insurance evidencing the above coverages  prior to the commencement of the Term and all expirations/renewals of such insurance. The certificate of insurance shall provide notice that  the policy is not cancelable or can  be materially changed without at least thirty (30) days prior written notice to the Hotel Owner Parties.  If Hotel Owner offers insurance packages to units in the Rental Program at rates equal to or below rates generally available in the insurance market, Unit Owner shall obtain such coverage through Hotel Owner and the costs thereof shall be deducted pursuant to Section 7.  The amount of insurance contained in any of the aforementioned insurance coverages shall not be construed to be a limitation of the liability on the part of Unit Owner.

9.    **Maintenance of Standards.**

(a)    **Standards for Unit.**    Unit Owner acknowledges and agrees that acceptance of the Unit for inclusion in the Rental Program shall be subject to (i) the Unit (and all furnishings, furniture, finishes and equipment, and operating supplies and equipment therein; collectively the "Furnishings and Supplies") being as of the commencement of the Term, and remaining thereafter throughout the Term, at Unit Owner's sole cost and expense, in compliance with the standards of the Hotel in effect from time to time as determined in Hotel Owner's sole discretion (the "Standards").  Unit Owner agrees that once the Unit is accepted into the Rental Program, there shall be no change to the Unit or the Furnishings and Supplies (other than replacements of the same as needed, with comparable Furnishings and Supplies meeting the Standards) without the prior written consent of Hotel Owner.

(b)    **Maintenance of Standards; Reserve.**    Unit Owner agrees that upon being accepted into the Rental Program, the Unit must at all times during the Term be maintained, furnished, finished, supplied and equipped in accordance with the Standards, and that Unit Owner shall be solely responsible for payment of the cost of maintaining the Standards within the Unit (inclusive of all Furnishings and Supplies therein).  In furtherance of the foregoing, Unit Owner hereby agrees that Hotel Owner shall deduct from the Unit Owner's Payment (and to the extent of insufficient funds from

Unit Owner's Payment, Unit Owner shall pay to Hotel Owner) on a monthly basis an amount equal to five percent (5%) of the Gross Unit Revenue for the previous month to fund a reserve account (the "Reserve") for the Unit.  The Reserve shall be applied by Hotel Owner to the costs of maintenance, supply, repair, replacement and refurbishing of the Unit and all Furnishings and Supplies therein, as necessary or appropriate (as determined by Hotel Owner in its sole discretion), to meet the Standards (and including, without limitation, payment of periodic deep cleanings), but excluding in all events payment of the costs of maintenance, supply, repair, replacement and refurbishing of the Unit after an Owner Occupancy Period to the extent that Departure Cleaning Charges imposed and collected pursuant to Section 10(f) are adequate for the payment thereof.  To the extent that the amounts in the Reserve are at any time insufficient to maintain the Unit (inclusive of all Furnishings and Supplies therein) in accordance with the Standards pursuant to this subsection (b), as determined by Hotel Owner in its sole discretion, then Unit Owner will be notified of the amount of additional funds necessary to correct such deficiencies and Unit Owner shall supply such additional funds to Hotel Owner within ten (10) business days of such notice, so that Hotel Owner can correct such deficiencies on Unit Owner's behalf and at Unit Owner's sole cost and expense.  If Unit Owner does not timely provide such funds, Hotel Owner may, in its sole discretion, elect to correct any such deficiency on Unit Owner's behalf and at Unit Owner's cost and expense by deduction of such amounts from current and future Unit Owner's Payment or otherwise billing Unit Owner for same.  Hotel Owner reserves the right to adjust the percentage of Gross Unit Revenue applied to the reserve from time to time in order to provide adequate funding of the same.

Unit Owner agrees and understands that the Hotel may charge a fee for performance of the foregoing maintenance, cleaning, supply, repair, replacement and refurbishing services, including, without limitation, a procurement charge for purchasing Furnishings and Supplies for the Unit, a refurbishing fee for the Unit requiring refurbishment or capital improvement, and/or a service fee for coordinating any repairs or scheduled maintenance or cleaning with respect to the Unit or items therein.  To the extent that such services and costs are appropriately funded from the Reserve, Hotel Owner shall deduct sufficient funds therefrom for the payment of the applicable services

and costs and any remaining balance shall be billed to Unit Owner or deducted from Unit Owner's Payment.

Any replacement Furnishings and Supplies added to the Unit (and paid from the Reserve, from deductions to Unit Owner's Payment or from funds provided by Unit Owner) shall be the property of Unit Owner. All amounts in the Reserve shall be the property of Unit Owner and, subject to <u>Section 11(e)</u> herein, any amounts remaining in the Reserve shall be delivered to Unit Owner at the later to occur of the expiration of the Term or the final Renewal Term, or upon the earlier termination of this Agreement. All proceeds (if any) from the sale of any replaced or obsolete Furnishings and Supplies within the Unit shall be deposited into the Reserve.

(c)     **Personal Storage.**  Unit Owner shall not store private property in the Unit other than in a locked Unit Owner's closet specifically designated for that purpose. The Hotel Owner Parties shall not be responsible for any private property left in the Unit. Unit Owner hereby grants Hotel Owner access to the interior of the Unit Owner's closet and shall provide Hotel Owner with a copy of the key to the Unit Owner's closet. Hotel Owner shall be entitled to access the Unit Owner's closet in its sole discretion to remove and discard any contents that are considered by Hotel Owner as a health or safety hazard or which interfere with the maintenance of the Standards.

(d)     **Failure to Comply with Standards.**  Unit Owner acknowledges and agrees that the failure of the Unit or any Furnishings and Supplies therein to be in compliance with the Standards at any time during the Term shall be a default by Unit Owner under this Agreement entitling Hotel Owner (in addition to any and all other remedies available to it) to immediately suspend the rental of the Unit and the provision of other services under this Agreement until such time as the default is cured by Unit Owner to Hotel Owner's satisfaction, and if the same is not so cured within thirty (30) days of written notice to Unit Owner, to terminate this Agreement.

10.     **<u>Unit Owner Occupancy.</u>**

(a)    **General.**    Occupancy of a Unit shall be afforded to Unit Owner in accordance with the provisions of this <u>Section 10</u>.  Unit Owner shall be entitled to the Basic Owner Occupancy and Additional Owner Occupancy as described in this Agreement.   Notwithstanding anything to the contrary contained in this Agreement, neither Unit Owner nor its guests (in either instance, an "<u>Owner Occupant</u>") may use, occupy or enter the Unit for any period of time without a confirmed reservation obtained in accordance with this <u>Section 10</u> (the duration of such reservation period being an "<u>Owner Occupancy Period</u>" and the use of such Unit by an Owner Occupant being referred to as "<u>Owner Occupancy</u>").   In no event shall Unit Owner accept payment or other consideration for the use of the Unit during an Owner Occupancy Period.

(b)    **Reservation Policy.**    If Unit Owner desires to schedule an Owner Occupancy Period in the Unit, Unit Owner shall submit a reservation request to the Unit Owner Reservations Department at the Hotel, by a dedicated Unit Owner's reservation telephone number for this purpose.  All Owner Occupancy Period reservation requests received from Unit Owner through such Unit Owner's reservation number will be free of any reservation charges.  Reservations for an Owner Occupancy Period should be made at least forty five (45) days in advance, with the exception of reservations for Peak Season Usage, as to which reservations should be made at least ninety (90) days in advance, and Prime Peak Season Usage, as to which reservations should be made at least one (1) year in advance.  Provided that Unit Owner is in compliance with the material terms of this Agreement, reservations for Owner Occupancy Periods shall be accepted by Hotel Owner subject to prior confirmed reservation of the Unit, subject to "Blackout Periods" (as defined below) announced prior to such requests, and absent extraordinary circumstances preventing Hotel Owner from accepting such reservation. All other requests for reservations for Owner Occupancy Periods made outside of the time frames outlined (including those requests made on notice that is less than the time frames outlined hereinabove) will also be accepted by Hotel Owner subject to prior confirmed reservations of the Unit.   Unit Owner acknowledges that there is no guarantee that the Unit will be available for a requested Owner Occupancy Period regardless of when the Owner Occupancy reservation request is made.

(c)   **Basic Owner Occupancy.**   Unit Owner shall have the following Owner Occupancy with respect to the Unit:  a total of sixty (60) days of annual usage in any calendar year, of which no more than thirty (30) days may be consecutively, and no more than fourteen (14) days thereof may be Peak Season Usage or Prime Peak Season Usage ("Basic Owner Occupancy").

For the purpose of this Agreement:

"**Prime Peak Season Usage**" shall refer to a period of Owner Occupancy that includes any of the following: Christmas Eve or Christmas Day, New Year's Eve or New Year's Day, President's Day, or Easter Sunday ("Prime Peak Season").   Owner Occupancy of less than seven (7) days that includes any such date shall be deemed to be seven (7) days of Owner Occupancy Prime Peak Season Usage for the purpose of computing Unit Owner's remaining Base Unit Owner Occupancy.

"**Peak Season Usage**" shall refer to a period of Owner Occupancy that includes any day between November 15 of each year and April 30 of the following year ("Peak Season").  Owner Occupancy during Peak Season shall be for a period of not less than seven (7) days.

"**Blackout Periods**" shall refer to periods designated as such by Hotel Operator, or, if no Hotel Operator exists, by Hotel Owner, during which Unit Owner may be prohibited from making a reservation for Owner Occupancy that would occur during such Blackout Periods.  Blackout Periods will be announced on or before November 30 of each year for the following year's Blackout Periods.

(d)   **Housekeeping; Other Services.**   During any Owner Occupancy Period, Unit Owner may request daily housekeeping services for the Unit at such rates as are determined by Hotel Owner from time to time ("Owner Occupancy Daily Housekeeping").  An Owner Occupant may use any other service or amenity provided by Hotel Owner to a Unit or otherwise provided at the Hotel or Condominium, including (without limitation) mini bar, internet, telephone, business center, food and beverage and/or room service (the foregoing along with Owner Occupancy Daily Housekeeping

are hereinafter referred to as the "Hotel Services") during an Owner Occupancy Period. Hotel Owner shall provide such Hotel Services at such rates and on other terms as are determined by Hotel Owner from time to time. Owner Occupant shall pay for all the foregoing Hotel Services at the time of check-out, and if not then paid the same shall be the obligation of the Unit Owner.  At the election of Hotel Owner, delivery of Hotel Services to Owner Occupants may be subject to the Unit Owner's execution of a separate hotel services agreement confirming Unit Owner's agreement to pay for such services.

(e)    **Departure Cleaning Charge.**  At the end of each Owner Occupancy Period, Unit Owner shall pay a departure cleaning charge when the Unit is returned to Hotel Owner for rental pursuant to this Agreement ("Departure Cleaning Charge").  The amount of the Departure Cleaning Charge shall be determined by Hotel Owner in its discretion after the end of each Owner Occupancy Period.  The Departure Cleaning Charge is intended to cover the costs incurred by Hotel Owner to clean, supply and prepare the Unit (and all Furnishings and Supplies therein, including any additional cleaning required due to Owner Occupant or its guests permitting smoking or due to the presence of pets in the Unit) for rental under the Rental Program in accordance with the Standards, and to replace and repair any all Furnishings and Supplies in the Unit to the Standards.  The Departure Cleaning Charge shall be collected at check-out from Unit Owner.

(f)    **Additional Owner Occupancy.**  In addition to Basic Owner Occupancy, Unit Owner may, subject to the reservation policy set forth in subsection (b) of this Section 10, reserve a Unit for such additional Owner Occupancy as it chooses, including, without limitation, Prime Peak Season Usage and Peak Season Usage, provided that Unit Owner pays an Additional Owner Occupancy Use Charge (as defined below) in connection with each night of such "Additional Owner Occupancy".  The "Additional Owner Occupancy Use Charge" shall be a per night charge established and adjusted from time to time by Hotel Owner for each night of Additional Owner Occupancy, and the amount of same may vary depending on the time of year of such Additional Owner Occupancy.

11. **Termination and Default.**

(a)    **Termination; Notice of Default; Right to Cure.**  A non-defaulting party shall have the right to terminate this Agreement if (i) the other party fails to pay an amount due to the non-defaulting party hereunder for a period of five (5) days after the date on which notice of such failure has been given to the defaulting party by the non-defaulting party, or (ii) the other party fails to perform, keep or fulfill any of the material covenants, obligations, or conditions set forth in this Agreement (other than a failure to pay an amount of money due hereunder, which is subject to the preceding clause (i)) and such failure continues for a period of thirty (30) days after receipt by the defaulting party of written notice from the non-defaulting party specifying such failure.

(b)    **Use of Unit During Unit Owner Default.**  In the event Unit Owner shall be in default hereunder, Hotel Owner may elect (in addition or as an alternative to any other remedies provided for in this Agreement) to suspend the rental of the Unit and the provision of other services under this Agreement until such time as Unit Owner has cured the default to Hotel Owner's reasonable satisfaction.

(c)    **Possible Termination upon Change in Operator.**  Unit Owner also agrees that Hotel Owner may terminate this Agreement at any time immediately upon notice to Unit Owner if any agreement for management of the Hotel terminates or otherwise expires.

(d)    **Termination upon Sale of Unit.**  This Agreement shall automatically terminate upon the sale or other conveyance or transfer of title (be it voluntary or involuntary) of the Unit from Unit Owner, unless Hotel Owner expressly waives such termination and approves an assignment of this Agreement to the subsequent Unit Owner of the Unit (a "Subsequent Unit Owner"). Unit Owner shall provide Hotel Owner with at least thirty (30) days prior written notice of any proposed sale or other conveyance or transfer of title of the Unit.  In the event that Hotel Owner waives such termination of this Agreement and approves the assignment of this Agreement to the Subsequent Unit Owner, then the amounts then remaining in the Reserve shall not be delivered to Unit Owner and shall be retained by the Hotel (for the benefit of the

Subsequent Unit Owner) for use with respect to the Unit in accordance with this Agreement (as assigned to such Subsequent Unit Owner).

(e)     **Post-Termination Use of Unit.**  Notwithstanding any termination of this Agreement, this Agreement shall survive and remain in full force and effect for any Unit reservations that have been confirmed prior to termination of this Agreement (subject to Hotel Owner's right to transfer any such confirmed reservation to another Rental Program unit, in its sole discretion), and Unit Owner specifically agrees to honor this Agreement as to such periods of confirmed occupancy. The foregoing Unit Owner obligation shall survive termination or expiration of this Agreement.

(f)     **Final Accounting.**  Within thirty (30) days following the termination or expiration of this Agreement, Hotel Owner shall deliver to Unit Owner a final report with respect to any remaining unreported Gross Unit Revenue or payments due to or from Unit Owner, the Reserve balance and the final Unit Owner's Payment.  Hotel Owner shall be entitled to deduct from the final Unit Owner's Payment (prior to delivery of same to Unit Owner) and from any amounts remaining in the Reserve, any and all amounts otherwise due and payable to Hotel Owner pursuant to this Agreement; provided that if the foregoing amounts shall not be sufficient to pay same, Unit Owner shall pay any such difference to Hotel Owner within no more than five (5) days after Unit Owner's receipt of the foregoing final report. The foregoing shall survive termination or expiration of this Agreement.

12.    **Set-Off; Advancing Funds.**  In the event that Hotel Owner incurs any charge, fee, cost or expense with respect to the Unit pursuant to this Agreement or otherwise at the request or with the consent of Unit Owner, Hotel Owner shall have the right to deduct such expenditures from Unit Owner's Payment or other funds of Unit Owner that are available to Hotel Owner, such as the Reserve.  The foregoing shall survive termination or expiration of this Agreement.  In the event that Hotel Owner or any Hotel Operator advances funds to fulfill Unit Owner's obligations under this Agreement, the same shall be repaid to the advancing party with interest at an annual rate of interest

equal to the lesser of (a) the prime or base rate of interest quoted by Citibank, N.A. plus five percent, or (b) the highest lawful rate.

13.    **Indemnity.** The term "Hotel Owner Parties" shall include (without limitation) the Hotel Owner, any operator, manager, licensor, franchisor, contract vendee or service provider to Hotel Owner in connection with the Hotel or Rental Program, and their affiliates and successors, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents, and each and every assignee or other party who may claim to have rights in this Agreement by, through or under the Hotel Owner Parties, and such party's affiliates and successors, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents. "Liabilities" means claims, demands, civil or criminal actions, suits, proceedings, losses, damages, costs, expenses, penalties, and other liabilities (including, without limitation, all reasonable attorneys' fees, experts' fees, court costs, and other costs incurred in investigating, defending or prosecuting any litigation or proceeding), of any nature, kind or description, whether known or unknown, whether predating this Agreement or not, or whether arising out of contract, tort, strict liability, misrepresentation, or violation of applicable law.  Unit Owner shall indemnify, defend, and hold the Hotel Owner Parties harmless for, from and against, any and all Liabilities directly or indirectly arising out of, caused by, in connection with, related to, or resulting from (in whole or in part) (i) any maintenance, renovation, replacement, repair, condition, rental, management or operation of the Hotel, the Unit (and all property therein) or the Rental Program, or (ii) the performance of this Agreement by Hotel Owner Parties; except to the extent such Liabilities are caused by the gross negligence, willful misconduct or fraud of Hotel Owner during the Term.  The obligations of Unit Owner under this Section shall apply to Liabilities even if such Liabilities are caused in whole or in part by the sole, joint or concurrent ordinary negligence, fault or strict liability of any Hotel Owner Party, whether or not such sole or concurrent ordinary negligence, fault, or strict liability is active or passive.

Each party, including the Hotel Owner Parties, (each, a "Releasing Party") hereby releases the other, including the Hotel Owner Parties, (each, a "Released Party") from

any liability that the Released Party would, but for this Section, have had to the Releasing Party arising out of or in connection with any accident or occurrence, or casualty to the extent that proceeds are received from insurance being carried by or otherwise covering the Releasing Party, its officers, agents or employees; provided that this release will become inoperative if the provisions of this Section invalidate any insurance maintained by the Releasing Party.

The provisions of this Section shall survive any termination or expiration of this Agreement, whether by lapse of time or otherwise, and shall be binding upon the parties hereto and their respective heirs, successors and assigns.

14.   **Miscellaneous.**

(a)   **Force Majeure.**  None of the Hotel Owner Parties shall be liable for, nor shall they be deemed to be in default of their obligations under this Agreement due to, any delay or other inability to perform this Agreement attributable to a force majeure event, including, without limitation fire, earthquake, storm or other casualty; performance of capital improvements adversely affecting the Unit, a material portion of the income-generating areas of the Hotel or any other area material to the operation of the Hotel; strikes, lockouts, or other labor interruptions; war, rebellion, riots, acts of terrorism, or other civil unrest; acts of God or of any government; disruption to local, national or international transport services; epidemics, quarantine or any other public health restrictions or public health advisories; or any other event beyond the parties' reasonable control.

(b)   **Modification and Changes.**  This Agreement cannot be changed or modified except by another agreement in writing signed by Hotel Owner and Unit Owner.

(c)   **Understandings and Agreements.**  This agreement constitutes all of the understandings and agreements of whatsoever nature or kind existing between the parties with respect to the subject matter hereof.  This agreement supersedes all prior, whether oral or written, agreements between the parties.

(d)     **Headings and Section References.**  The article and paragraph headings contained herein are for convenience of reference only and are not intended to define, limit or describe the scope or intent of any provision of this Agreement.  All references in this Agreement to Sections or subsections shall, unless otherwise noted, refer to the Sections or subsections of this Agreement.

(e)     **Cost of Enforcement.**  Except as otherwise provided in this Agreement, in any proceeding to enforce this Agreement, to collect damages, or to collect any indemnity provided for herein, the prevailing party shall also be entitled to collect all its costs in such action, including the costs of investigation, settlement, expert witnesses and reasonable attorneys' fees, together with all additional costs incurred in enforcing or collecting any judgment rendered.  The foregoing shall survive termination or expiration of this Agreement.

(f)     **Arbitration.**  Notwithstanding anything to the contrary in this Agreement, all claims for monetary damages and disputes relating in any way to the performance, interpretation, validity, or breach of this Agreement shall be resolved by final and binding arbitration, before a single arbitrator, under the commercial arbitration rules of the American Arbitration Association in Collier County, Florida.  The arbitrator shall be selected by the parties pursuant to the standards set forth in the next sentence of this paragraph, and if the parties are unable to reach agreement on selection of the arbitrator within ten (10) days after the notice of arbitration is served, then the arbitrator will be selected by the American Arbitration Association.  The Arbitrator shall be a person working for a nationally recognized hospitality industry consulting or accounting firm, and shall have not less than ten (10) years' experience in the area of expertise on which the dispute is based (*e.g.,* with respect to operational matters, experience in the management of hotels of generally the same class and category as the Hotel, as a consultant or otherwise, or, with respect to financial matters, experience in the financial or economic evaluation or appraisal of such first-class hotels as a consultant or otherwise); provided that either party may elect the use of a commercial arbitrator in lieu of the foregoing hospitality industry arbitration, in which event the Arbitrator shall be an American Arbitration Association qualified commercial arbitrator having at least five (5)

years' experience in the hospitality industry. All documents, materials, and information in the possession of a party to this Agreement and in any way relevant to the claims or disputes shall be made available to the other parties for review and copying not later than sixty (60) days after the notice of arbitration is served. To the extent that a party would be required to make confidential information available to any other, an agreement or an order shall be entered in the proceeding protecting the confidentiality of and limiting access to such information before a party is required to produce such information. Information produced by a party shall be used exclusively in the arbitration or court proceeding that may arise, and shall not otherwise be disclosed. No arbitrator shall have authority to award any punitive, exemplary, statutory or treble damages or to vary or ignore the terms of this Agreement, and shall be bound by controlling law and the terms of this Agreement. The arbitrator shall NOT have subject matter jurisdiction to decide any issues relating to the statute of limitations or to any request for injunctive relief, and the parties hereby stipulate to stay the arbitration proceeding (without the need of a bond) until any such issues in dispute are resolved. Judgment upon the award rendered by the arbitrator shall be final, binding and conclusive upon the parties and their respective administrators, personal representatives, legal representatives, heirs, successors and permitted assigns, and may be entered in any court of competent jurisdiction. The non-prevailing party in an arbitration proceeding shall pay for all reasonable fees, costs and expenses (including reasonable attorney's fees and expenses) of the other party incurred in connection with the dispute resolution process, along with all arbitrator's and arbitration fees, costs and expenses. This subsection shall survive termination or expiration of this Agreement.

(g)     **Governing Law, Jurisdiction and Venue.** This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without regard to principles of conflicts of laws. The parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Collier County, Florida. Subject to the subsection (f) above, any permitted civil action, arbitration or legal proceeding with respect to this Agreement shall be brought only in the courts of record of the State of Florida in Collier County or the United States

District Court, Middle District of Florida.  Each party consents to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court. Service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules.  The foregoing shall survive termination or expiration of this Agreement.

(h)    **Third Parties.**  The provisions of this Agreement are solely for the benefit of the parties hereto and the Hotel Owner Parties, and nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies under or by reason of this Agreement. The foregoing shall survive termination or expiration of this Agreement.

(i)    **Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be considered an original for all purposes.

(j)    **Successors and Assigns.**  The rights and obligations of Hotel Owner may be assigned or delegated pursuant to Section 3 of this Agreement. The rights and obligations of Unit Owner under this Agreement may not be assigned without the prior written consent of Hotel Owner (which may be granted or withheld in Hotel Owner's sole discretion).    The terms, provisions, covenants, agreements, and obligations of this Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assigns of the parties hereto.

(k)    **Invalid Provisions.**  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never been a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

(l)     **No Waiver.** No failure of any party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder shall constitute a waiver of any party's right to demand strict compliance with the terms of this Agreement unless otherwise specifically provided in this Agreement.

(m)     **Notices.**   Whenever any notice, demand, or request is required or permitted under this Agreement, such notice, demand, or request shall be made in writing and shall be given by personal delivery, or sent via overnight delivery service, prepaid courier or facsimile, or deposited in the U.S. mail, registered or certified, return receipt requested, airmail postage prepaid.   Any notice, demand, or request that is served upon any party shall be deemed sufficiently given to, and received by, such party for all purposes under this Agreement, (i) if sent via overnight delivery service, courier or personal delivery, at the time such notice, demand or request is personally delivered, to the address specified by the party to receive such notice, (ii) if sent via U.S. mail, registered or certified, return receipt requested, airmail postage prepaid, five (5) days from the date so deposited in the mail, or (iii) if sent via facsimile, at the time of confirmed receipt by such party.   The notification addresses of the parties are specified on the signature page of this Agreement.   Each party may change its address on at least ten (10) days' prior written notice to the other party.   For purposes of this Agreement, statements, invoices and other correspondence from Hotel Owner relating to the Unit shall not constitute a notice, demand or request and shall be deemed to be sufficiently given to Unit Owner if sent by regular U.S. mail.

(n)     **Radon Gas.** In accordance with the requirements of Florida Statutes Section 404.056(5), the following notice is given:

RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME.  LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA.  ADDITIONAL INFORMATION REGARDING

RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY HEALTH DEPARTMENT.

(o)   **Cumulative Remedies.** Except as otherwise provided in this Agreement (including, without limitation, in subsection (o) below) or otherwise set forth in subsection (f) above, the remedies provided in this Agreement are cumulative and not exclusive of the remedies provided by law or in equity.  The foregoing shall survive termination or expiration of this Agreement.

(p)   **LIMITATION ON REMEDIES.  ANYTHING IN THIS AGREEMENT AND ANYTHING AT LAW OR IN EQUITY TO THE CONTRARY NOTWITHSTANDING, IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES (INCLUDING, WITHOUT LIMITATION, ANY ARBITRATION PROCEEDING) ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT OR IN ANY MANNER PERTAINING TO THE HOTEL, THE UNIT, THE RENTAL PROGRAM, ANY CLAIMED BREACH OF FIDUCIARY DUTIES OR TO THE RELATIONSHIP OF THE PARTIES HEREUNDER, EACH PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY (I) AGREES THAT EACH PARTY WILL ONLY CLAIM AND BE ENTITLED TO RECEIVE FROM THE OTHER PARTY HERETO HIS OR HER ACTUAL DAMAGES, AND (II) WAIVES AND RELEASES ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY HERETO ANY PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES, OR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY LOST PROFITS OR EARNINGS), EACH PARTY ACKNOWLEDGING AND AGREEING THAT THE REMEDIES HEREIN PROVIDED, AND OTHER REMEDIES AT LAW AND IN EQUITY, WILL IN ALL CIRCUMSTANCES BE ADEQUATE.  THIS SUBSECTION SHALL SURVIVE TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

(q)   **Effective Date of Agreement.** Notwithstanding the date in which this Agreement is executed, this Agreement shall not become effective until and unless Unit Owner shall have closed on the purchase of the Unit as evidenced by delivery of the deed therefor to the Unit Owner.

**IN WITNESS WHEREOF,** the parties hereto have executed or caused to be executed this Agreement, all as of the day and year first above written.

**HOTEL OWNER:**

Address:

**BASIL STREET PARTNERS, LLC**

a Delaware limited liability company

_____

_____   By: _____

_____   Name: _____

Attention: _____   Title: _____

Facsimile No.: _____

Address:   **UNIT OWNER:**

_____   _____

_____   Name: _____

_____   _____

Attention: _____   Name: _____

Facsimile No.: _____

Telephone No.: _____

Soc Sec or Tax I.D. No.: _____

## SCHEDULE A

## <u>SMOKING DESIGNATION</u>

- Smoking [shall] [shall not] be permitted in the Unit.

**Unit Owner acknowledges that an election to prohibit smoking in a Unit shall not impose an obligation on Hotel Owner to prevent either smoking or pets within the Unit, it being acknowledged that Hotel Owner will make reasonable efforts to require compliance with this election but that compliance with such restrictions cannot generally be assured.**

# EXHIBIT "5"

NBR Year by year comparison

| Revenue | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $43,694.54 | $43,991.26 | $57,628.71 | $60,717.15 | $63,163.82 | $57,389.52 | $68,935.49 | $68,417.93 | $67,888.08 |
| Expense Deduction | $16,222.54 | | $20,899.40 | | | $31,211.81 | $26,667.56 | $26,747.99 | $26,832.55 |
| Administration Fee | $4,273.84 | | $6,505.37 | | | $11,477.87 | $13,786.99 | $13,683.60 | $13,577.80 |
| Management Fee | $2,104.20 | | $2,787.26 | | | $1,721.69 | $2,068.07 | $2,052.55 | $2,036.65 |
| Reserve | $1,282.15 | | $1,728.86 | | | $2,869.47 | $3,446.79 | $3,420.91 | $5,569.32 |
| Total | $23,882.73 | $27,928.15 | $31,920.89 | $34,984.97 | $36,003.38 | $47,280.84 | $45,969.41 | $45,905.05 | $48,016.32 |
| Insurance | $2,391.00 | $1,107.00 | $1,148.00 | $1,658.00 | $3,680.96 | $2,084.00 | $2,084.00 | $1,962.37 | $4,764.05 |
| Property Tax | $4,005.00 | $4,030.53 | $2,748.00 | $2,505.67 | $2,744.81 | $2,356.23 | $1,339.30 | $1,084.94 | $1,086.96 |
| Utilities | $1,799.00 | $2,803.79 | $2,595.00 | $1,933.00 | $2,084.16 | $2,129.41 | $2,146.43 | $1,957.33 | $2,188.55 |
| QTR Dues | $22,803.68 | $26,944.22 | $22,859.00 | $25,270.33 | $25,831.24 | $28,909.64 | $28,139.20 | $29,589.33 | $32,776.13 |
| Total | $30,998.68 | $34,885.54 | $29,350.00 | $31,367.00 | $31,341.17 | $36,079.28 | $33,708.93 | $34,593.97 | $40,815.69 |
| Total Expenses | $54,881.41 | $62,813.69 | $61,270.89 | $66,351.97 | $70,344.55 | $83,360.12 | $79,678.34 | $80,499.02 | $88,832.01 |
| Net | -$11,186.87 | -$18,822.43 | -$3,642.18 | -$5,634.82 | -$7,180.73 | -$25,970.60 | -$10,742.85 | -$12,081.09 | -$20,943.93 |

# NOTICE TO FILER
## Dated October 16, 2017

THE COLLIER COUNTY CLERK OF COURTS HAS UPDATED OUR SUMMONS ISSUANCE PROCEDURES.  THE STANDING ORDER WILL NO LONGER BE ATTACHED TO THE ELECTRONICALLY ISSUED SUMMONS.  THE STANDING ORDER WILL BE EMAILED TO COUNSEL OF RECORD VIA ESERVICE.  FILER MUST PRINT AND ATTACH THE STANDING ORDER TO THE SERVICE SET BEFORE SUBMITTING TO THE PROCESS SERVER, PER PARAGRAPH 1 OF THE ATTACHED ORDER.

THANK YOU FOR YOUR COOPERATION.

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
COLLIER COUNTY, FLORIDA                                    CIVIL ACTION

James Richards
James Richards As Representative Of
    Plaintiff(s),
vs.                                          CASE NO:  11-2020-CA-002657-0001-XX

The Restaurant At Naples Bay Resort Llc
Naples Bay Resort Holdings Llc
Naples Bay Properties Llc
Nbr Manager Llc
Naples Bay Resort Investment Company Llc
Knightsbridge Partners Of Naples Llc
Sojourn Hospitality Group Llc
Summit Management Group Of Florida Llc
Gulfwater Investments Llc
The Club At Naples Bay Resort Llc
The Shoppes At Naples Bay Resort Llc
Fred Pezeshkan
Thomas Macivor
I J Zand
Raymond Sehayek
    Defendant(s).

## <u>STANDING ORDER IN CIVIL CASES IN THE TWENTIETH JUDICIAL CIRCUIT</u>

PURSUANT to Florida Rule of Civil Procedure 1.200(a), Florida Rule of Judicial Administration 2.545, and Administrative Order 1.13 entered by the Chief Judge of this Circuit, the parties are ordered to adhere to the following information and procedures applicable to civil lawsuits:

1. **<u>SERVICE OF THIS ORDER.</u>** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service. The Plaintiff shall pay the appropriate statutory clerk's fees on copies for each Standing Order issued and attached to the Summons.

2. **<u>CIVIL CASE MANAGEMENT SYSTEM.</u>** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases (other than foreclosures, involuntary commitment of sexually violent predators and eminent domain cases), the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan, early interaction with a Civil Case Manager and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith, attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court and establish a schedule for

addressing those issues.[1]  The Agreed Case Management Plan may be accessed at the Court's website at: [www.ca.cjis20.org].

Unless all of the Defendants have been served and have defaulted, an Agreed Case Management Plan will be submitted to the Civil Case Manager c/o Magistrate's Office (ATTENTION: Sherry), Collier County Courthouse, 3315 Tamiami Trail E., Suite 509, Naples, FL 34112 on or before 150 days from the date of filing the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan, a case management conference will be scheduled by the Court. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

3. **ALTERNATIVE DISPUTE RESOLUTION (ADR).**  ADR provides parties with an out-of-court alternative to settling disagreements. The Court requires the parties to participate in ADR prior to trial. Mediation is mandatory unless the parties agree to another form of ADR. Mediation is a conference at which an independent third party attempts to arrange a settlement between the parties.

4. **RULES OF PROFESSIONALISM.**  The Twentieth Judicial Circuit has adopted Administrative Order 2.20, which sets forth standards of professional courtesy and conduct for all counsel or pro-se litigants practicing within the Circuit. The Court requires that all familiarize themselves and comply with Administrative Order 2.20. Administrative Order 2.20 may be viewed on the Court's website at: [www.ca.cjis20.org].

**DONE AND ORDERED** in Chambers at Naples, Collier County, Florida, on this 21st of August, 2020

_Hugh D. Hayes_
_____
Hugh D Hayes, Circuit Judge

---

[1] Case Track options include Expedited, Standard or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of Judicial Administration 2.250(a)(1)B.

# CRYSTAL K. KINZEL

# RECEIPT
1130796

CLERK OF THE CIRCUIT COURT AND
COMPTROLLER
COLLIER COUNTY, FLORIDA

Printed On:

08/21/2020 02:10

Page 1 of 1

| Receipt Number: 1130796 - Date 08/21/2020  Time 2:09PM | |
|---|---|
| **Received of:** Elliott D Goldberg | |

| | | | |
|---|---|---|---|
| **Cashier Name:** | efiling account | **Balance Owed:** | 425.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | 425.00 |
| **Receipt ID:** | 2135516 | **Remaining Balance:** | 0.00 |
| **Division:** | | | |

| Case# 11-2020-CA-002657-0001-XX -- Plaintiff: Richards, James | | | |
|---|---|---|---|
| Item | Balance | Paid | Bal Remaining |
| Fees | 425.00 | 425.00 | 0.00 |
| **Case Total** | **425.00** | **425.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFILING | 28835572 | **425.00** |
| **Total Received** | | **425.00** |
| **Total Paid** | | **425.00** |

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.

                                     CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**NAPLES BAY RESORT HOLDINGS, LLC**
**C/O Summit Management Group of Florida, LLC, Registered Agent**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Naples Bay Resort Holdings, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August ⎯25⎯, 2020

As Clerk of the Court

By: _Crystal Hackler_

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.                                  CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**NAPLES BAY PROPERTIES, LLC**
**C/O GFPAC Services, LLC, Registered Agent**
**5551 Ridgewood Drive, Suite 501**
**Naples, FL 34108**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Naples Bay Properties, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August 25 , 2020

As Clerk of the Court

By: _Leoma Hackler_

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

      Plaintiff,

vs.                               CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**NBR MANAGER, LLC**
**C/O Summit Management Group of Florida, LLC, Registered Agent**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, NBR Manager, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August _25_, 2020

As Clerk of the Court

By: _Peanna Hackler_

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.                              CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**NAPLES BAY RESORT INVESTMENT COMPANY, LLC**
**a/k/a Knightsbridge Partners of Naples, LLC**
**C/O GFPAC Services, LLC, Registered Agent**
**5551 Ridgewood Drive, Suite 501**
**Naples, FL 34108**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Naples Bay Resort Investment Company, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses

with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August  25 , 2020

As Clerk of the Court

By: _Leerna Hackler_

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.

                         CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC**
**C/O GFPAC Services, LLC, Registered Agent**
**5551 Ridgewood Drive, Suite 501**
**Naples, FL 34108**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Knightsbridge Partners of Naples, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August _25_ , 2020

As Clerk of the Court

By: _Leona Hackler_

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.                                  CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**SOJOURN HOSPITALITY GROUP, LLC**
**C/O GFPAC Services, LLC, Registered Agent**
**5551 Ridgewood Drive, Suite 501**
**Naples, FL 34108**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Gulfwater Investments, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August __25__, 2020



As Clerk of the Court

By: _Leanna Hackler_

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.

                              CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**SUMMIT MANAGEMENT GROUP OF FLORIDA, LLC**
**C/O GFPAC Services, LLC, Registered Agent**
**5551 Ridgewood Drive, Suite 501**
**Naples, FL 34108**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Summit Management Group of Florida, LLC, via its Registered Agent noted above.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August  <u>25</u> , 2020

As Clerk of the Court

By: _Crystal K. Kinzel_ (signature)

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.

        CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**GULFWATER INVESTMENTS, LLC**
**C/O GFPAC Services, LLC, Registered Agent**
**5551 Ridgewood Drive, Suite 501**
**Naples, FL 34108**

       YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, Gulfwater Investments, LLC, via its Registered Agent noted above.

       Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August  25 , 2020

As Clerk of the Court

By: _Leesma Hackler_
Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

        Plaintiff,

vs.

        CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

        Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**THE CLUB AT NAPLES BAY RESORT, LLC**
**C/O Summit Management Group of Florida, LLC**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, The Club at Naples Bay Resort, LLC.

      Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August 25 , 2020

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.                            CASE NO: 11-2020-CA-002657-0001-XX.

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.
_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**THE RESTAURANT AT NAPLES BAY RESORT, LLC**
**C/O Summit Management Group of Florida, LLC**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

     YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, The Restaurant at Naples Bay Resort, LLC.

     Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August __25__, 2020

Deputy Clerk

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.

                    CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**THE SHOPPES AT NAPLES BAY RESORT, LLC**
**C/O Summit Management Group of Florida, LLC**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

     YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this action on Defendant, The Shoppes at Naples Bay Resort, LLC.

     Each Defendant is required to serve written defenses to the Complaint and/or Petition on Elliott Goldberg, Esq., Plaintiff's attorney, whose address is set forth in the documents, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiffs' attorneys or immediately thereafter. If a

Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint and/or Petition.

DATED on August __25__, 2020

_Leerna Hackler_

Deputy Clerk



IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.                            CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS -- PERSONAL SERVICE ON A NATURAL PERSON
## IMPORTANT

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**FRED PEZESHKAN**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

      A lawsuit has been filed against you. You have 20 calendar days after this summons is served on
you to file a written response to the attached Complaint in this Court. A phone call will not protect you.
Your written response, including the above case number and names parties, must be filed if you want the
Court to hear your case. If you do not file your response on time, you may lose the case, and your wages,
money, and property may thereafter be taken without further warning from the Court. There are other legal

money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiffs' Attorney" named below.

Elliott Goldberg, Esquire
Florida Bar No. 0133770
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel. (954) 493-7400

DATED on August 25 , 2020

As Clerk of the Court

By: _Perma Hackler_

Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiffs/Plaintiffs' Attorney". (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la data de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que la Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans de relai requis, vous risquez de la perdre la cause ainsi que vote salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ultrerieur du Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en memo temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiffs/Plaintiffs' Attorney" (Plaignant ou a so avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.

CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS -- PERSONAL SERVICE ON A NATURAL PERSON
### IMPORTANT

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**THOMAS MACIVOR**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

      A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. A phone call will not protect you. Your written response, including the above case number and names parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal

money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiffs' Attorney" named below.

Elliott Goldberg, Esquire
Florida Bar No. 0133770
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel. (954) 493-7400

DATED on August 25, 2020

As Clerk of the Court

By: _Leona Hackler_
      Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiffs/Plaintiffs' Attorney". (Demandate o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la data de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que la Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans de relai requis, vous risquez de la perdre la cause ainsi que vote salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ultrerieur du Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en memo temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiffs/Plaintiffs' Attorney" (Plaignant ou a so avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

      Plaintiff,

vs.                              CASE NO: 11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

      Defendants.

_____/

## SUMMONS -- PERSONAL SERVICE ON A NATURAL PERSON
## IMPORTANT

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**I.J. ZAND**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

    A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. A phone call will not protect you. Your written response, including the above case number and names parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal

money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiffs' Attorney" named below.

Elliott Goldberg, Esquire
Florida Bar No. 0133770
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel. (954) 493-7400

DATED on August __25__, 2020

As Clerk of the Court

By: _Teesma Hacklar_

Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiffs/Plaintiffs' Attorney". (Demandate o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la data de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que la Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans de relai requis, vous risquez de la perdre la cause ainsi que vote salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ultrerieur du Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en memo temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiffs/Plaintiffs' Attorney" (Plaignant ou a so avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT,
IN AND FOR COLLIER COUNTY, FLORIDA

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel"
and as the representative of the members
of the Naples Bay Resort West Parcel
Property Owners Association, Inc.,
a Florida not-for-profit association,

       Plaintiff,

vs.                               CASE NO:  11-2020-CA-002657-0001-XX

NAPLES BAY RESORT HOLDINGS LLC,
NAPLES BAY PROPERTIES LLC,
NBR MANAGER LLC,
NAPLES BAY RESORT INVESTMENT COMPANY LLC
aka KNIGHTSBRIDGE PARTNERS OF NAPLES, LLC,
SOJOURN HOSPITALITY GROUP LLC,
SUMMIT MANAGEMENT GROUP OF FLORIDA LLC,
GULFWATER INVESTMENTS LLC,
THE CLUB AT NAPLES BAY RESORT LLC,
THE RESTAURANT AT NAPLES BAY RESORT LLC,
THE SHOPPES AT NAPLES BAY RESORT, LLC,
and other legal entities as of yet unidentified,
and
FRED PEZESHKAN, Individually,
THOMAS MACIVOR, Individually,
I.J. ZAND, Individually and
RAYMOND SEHAYEK, Individually.

       Defendants.

_____/

## SUMMONS -- PERSONAL SERVICE ON A NATURAL PERSON
## IMPORTANT

THE STATE OF FLORIDA:
To Each Sheriff of the State:

**RAYMOND SEHAYEK**
**1500 Fifth Avenue South, Suite 111**
**Naples, FL 34102**

     A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. A phone call will not protect you. Your written response, including the above case number and names parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal

money, and property may thereafter be taken without further warning from the Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

       If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiffs' Attorney" named below.

Elliott Goldberg, Esquire
Florida Bar No. 0133770
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel. (954) 493-7400

DATED on August __25__, 2020

As Clerk of the Court

By: _____
    Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiffs/Plaintiffs' Attorney". (Demandate o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la data de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que la Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans de relai requis, vous risquez de la perdre la cause ainsi que vote salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ultrerieur du Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en memo temps que cette formalite, faire parvenir ou expediter une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiffs/Plaintiffs' Attorney" (Plaignant ou a so avocat) nomme ci-dessous.

**CRYSTAL K. KINZEL**

# RECEIPT
1131439

CLERK OF THE CIRCUIT COURT AND
COMPTROLLER
COLLIER COUNTY, FLORIDA

Printed On:

08/25/2020 04:33

Page 1 of 1

| Receipt Number: 1131439 - Date 08/25/2020  Time 4:33PM | |
|---|---|
| **Received of:** Elliott D Goldberg | |

| | | | |
|---|---|---|---|
| **Cashier Name:** | efiling account | **Balance Owed:** | 150.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | 150.00 |
| **Receipt ID:** | 2136211 | **Remaining Balance:** | 0.00 |
| **Division:** | | | |

| Case# 11-2020-CA-002657-0001-XX -- Plaintiff: Richards, James | | | |
|---|---|---|---|
| Item | Balance | Paid | Bal Remaining |
| Fees | 150.00 | 150.00 | 0.00 |
| **Case Total** | **150.00** | **150.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFILING | 28853354 | **150.00** |
| **Total Received** | | **150.00** |
| **Total Paid** | | **150.00** |

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA
CIVIL ACTION

JAMES RICHARDS, individually as a unit owner
within the "Naples Bay Resort West Parcel" and as
the representative of the members of the Naples Bay
Resort West Parcel Property Owners Association,
Inc., a Florida not-for-profit association,

CASE NO.  20-CA-2657

       Plaintiffs,

vs.

NAPLES BAY RESORT HOLDINGS LLC; NAPLES
BAY PROPERTIES LLC; NBR MANAGER LLC;
NAPLES BAY RESORT INVESTMENT COMPANY
LLC, a/k/a KNIGHTSBRIDGE PARTNERS OF NAPLES,
LLC; SOJOURN HOSPITALITY GROUP LLC; SUMMIT
MANAGEMENT    GROUP    OF    FLORIDA    LLC;
GULFWATER INVESTMENTS LLC; THE CLUB AT
NAPLES BAY RESORT LLC; THE RESTAURANT AT
NAPLES BAY RESORT LLC; THE SHOPPES AT
NAPLES BAY RESORT, LLC and other legal entities as of
yet unidentified, and FRED PEZESHKAN, Individually,
THOMAS    MACIVOR,    Individually;    I    J    ZAND,
Individually, and RAYMOND SEHAYEK, Individually,

       Defendants.

_____/

## STIPULATION FOR EXTENSION OF TIME FOR
## DEFENDANTS TO RESPOND TO PLAINTIFF'S COMPLAINT

Counsel for Plaintiff, JAMES RICHARD ("Plaintiff"), and counsel for Defendants,

NAPLES BAY PROPERTIES LLC, NAPLES BAY RESORT INVESTMENT COMPANY

LLC a/k/a KNIGHTSBRIDGE PARTNERS OF NAPLES LLC, SOJOURN HOSPITALITY

GROUP LLC, SUMMIT MANAGEMENT GROUP OF FLORIDA LLC, GULFWATER

INVESTMENTS LLC, FRED PEZESHKAN, individually and THOMAS MACIVOR,

individually, (hereafter collectively "Defendants"), hereby stipulate and agree to counsel for

Defendants' request for an extension of time to file a response the Plaintiff's complaint, and state:

    1.    Plaintiff filed his complaint on August 20, 2020.

    2.    Counsel for Defendants have requested an extension of time for serving and filing their response to Plaintiff's complaint to and including October 5, 2020. Counsel for Plaintiff has stipulated to the requested extension.

GRANT FRIDKIN PEARSON, P.A.

By:/s/  Jeffrey D. Fridkin
    Jeffrey D. Fridkin
    Florida Bar No. 0490245
    5551 Ridgewood Drive, Suite 501
    Naples, Florida 34108
    Telephone:  239.514.1000
    Facsimile:  239.514.0377
    jfridkin@gfpac.com
    lkinder@gfpac.com
    *Attorneys for Defendant*

Date: September 22, 2020

DiGIACOMO & GOLDBERG, P.A.

By:
    Elliott D. Goldberg, Esq.
    Florida Bar No.: 133770
    One East Broward Blvd., Suite 700
    Ft. Lauderdale, FL  33301
    Telephone: (954) 493-7400
    Facsimile:  (954) 493-7770
    elliottglaw@hotmail.com

    *Attorney for Plaintiff*

Date:_____9/22/2020_____

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
COLLIER COUNTY, FLORIDA                                          CIVIL ACTION


**JAMES RICHARDS ET AL,**                    **Case Number:  2020-CA-2657**
            **Plaintiff(s),**

**vs.**

**THE RESTAURANT AT NAPLES BAY RESORT LLC, ET AL,**
            **Defendant(s).**

_____/


## ORDER OF REASSIGNMENT

THE ABOVE STYLED CASE is hereby reassigned to the Honorable Elizabeth V. Krier,

Judge of said Court.

All pending hearings and trials are by this Order cancelled. Hearings must be

rescheduled with the reassigned Judge.  If a trial notice has been filed, the party who filed the

notice shall send a copy of the notice to the reassigned Judge in order to have the case reset

for trial.

**DONE AND ORDERED** in Chambers in Naples, Collier County, Florida, this _24th_ day

of September, 2020.


                                        _____
                                        **Joseph G. Foster**
                                        **Administrative Judge**




Copies to:
Court Administration
Honorable Elizabeth V. Krier
Honorable Hugh D. Hayes

Attorneys of Record via Clerk's ePortal:

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
COLLIER COUNTY, FLORIDA                                          CIVIL ACTION

JAMES RICHARDS ET AL,
     Plaintiff,

                                             Case Number:2020-CA-2657

vs.

THE RESTAURANT AT NAPLES BAY RESORT LLC, ET AL
     Defendants.
_____/

## ORDER OF RECUSAL

     **THE UNDERSIGNED** Judge of this Court, <u>sua sponte</u>, **recuses** himself from any

further proceedings in the above captioned-case.

     **DONE AND ORDERED** in Chambers at the Collier County Courthouse, Naples,

Florida, this 23rd day of September, 2020.

                                 *Hugh D. Hayes*
                        _____
                          Honorable Hugh D. Hayes
                          Circuit Court Judge

Copies Furnished To:

Court Administration